30 March 2004-03-31

213 Kelton Street
Apt. # G-02
Allston, MA 02134-4384.

Mr. Justice Douglas P. Woodlock
United States District Judge
United States District Court
1 Courthouse Way
Boston, MA 02210

Dear Mr. Justice Woodlock,

United States District Court
District of Massachusetts

**Kofi Asimpi (Plaintiff) v. Relief Resources, Inc. (Defendant)
C. A. No. 04-10117-DPW**

Enclosed please find my response to your "Memorandum and Order" in which I am asked to demonstrate good cause why the above-referenced action should not be dismissed.

Sir, if I may crave your indulgence for a moment, I would like to respectfully take this opportunity to add a few points of explanation with regard to my response to your memorandum and order and the EEOC's "right-to-sue" notice which has authorized me to take this action.

First, throughout the case with the Massachusetts Commission Against Discrimination (MCAD), the Defendant insisted all along that they had not terminated me and that it was I myself who had not contacted their office to schedule assignments. This is how they explained it in their Position Statement: "Mr. Asimpi was placed on inactive status due **solely and exclusively to his failure to contact his employer for a period of one month**" to schedule assignments. It was not until at the final meeting (public hearing) on December 10, 2001, that the Defendant strangely for the very first time introduced a new reason for my termination, i.e., **"that it was difficult to place [me at an available facility] since most of their client facilities had been adamant that [I] not return and because there were several facilities where [I] refused to work."**

This newly introduced statement by the Defendant was significant, partly because it was one of the major reasons the Hearing Officer (HO) gave for her decision against me and in favor of the Defendant and partly because the Defendant never mentioned this point either in their Position Statement or anywhere else throughout the entire case until at this last meeting. In fact, the Defendant all along maintained that I was banned from "approximately seven agencies."[1] That the HO, with the acquiescence of my counsel, admitted into evidence at this late stage this fabrication by the Defendant as a valid explanation for not placing me and citing this very point as a basis of her decision to rule against me without drawing their attention to how this contradicted their original claim of my alleged failure to contact them for one month still beats my imagination. Please see a copy of the HO's decision.

---

[1] Please note how the Defendant at this last hearing now suddenly changed their original phrase, *approximately seven*, to *most of their client facilities*. This was nowhere mentioned in the Position Statement. Please note also that I even disputed the allegation that I was banned from *approximately seven agencies*, because I had not heard about most of these alleged bans until I filed this case against the Defendant. I clearly spelt out all this in my Position Statement and in my written testimony.

Second, as I explained in my response to your memorandum, it did not occur to me immediately upon the receipt of the "right-to-sue" notice that I might need to tender in evidence at a later date the envelope with which the EEOC's notice was enclosed and mailed to me, showing the post-mark of October 17, 2003. Only several days after I had discarded it did I realize how useful to me it would have been had I recognized then the importance of keeping it. This explains why I have not enclosed with this letter the said envelope showing the post-mark.

Third, when I filed my original complaint against the Defendant and The Center for Mental Health (CMH) with the MCAD on August 18, 1998, my charge was that I was wrongfully terminated (retaliated against) because I had written a letter to my facility manager complaining about what I believed to be racially motivated harassment to which a client of the facility had subjected me. As a result of their investigations, the MCAD Investigators, namely, J. Lynn Milinazzo Gaudet, Esq., Sunila Thomas George, Esq. and Douglas T. Schwarz, Esq., indicated that they "found **probable cause** to credit the allegation of retaliation." At the same time, however, they also concluded that I failed to establish that I had been terminated because of my race and color. I had therefore expected that the focus would be shifted entirely onto the unlawful termination aspect of the case.

However, at the public hearing on December 10, 2001, the HO, to my surprise, allowed focus to be shifted from the retaliatory aspect almost entirely onto that of the discriminatory, based on race and color and also onto the false charge by the Defendant of what a poor worker I was. In fact, at this stage of the hearing it appeared as though I was rather the one on trial since the focus was entirely placed on my alleged "poor work performance". Indeed, the HO made no reference to my testimony in which I denied most of their "poor work performance" allegations and to their apparent concoctions and contradictions that I had pointed out. This despite the fact that the MCAD had already dismissed the termination based on race and color aspect while finding probable cause for the allegation of termination, notwithstanding the fact that the Defendant even categorically denied that they terminated me; they instead maintained, as indicated, that it was I who did not contact them for a month. Indeed, the term "retaliation" or "unlawful termination" was hardly used, if at all, by the HO or anyone else throughout the entire hearing process. Yet in her written decision the HO gave the impression that that was adequately given attention at the hearing. (Please see pp. 9ff. of the HO's decision; also my "Petitioner's Rebuttal to Respondent's Position Letter", dated January 15, 1999, and signed by Thomas S. Gildea).

Fourth, although my testimony and that of the Defendant were both written and oral (tape-recorded), the HO in her written decision attributed statements or ideas to the Defendant and me that misrepresented the facts. In some instances, she deliberately distorted parts of our testimonies while completely fabricating her own ideas in others, all designed ostensibly to damage my case while favoring the Defendant's. Whereas some of the HO's distortions and fabrications were significant, others were less so. Here are two examples of the most significant ones:

(i) One of the very first places where I worked in May 1997 was the League School in Newton, Mass. In presenting the testimony of Douglas Hammond, President of the Defendant, the HO stated: **"The principal of the League School called Hammond to complain that Complainant had fallen asleep, leaving the children unsupervised. As a result, he would not allow Complainant to be reassigned to the facility."**

This is a complete distortion by the HO of Hammond's testimony with regard to the report he allegedly received from the League School. I did not know, for instance, where the HO got the idea that it was the League School principal who reported me to Hammond, for Hammond did not say so anywhere. He only mentioned a man's name in his "Work History" on me. Besides, the HO completely ignored my testimony. Hammond testified that a man (apparently the HO's principal) called from the school to report that I had dozed while working with a child. Hammond did not say that I left "the children unsupervised" and that "he would not allow [Defendant] to be reassigned to the facility". In fact, I dealt with only one child

The HO completely ignored my denials that I dozed while supervising a child, that I worked with only one child, that I never worked with any man but that there were only ladies on duty on the day in question and finally that it was I myself who chose not to go back because of the false complaint the above-named man allegedly made against me to the effect that I slept on duty. I also pointed out that Hammond's version was also false and that his statement that "Mr. Asimpi was not sent back" was a distortion designed to give a negative connotation that I was banned from this school. (Please note that Mr. Hammond admitted at the hearing that his "Work History" on me was prepared only after I had filed my complaint with the MCAD).

(ii) According to the HO, Hammond spoke "at length" with the program manager on my behalf and she agreed to have me re-assigned to her facility. However, during a subsequent assignment at Norfolk Street, I was involved in an incident with one of the resident's dogs. As a result, the manager cancelled my next scheduled shift and requested that Defendant send a different field staff worker. According to the HO, I did not receive any communication from Defendant prior to reporting to work again at Norfolk Street and that I was angry to find out that I was being replaced and so I engaged in a heated discussion with staff at Norfolk Street. After that incident, the HO added, the Defendant received a request that I should not be assigned again to work at any of the CMH facilities.

All this is another classic example of the Ho's complete distortion of Hammond's testimony and her failure to take mine into account and determine the truth. Hammond never said that he spoke at length to the facility manager on my behalf and asked her to allow me to go back; he did not say that I was involved in an incident with one of the resident's dogs. Neither did Hammond say that the manager cancelled my shift and requested that Defendant should send a different staff person, nor did he say with respect to Norfolk Street that the Defendant "received a request that I not be assigned to work at any of the CMH facilities."

What Hammond said, though his too was a distortion in a different way, was that the Defendant was "requested not to return due to Mr. Asimpi's inability to get along with a consumer's dog. Mr. Asimpi returned to the site because staff was unable to contact him before he returned. At that time, Mr. Asimpi had a confrontation with Katie [Curley, the program manager]. He was then banned from all CASCAP programs."

If she had considered my testimony seriously and fairly, the HO would have ascertained the truth when I stated that the Defendant had made a mistake and sent two of us (a colleague and I whom I unexpected met there) to the same shift and we were both asked to go back because we were not being expected, a fact that had not been conveyed to us ahead of time. By putting it the way she did, the HO clearly meant to put me in a bad light.

Again, by saying that the Defendant received a request that I should not be assigned to work at any CMH facilities was also the HO's distortion, aimed at "proving" that the Defendant's sites to which to assign me were limited, and this too was false. CASCAP and CMH were both large and quite different companies altogether, located in Cambridge and Waltham, respectively. Similarly saying that I had an incident with a resident's dog was another fabrication by the HO, for I had had no incident with a resident's dog. What the program manager said, as I pointed out in my testimony, was that, according to her, I was afraid of dogs and, therefore, I should not be sent back again to work at the Norfolk Street facility, because one of the residents there had a dog

The HO also completely ignored my testimony that I had played with this particular dog on a previous shift and that, according to one of the Defendant's Regional Coordinators, Bob Lindner, the Defendant had previously received a letter from this same manager in which she reported that another staff member of the Defendant had told her that he did not like dogs. Thus, according to Lindner, the manager must have confused me with this other field staff, thinking I was rather the one who did not like dogs.

The fabrication by the HO was significant because the alleged limitedness of the Defendant's sites was another reason the HO used to rule in the Defendant's favor. The HO would have discovered the truth if she had seriously taken my testimony into account and cross-examined the Defendant. But she—like my own counsel who completely failed to cross-examine the Defendant—asked the Defendant just about three questions throughout the entire hearing, even though, besides their false claim that they did not terminate me and that I failed to contact them for assignments, there were so many other obvious contradictions, distortions and fabrications in the Defendant's testimony. I may add that even when Hammond replied in response to the HO's question as to when their "Work History" on me was prepared, she failed to follow-up, but merely accepted their testimony in its entirety, except the Defendant's false claim that I did not contact their office to ask for work.

I shall at the appropriate time demonstrate, should my case go to trial, the many other examples of the HO's distortions and fabrications which, in large measure, formed the basis of her decision in the Defendant's favor.

Please permit me to point out that all this happened with the acquiescence, connivance and condonation of my own counsel, a person whose services I engaged through the Boston Bar Association Lawyer Referral Service. That this organization referred me to a counsel explains in the main why I trusted him, but I only regretted to discover later that he had teamed up with both the HO and the Defendant and, as a result, I was denied justice. I shall at the appropriate time show how my counsel took certain actions without my prior knowledge and approval, actions that adversely affected me and my case, how he and the HO prevented me from attending negotiating meetings with the Defendant, my counsel having claimed that only he and the Defendant's counsel had been invited to attend, although it was my own case that was at stake, how my counsel suppressed crucial aspects of my written testimony that clearly would have exposed the Defendant's lies and, finally, my counsel's general mishandling of my case, which he artfully designed with the express purpose of ensuring that I lose it.

For example, he failed to invite any of my approximately twenty witnesses, whose names I had furnished him at his own request well ahead of time, to appear before the HO at the public hearing to testify to what they knew about me and my work for the Defendant, although he had repeatedly assured me he was going to invite them; he failed to cross-examine Hammond, the president of the Defendant, whose name was among my witnesses list and whose counsel had led him in evidence at the December 10, 2001, public hearing; he failed to lead me back into evidence when I requested that during the hearing and the HO concurred, and so on.

It is basically my conviction that I was denied justice, that the Defendant won the case because of their lies and distortions and that they were aided in these one way or another by my own counsel and the MCAD Hearing Officer that I have decided to institute a civil action against the Defendant.

Enclosed please find a copy each of the Investigating Commissioner, Douglas T. Schwarz, Esq.'s, "Notice" and a Disposition Memorandum signed by the three MCAD investigators named above.

Thanking you for allowing me to share these things with you, I remain.

Sincerely,

*[signature]*

Kofi Asimpi

Enclosures:

1. "Waiver of State Claim"
2. Asimpi's "Memorandum and Order"
3. MCAD Hearing Officer Helene Horn Figman's Decision
4. MCAD's Full Commission's Decision
5. EEOC's "Dismissal and Notice of Rights"/"Notice of Suit Rights"
6. Petitioner's Rebuttal to Respondent's Position Letter
7. Investigating Commissioner Douglas T. Schwarz, Esq.'s Notice
8. MCAD's Full Commission's Memorandum of Disposition

COMMONWEALTH OF MASSACHUSETTS

COMMISSION AGAINST DISCRIMINATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Massachusetts Commission
against Discrimination and
Kofi Asimpi

    Complainant

    Against                           DOCKET NO. 98-BEM-2570

Relief Resources

    Respondent

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## WAIVER OF STATE CLAIM

Pursuant to G. L. c. 151B, §9, and 804 CMR 1.15 (2) (f), the undersigned Complainant acknowledges that the commencement of the public hearing on the above-captioned matter, he/she waives his/her right to remove the complaint to state court.

10 Dec. 2001
Date

_____
Complainant