UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE

2005 FEB 17 P 1: 21

U.S. DISTRICT COURT
DISTRICT OF MASS

| | |
|---|---|
| KOFI ASIMPI<br>    PLAINTIFF | )<br>)<br>) |
| v | )<br>) |
| RELIEF RESOURCES, INC.<br>    DEFENDANT | )<br>)<br>) |

CIVIL ACTION NO. 04-10117-DPW

## MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Kofi Asimpi, moves that the United States District Court, District of Massachusetts, presided over by Mr. Justice Douglas P. Woodlock, issues a summary judgment in favor of the Plaintiff, for the Defendant, Relief Resources, Inc., have no genuine defense in response to the Plaintiff's complaint of unlawful retaliation by the Defendant who summarily terminated him. Whatever defense the Defendant claims to have had and still have is a completely blatant fabrication. After their original fabrication had been clearly exposed, the Defendant, in a face saving, damage-control attempt, fabricated even more serious sets of lies than the first. To do this, the Defendant strangely and belatedly amended their Position Statement in an unsigned document entitled, "RESPONDENT'S MEMORANDUM", dated June 9, 2000. This "illegitimate" document, which should not have been admitted in the first place but upon which the Hearing Officer (HO) of the Massachusetts Commission Against Discrimination (MCAD) largely based her ruling, was apparently written as a corrective to the Defendant's one and only defense in their Position Statement whose fabrications became quite obvious. (Please see "RESPONDENT'S MEMORANDUM", marked as Exhibit I). All this happened solely because of the acquiescence, connivance and condonation of the Plaintiff's own attorney at the time in collaboration with the Defendant and the HO.

1. The Plaintiff was employed by the Defendant effective April 02, 1997 to the Spring of 1998. The Plaintiff's final day of work for the Defendant was Saturday, March 14, 1998. The

1

Defendant received from Catherine Harper of The Center for Mental Health a faxed copy of personal letter dated March 1, 1998, written by the Plaintiff and addressed to Ray Castagnola, Manager of Adam's Street facility in Waltham and operated by The Center for Mental Health. The letter addressed the Plaintiff's concerns about his work environment at The Center for Mental Health. The person about whom the Plaintiff complained in his letter was a resident of the Adam's Street facility. The resident's diagnosis was schizophrenic affective disorder.

2.  The Plaintiff filed a complaint with the MCAD on August 18, 1998, alleging that based upon his complaint of being racially harassed at The Center for Mental Health, the Defendant retaliated by summarily terminating him in violation of Title VII of the Civil Rights Act of 1964 and of M.G.L. c. 151B. The Defendant categorically denied that they terminated the Plaintiff and alleged that they merely placed his file on inactivate status. They also denied that placing his file on inactive status was due to the Plaintiff's complaint of racial harassment and attack and insisted that it was rather the result of his failure to contact his employer for a period of one month. The Defendant also alleged, however, that based upon the Plaintiff's work performance, it would have been justified to terminate him.

3.  The Defendant's argument that the Plaintiff's file was placed on inactive status because he failed to contact his employer for a month is totally false. The Plaintiff was in contact with his employer on numerous occasions during the time period of March 1998 to May 1998. The Plaintiff was repeatedly told that someone from the Defendant's office would return his calls, but the calls were never returned. The Defendant in their Position Statement did admit that the Plaintiff had "expressed his desire to work as much as possible." This fact remains the same; only the Defendant's acknowledgment of this fact changed.

4.  The Defendant relied upon their assertion that "*Mr. Asimpi was placed on inactive status due solely and exclusively to his failure to contact his employer for a period of one*

*month.*" (emphasis added). From the Defendant's own telephone records, however, it is clear that the Plaintiff was in constant contact with the Defendant, including the following dates: 3/18/98, 3/19/98, 3/20/98, 3/22/98, 3/27/98, 4/2/98, 4/3/98, 5/3/98, 5/31/98, 6/1/98, 6/5/98 and 6/12/98. Apparently, at the time the Defendant submitted this defense, they either forgot about the existence of their own telephone records that would expose their lie or it did not occur to them that the Plaintiff would ask for those records to show they were lying. (For the Defendant's telephone records, please see "RESPONDENT'S ANSWERS TO INTERROGATORIES FROM THE COMPLAINANT", dated 31st day of January, 2000, p. 6 and marked as Exhibit II).

5. The Defendant's claim that the Plaintiff's file "was placed on inactive status due solely and exclusively to his failure to contact his employer for a period of one month." was the one and only defense the Defendant adamantly offered, albeit it was totally false.

6. To bolster their claim that the Plaintiff's file "was placed on inactive status due solely and exclusively to his failure to contact his employer for a period of one month", the Defendant prepared a document called "Work History", purposely designed to clearly and sufficiently demonstrate, apart from numerous other fabrications and distortions, that it was the Plaintiff who indeed had failed to contact his employer for a period of one moth. On the first page of the Work History document, under "KOFI ASIMPI", the following entries, *inter alia*, are made:

7.    [a.] "Date of hire:      April 2, 1997
      "Date of Inactivation: April 22, 1998

      "Reason:  No contact for over 1 month."

      [b.] Then for the week of 3/14 – 3/20 (1998) and under the sub-title, "**Date of Incident, Reason and outcome**", a lie is concocted, thus: "3/19 – Kofi said that he would call us with the dates and time he is available for work", p. 6.

[c.] Again, for the week of 3/21 – 3/27, the reason given for the Plaintiff's failure to work is another lie: "3/22 – We left a message for Kofi regarding when he was available to work. We did not hear back from him."

[d.] For the weeks of 3/28 - 4/3 (1998), 4/4 - 4/10 (1998), and 4/11- 4/17 (1998), the reason the Plaintiff did not work is said to be: "No contact"; "No contact"; "No contact", respectively, all of which are fabrications.

[e.] Then finally for the week of 4/18 - 4/24 (1998), the reason the Plaintiff did not work is another fabrication, namely, his failure to contact the Defendant: "No contact so his file was inactivated."

[f.] Please see the Defendant's Position Statement captioned, "RE: Kofi Asimpi v. Relief Resources, No. 98132570, signed by Mr. Alan Seewald and addressed to Mary Garippo, Investigator, Massachusetts Commission Against Discrimination (MCAD), dated October 30, 1998, and marked as Exhibit III; also "Work History" document; marked as Exhibit IV).

8. As indicated, the Defendant's own telephone records have, however, destroyed their sole argument that the Plaintiff failed to contact his employer for a period of one month. In fact, the Plaintiff was in constant contact with the Defendant throughout the period. In her decision of 15 January 2003 the HO, Ms. Helene Horn Figman, acknowledged this fact and made the following observations on the Defendant's claim that it was the Plaintiff who had failed to make contact with his employer:

Hammond testified that once an employee is not placed, he/she is "inactivated." Hammond testified that Complainant remained employed but was notified on May 19, 1998 that he had been reclassified as "inactive." This reclassification allegedly took place because the regional coordinator had not received a request for assignment from him for a period of thirty days. However, Respondent's records show that outgoing calls to Complainant were made on 3/18/98 and 3/20 and that incoming calls from Complainant were received on 3/19, 3/27, 3/31, and 4/2. After this reclassification, Complainant placed calls to Respondent on 5/29, 5/31, 6/1, 6/3, 6/5, and 6/12. (Exhibit C-5 Respondent's Answers to Interrogatories from the Complainant). Further, staff at Respondent's Cambridge office contacted Complainant on 4/15/98 asking Complainant if he would conduct an orientation for newly employed field staff. The details were never provided to Complainant and his calls to the Cambridge office, regarding this opportunity, were not returned. I find that Complainant did attempt to stay in contact with the Respondent, that he was no longer called for work, and was thus terminated for all practical purposes (p. 9).

9. On page 5 of the above-cited "RESPONDENT'S ANSWERS TO INTERROGATORIES", the Defendant further fabricated stories and distorted facts to boost their defense. For example,

in stating what action Mr. Hammond purportedly took on March 13, 1998 following his receipt of the Plaintiff's letter dated 1 March 1998 that Catherine Harper had faxed to Hammond, the Defendant stated in this document that Mr. Hammond spoke to the Plaintiff on this day, the synopsis of their conversation, Hammond claimed, being the following:

[a.] I informed Mr. Asimpi that he had committed a serious violation of protocol in writing the letter directly to Mr. Castagnola. He acknowledged the inappropriateness of doing so, and agreed to send any future letters through Relief Resources.

[b.] I informed Mr. Asimpi that it was inappropriate for Mr. Asimpi to hold this consumer, who had a clinical diagnosis of mental illness, responsible for the behavior alleged in the letter.

[c.] I also spoke with Mr. Asimpi about the inappropriateness of involving other consumers at Adams Street in these issues.

[d.] I pointed out that Mr. Asimpi included personal judgments and criticisms in the letter, the very conduct that he was complaining about Mr. Izzi.

[e.] I spoke with Mr. Asimpi about not internalizing and personalizing the consumer's behavior toward him.

[f.] I informed Mr. Asimpi that his threat of legal action was premature given that he had not previously informed the organization of the problem and given them a chance to rectify any problem.

In the Defendant's "Work History" document on the Plaintiff, however, besides a reference to receiving a fax from The Center for Mental Health (CMH) and the ban allegedly placed on the Plaintiff, none of these points is entered for the date in question, i.e., 13 March 1998. The entire entry for this day reads:

"3/13 – We received fax from CMH and they requested that he not be sent to any CMH programs. Banned from CMH."

10. That the Defendant did not enter any of these issues in their Work History document, issues which must have been very crucial to their defense if they were indeed true, means that they

were fabrications and/or distortions which came only as an after-thought—after they had later discovered that their own records did not support their only fabricated defense that the Plaintiff's file was placed on inactive status because he had failed to contact his employer for one month.

11. The aforementioned six points are also listed in the above-cited "RESPONDENT'S MEMORANDUM", in which the Defendant recorded their most elaborate fabrications and distortions. No doubt, the Defendant wrote this document for the express purpose of extricating themselves from the difficulty in which they placed themselves by repeatedly lying in their Work History document, categorically insisting that they had not terminated the Plaintiff but that it was he who had made no contact with them for a period of one month and thus his file was "administratively" placed on inactive status (p. 11).

12. Indeed, whereas they categorically stated in their Work History document and elsewhere that the Plaintiff had failed to contact his employer for a period of one month and so his file was placed on inactive status, the Defendant have now shifted their position, at long last admitting in this newly and illegally introduced MEMORANDUM that the Plaintiff did contact them on "several occasions"; they have, however, added another fabrication that suggests that it was only the "weekend coordinator" whom the Plaintiff contacted. The truth however is that there was no officially designated title known as "weekend coordinator". The Plaintiff had not heard this term until he read it the first time in this MEMORANDUM. In addition, the official the Defendant imply here must have been the Eastern Massachusetts Coordinator, Ms. Genie Bush, one of those the Plaintiff spoke to several times who could also have assigned him, and did assign him many times previously. Ms Bush did serve also at some weekends but by no means only at weekends. Indeed, she worked at weekdays also. Thus, by coining this strange term, "weekend coordinator", the Defendant's intent was clear: merely to defend themselves in this case and to mislead the court to believe in the existence of an official who did not exist but most importantly to give the false impression that the Plaintiff dealt only with

this so-called "week-end coordinator" who was unavailable at weekdays and so this created a problem for them.

13. Another fabrication by the Defendant was that the Plaintiff's file was placed on inactive status because of "a breakdown in communication between the weekend coordinator and the human resources department", a point that was nowhere stated in their 1998 Position Statement. The Defendant also distorted the truth by stating that partly because the Plaintiff relied solely on public transport and partly because he had been banned from "so many" sites that were accessible by public transport, the "weekend coordinator" had great difficulty finding him an assignment—additional points not mentioned anywhere in their Position Statement. The following are the Defendant's exact fabrications and distortions designed to control the damage they had unwittingly inflicted upon themselves by repeatedly lying that the Plaintiff had failed to contact his employer for a period of one month, so his file was placed on inactive status:

[a] Mr. Asimpi apparently did call Relief Resources speaking on several occasions with the weekend coordinator. The weekend coordinator had great difficulty placing him on assignment at that time because Mr. Asimpi depended exclusively upon public transportation and because he had been banned from so many of the client sites that were accessible by public transportation.

[b] Mr. Asimpi's contacts with the weekend coordinator were not noted or logged, and the human resources department was unaware of them. Given that the weekend coordinator's difficulties in placing him, the records of the human resources department reflected a 30-day period of no contact and, therefore, he was administratively placed on inactive status.

[c] Mr. Asimpi was not notified immediately that he was placed on inactive status. However, given the large turnover of the field staff, those placed on inactive status were routinely not sent inactivation letters.

[d] While Mr. Asimpi was placed on inactive status due to a breakdown in communication between the weekend coordinator and the human resources department, Mr. Asimpi's race and his letter to Mr. Castagnola did not enter into the decision to place him on inactive status.

14. No where in their Work History document did the Defendant mention any of the above-cited issues. The Defendant's claim that "Mr. Asimpi was not notified immediately that he was placed on inactive status" because of a breakdown in communication is completely false. At no time in his numerous calls to his employer during the period was the Plaintiff told that his file had been placed on inactive status, whether immediately or not. The first time the Plaintiff knew about this was when he read the Defendant's 1998 Position Statement. But most importantly, even though these issues were obviously fabrications that the Defendant secretively introduced in this "illegitimate", unsigned document entitled "RESPONDENT'S MEMORANDUM" after one-and-a-half years following their filing of their Position Statement and eight months after the hearing at the MCAD had already begun[1], the HO nevertheless admitted it and largely based her decision against the Plaintiff on it, using point [a], for example, from that document. Indeed, the HO erred by merely agreeing with the Defendant that a reason for their failure to offer an assignment to the Plaintiff was his lack of a means of transport, even though this point was not in the Defendant's Position Statement. This point [a] reads: "The weekend coordinator had great difficulty placing him on assignment at that time because Mr. Asimpi depended exclusively upon public transportation and because he had been banned from so many of the client sites that were accessible by public transportation." (Please see the HO's Decision, already submitted, pp. 5, 8, 10).

15. Throughout the Plaintiff's employ with the Defendant, the case of the Plaintiff's lack of a means of transport was never an issue. Please note that the Defendant have offered no

---

[1]This was possible only because of the acquiescence, connivance and condonation of the HO and the Plaintiff's own former counsel. Counsel secretively switched sides later in favor of the Defendant by "selling" the Plaintiff for his own personal gain.

example of a site where they could have assigned Plaintiff but were hampered by his lack of a means of transport. Please note also that the HO uses here the term "so many" and elsewhere "most" in referring to the sites the Plaintiff was allegedly banned from working, whereas in their Position Statement the Defendant mentioned only seven sites, even though this too is partly false. Please still note also that the Plaintiff disputed the Defendant's claim that the Plaintiff had been banned from as many as seven sites, saying that most of the so-called bans were the Defendant's total fabrications and that the Plaintiff was unaware of them until he read them in the Defendant's Position Statement. The banned sites included: (i) League School in Newtonville on "5/13/97 [for] [s]leeping during a day shift at the school while attending to 1 student. Banned"[2]. No name is given as the one responsible for the alleged ban; (ii) Moody Street, Waltham, on 10/5/97: "Banned from Overnight shifts at Moody St (CMH)." No reason is given for the alleged ban and no name is supplied as being the one responsible for the ban. Interestingly enough, the Plaintiff was the only person who worked the night shift on this date, as he had done many times previously.[3] (iii) Norfolk Street, Cambridge, on 12/31/97: "Banned from Norfolk because he was confrontational with Katie (program director). ... As a result of 2 situations at 2 different CASCAP programs, Kofi was banned from ALL CASCAP programs. (BOB)". Here again, the Defendant mentions no name as the one who banned the Plaintiff from ALL CASCAP sites and no evidence was introduced to back their claim. Secondly, whatever the two specific situations at two different CASCAP programs were are not mentioned[4]; nor are they noted anywhere else in the Work History

---

[2]Please note that the HO deliberately exaggerated this to make it sound even worse when she stated that "The principal of the League School called Hammond to complain that Complainant had fallen asleep, leaving the children unsupervised. As a result, he would not allow Complainant to be reassigned to the facility." (HO's Decision, p. 3).

[3]A good work performance report at Moody Street had been written about the Plaintiff who asked his counsel to invite the manager and his assistant as witnesses to testify about his work performance in general and about this alleged ban specifically, but he failed to do so, even though the two men were willing to testify. Counsel also failed to subpoena the Daily Incident Log which would have exposed the Defendant's fabrications. Not only did the Plaintiff's counsel fail to invite these two officials to testify at the hearing, but he failed to invite any and all of the numerous potential witnesses whose names the Plaintiff had furnished him long before the hearing started.

[4]CASCAP, like the CMH, is a very large organization from whom the Defendant contracted and any such ban as alleged here by the Defendant can be effected only by action from its headquarters. No program manager at a small site like Norfolk Street has the power and authority to ban a staff from the entire organization any

document. Like most of the alleged bans, the Plaintiff was unaware of them until he read about them in the Defendant's Position Statement. It is therefore logical to conclude that these are all clearly fabrications calculated only to tarnish as a "poor" worker the good image of the Plaintiff and so to win the case. (Please see Mr. Thomas S. Gildea's letter dated January 15, 1999, which is "the Petitioner's Rebuttal to Respondent's Position Letter", marked as Exhibit V). Please note finally on this point that in spite of the Plaintiff's denial that most of these bans took place, the HO merely accepted the Defendant's concocted versions as facts and used them as a basis of her decision against the Plaintiff. The HO made no effort whatsoever either by cross-examining or by making use of any other means available to her to determine the truth.

16 .Although the CMH and CASCAP are two large and separate organizations owned and operated by two distinct proprietors/administrations altogether and headquartered in Hadley and Cambridge (both in Massachusetts), respectively, the HO merely ignored these major distinctions and referred to the CASCAP facility at Norfolk Street in Cambridge as a CMH facility. As indicated, she made no attempt to probe to determine the truth of the issue. For example, the Plaintiff stated in his testimony that there was no incident involving him and a dog and that, in fact, Bob Lindner had told him that the program director, Katie Curly, must have confused the Plaintiff with another Field Staff about whom Curly had written to the Defendant, saying that this other Field Staff did not like dogs and therefore must not be sent back to Norfolk Street again. The HO completely ignored this. This is how she puts it in her decision:

> "Hammond testified that the program manager of the Norfolk Street facility called him and requested that Complainant not be re-assigned there. Hammond spoke at length with her on Complainant's behalf and she agreed to have Complainant re-assigned to

---

more than the Adams Street manager can ban any staff from the entire CMH sites. Unlike the CMH programs where the Plaintiff is said to have been banned, the president of the Defendant did not speak to the Plaintiff about this alleged ban. In fact, the Plaintiff knew nothing about this ban until he read about it in the Defendant's Position Statement. This alleged ban is obviously another example of the Defendant's numerous and blatant lies.

her facility. However, during a subsequent assignment at Norfolk Street, Complainant was involved in an incident with one of the resident's dogs. As a result, the manager cancelled Complainant's next scheduled shift and requested that Respondent send a different field staff worker. Complainant did not receive any communication from Respondent prior to reporting to work again at Norfolk Street. He was angry to find out that he was being replaced and engaged in a heated discussion with staff at Norfolk Street. After that incident, Respondent received a request that Complainant not be assigned to work at any of the CMH facilities." (p. 4).

17. In the first place, the Defendant's Work History document in no way reflects what the HO attributes to Mr. Hammond here. For example, no where in the Work History document is it stated that "Hammond spoke at length with [the program director] on Complainant's behalf and she agreed to have Complainant re-assigned to her facility." Also, it is not mentioned that "the manager cancelled Complainant's next scheduled shift and requested that Respondent send a different field staff worker." Again, the Plaintiff was unaware of these until he read them in the Defendant's Position Statement. They are in fact total fabrications.

18. Once again, the HO merely ignored the Plaintiff's testimony that indicated that both he and the other Field Staff had been wrongly sent to the same shift and both arrived at the same time and were both told they had not been scheduled to work that shift; therefore the two of them left. Second, by falsely concluding that the Norfolk Street facility was also a CMH one instead of what it really was, i.e., a CASCAP's, the HO found it plausible and much easier to use it in her decision against the Plaintiff. This is significant because one of the reasons the HO cited in favor of the Defendant was their fabrication that they had limited facilities to which to assign the Plaintiff because he had been allegedly banned from "most" of the facilities. As she puts it in her decision: "Hammond testified that once the Adams Street site [CMH] was no longer available to Complainant, few, if any other placements were possible." (p. 8). Finally, the HO has already stated that the Plaintiff was banned from all CMH facilities because of the

personal letter of complaint he had written to his manager of Adams Street. So, the question is, how many times was the Plaintiff banned from the same CMH organization?

19. Again, in her effort to exonerate the Defendant, the HO distorted the truth when she gave the impression that the Defendant worked only with the mentally ill. She wrote: "Respondent was faced with a narrow population within the groups of mentally ill residents with whom Complainant could work" (HO's Decision, p. 8). But that is false. In fact, the Defendant has contracted with several other institutions, including educational ones like Germaine Lawrence School, Renaissance School, to name only two, where the residents are not mentally ill. But more importantly, nothing is mentioned in the Defendant's Work History document indicating that they were "faced with a narrow population within the groups of mentally ill residents with whom Complainant could work".

20. Whereas the Defendant's initial and sole reason for allegedly placing the Plaintiff's file on inactive status, according to their Work History document, was that the Plaintiff failed to contact his employer for one month period, in the above-referenced MEMORANDUM, another fabricated reason is said to have been that "the director of Human Resources Department believed that after being banned from all CMH sites, the [Plaintiff] failed to contact the [Defendant] for assignment." The statement adds: "Therefore, in adherence to the stated policy contained in the Policy and Procedures Manual (p. 14), the [Plaintiff] was inactivated. Although there apparently were calls to the weekend coordinator, the weekend coordinator did not note those calls, and they were not conveyed to the Human Resources Department" (pp. 8f.). All this is not stated in the Defendant's Position Statement; they are lies.

21. As indicated, the Defendant purposely coined the term "weekend coordinator" solely for the purpose of defending themselves in this case. By coining this new term, they have given the false impression that the official in question worked only at weekends and/or dealt with issues

connected only with weekends. In the first place, Ms. Genie Bush, who is implied here and to whom the Plaintiff spoke on several occasions, was officially designated as Eastern Massachusetts Coordinator, who happened to have served at some weekends. She was not designated as a "weekend coordinator". Secondly, that the Plaintiff spoke to Ms. Bush does not mean that he spoke to her only at weekends or that she worked only at weekends. In fact, she worked on weekdays also and most of the contacts the Plaintiff made with her were on weekdays, as the Defendant's own telephone records show. Nor was she the only coordinator the Plaintiff spoke to regarding assignments. He often spoke to Mr. Hammond and other officials also; in fact, on this particular occasion, he also spoke to Mr. Bob Lindner, Regional Coordinator, about assignments, but he bluntly told the Plaintiff that so far as he was aware, the Plaintiff was no longer working for the company, i.e., Relief Resources, Inc. (Please see the entry for the date Monday, 1 June 1998 on page 3 of "Complainant's Answers to Respondent's Interrogatories"; marked as Exhibit VI).

22. Indeed, the Defendant's own letter to the Plaintiff dated May 29, 1998, and signed by Ms. Robin O'Farrel, human resources department director, testifies to this undeniable truth by referring to the Plaintiff as a "former employee". As a former employee, therefore, Ms. O'Farrel's letter says, the Plaintiff's file was placed on inactive status. Thus the term, "terminated" and the sentence "[his] file was placed on inactive status" are synonymous, contrary to the Defendant's vehement denial that the Plaintiff was terminated; they insisted instead that only his file had been placed on inactive status. (Please see copy of Ms. O'Farrel's letter, marked as Exhibit VII). In other words, Mr. Lindner clearly made it known to the Plaintiff that he had been terminated. And, in fact, the reason Ms. Bush gave the Plaintiff for not assigning him was that his schedules file had been removed. At no time did Ms. Bush tell the Plaintiff that she was having difficulty finding him an assignment because of his lack of a means of transport since he exclusively depended on public transport. In fact, as indicated, there is nothing in the Defendant's Position Statement to that effect. It is thus a fabrication.

13

23. In their attempt to explain why the numerous efforts the Plaintiff made to speak to the President of the Defendant, Mr. Hammond, failed after the Plaintiff had been terminated, the Defendant fabricated another story which the HO accepted as truth and thus used it as a reason for her negative decision against the Plaintiff. She wrote:

In March 1998, Hammond was in the process of removing himself from the role of "field coordinator." He testified that he needed to take a stronger management role, as many of the field staff did not know he was the owner of the company, because he was a placement person for the organization. He decided that he would no longer take calls from staff and had his calls redirected to the coordination staff. Hammond testified that this was not a measure directed against Complainant. I credit Hammond's testimony that he no longer accepted any field staff calls." (HO's Decision, p. 8).

22. Yet, during all the Plaintiff's calls to the Defendant at the time, no one mentioned to him anything that Hammond decided here. Neither is any mentioned in the Defendant's Position Statement. It is indeed a complete lie that there were some staff who did not know that Hammond was the owner of the company. One of the first things taught at orientation is the history of the organization, including the founders' names and the organizational structure as a whole. All the staff may not have met Mr. Hammond personally, just like the Plaintiff who did not meet him until they both met for the first time at the MCAD premises when the first hearing of this case was held on December 10, 2001; yet the Plaintiff knew all along that Hammond is the founder of the company, a lesson he learned at orientation. There was no way any field staff would have failed to know that Mr. Hammond owns the company since each staff was always in contact with the officials, including Hammond himself. If Mr. Hammond was indeed no longer taking staff telephone calls, why was the Plaintiff not simply told that? Why was he consistently told Hammond would return his call? Again, without

14

making any attempt to discover the truth, the HO merely credited Mr. Hammond's testimony that he no longer took calls from field staff.

24. The Plaintiff also pointed out that he did not violate any policy or procedures by writing a personal letter to his manager. He explained that he did follow the laid down official policy and procedures by writing an incident report and also by recording the day's incidents in the Daily Log-book. The Plaintiff explained further that the stage where he would have made an official report to the Defendant had not yet arrived, since he had to resolve the issue first with his manager; he would have officially reported the problem to the Defendant only if his manager and his superiors had failed to or did not want to take action to resolve it. Even so, the Plaintiff further pointed out, he did make a verbal report to Mr. Bob Lindner, the Regional Coordinator, the only action he could have taken at the time, but Lindner did not seem interested in the case[5]. But more importantly, the Plaintiff was summarily terminated a day after his manager had received his letter. Thus, Mr. Hammond's statements that he "informed Mr. Asimpi that he had committed a serious violation of protocol in writing the letter directly to Mr. Castagnola [and that h]e acknowledged the inappropriateness of doing so, and agreed to send any future letters through Relief Resources" are not only deliberate concoctions; they are also very disingenuous, for he is fully aware that the Plaintiff would have violated both The CMH and the Defendant's own official policies and procedures if he had followed the step Mr. Hammond is said to have advocated here for the Plaintiff.

25. A lot has been made of the notion that the Adams Street resident was a mentally ill patient who, among other things, is said not to have been legally responsible for his actions or capable of forming the requisite intent to discriminate and could therefore not be held liable for alleged harassment meted out by him. Again, the Defendant mentioned in their Position Statement nothing about this so-called mentally ill patient except in their "illegitimate",

---

[5] Please note that the HO also merely ignored this aspect of the Plaintiff's testimony, while using the Defendant's false version against the Plaintiff.

fabricated MEMORANDUM. Yet, the HO in part, again, based her negative decision against the Plaintiff on this also (Please HO's decision, p. 14).

25. At any rate, the Defendant's contention that the resident was a mentally ill patient who could not be held liable for his actions is false and it is used only as a cheap defensive tool. The Defendant presented no expert, say, a psychiatrist, to testify in support of their claim that the resident did not know what he was doing and so could not be held liable for his actions. It is only about the mentally retarded and the insane who cannot be legally held liable for their actions. The resident in this case and all those at the Adams Street home at the time in question were neither mentally retarded nor insane. This particular resident's diagnosis, as pointed out, was schizophrenic affective disorder and so to simply describe him as a mentally ill patient without describing his exact condition, as the Defendant has done, is to deliberately confuse the issue and to mislead for the sake of defending themselves to win this case.

26. That the residents at the Adams Street home, including this particular individual, were not retarded nor crazy is evidenced by the fact that they prepared their own food most of the time, most of them worked and earned their own living, some did volunteer work and those on medications would go to the pharmacy for their own medications, as the particular resident in this case did all the time. In fact, not long after the Plaintiff had been unlawfully terminated by the Defendant, the Plaintiff later learned, all the residents at the Adams Street home went their own separate ways to live on their own. This is because they were in full control of their faculties. The insane and the mentally retarded hardly, if at all, do all that. Any claim that the Adam Street resident who assaulted the Plaintiff was mentally ill and could therefore not be held liable for his actions is false.

27. It should be noted that in the above-referenced Work History document, there is not a single positive thing said about the Plaintiff during the entire period that he was in the Defendant's

employ. Yet, as he stated in his written testimony, the Plaintiff noted how the officials, including Mr. Hammond and Mr. Lindner as well as Ms. Genie Bush often praised him for his good work performance and his work attitude in general. The Plaintiff was often praised, for example, for his willingness to step in and to work other shifts in emergency situations when other Field Staff suddenly called from time to time to say they could not work. In his written testimony, the Plaintiff also pointed out how on meeting in person the first time at the Defendant's Cambridge/Somerville office one day Ms. Bush was exhilarated and exclaimed with excitement in the presence of Kerri Lee, the office manager who introduced the Plaintiff to her: "Oh, you're Kofi! People at the office are always saying good things about you." In his own testimony in this case, Mr. Hammond confirmed that there indeed had existed a good relationship between him and the office staff on the one hand and the Plaintiff on the other. Yet, all that the Defendant has done in this case is to calculatedly portray the Plaintiff as a very poor, uncooperative and belligerent worker—so very bad, in fact, that they even significantly increased his work hours! Another important factor also to note is that the Work History document that the Defendant filed with the MCAD, according to their own statement, was not the original but only a summary. Indeed, Mr. Hammond acknowledged under oath at the MCAD hearing that this document was prepared after the Plaintiff had filed his complaint with the MCAD. Nor the Defendant's above-referenced telephone records the original from the telephone company.

28. The above-referenced issues were among those the Defendant fabricated solely to defend themselves in this case. In fact, the Plaintiff denied that Mr. Hammond mentioned all these points in their very brief conversation. The only exceptions are Mr. Hammond's expression of concern that other clients witnessed Mr. Izzi's threatening of and abusive behavior towards the Plaintiff and also Hammond's concern that the Plaintiff expressed his intention to take legal action against Mr. Izzi if he physically assaulted him again. Even so, the Plaintiff explained that his letter to his manager was a personal one written merely to prompt him to take quick and necessary action to resolve the differences between the Plaintiff and Mr. Izzi,

just as the manager had done previously in a case involving another resident and the Plaintiff, as a result of which the relationship between the two improved for the better. The Plaintiff also explained that he had no intention of actually taking legal action against the resident. The Plaintiff further explained that he wrote the letter to his manager because of his good working relationship to him—as can be seen, for example, by his more "personal" signature which is different from those in his official incident reports and in the Daily Log-book. The Plaintiff still further explained that he wrote his manager with the express purpose of prompting him to act quickly because he feared that Mr. Izzi could physically assault him again and do him more serious harm than the first. For these reasons, therefore, it is unjust for the Defendant to use this personal, unofficial letter to put the Plaintiff rather on trial.

29. Inasmuch as the Defendant have blatantly and categorically lied repeatedly, insisting that the Plaintiff was not terminated and that his name had merely been placed on inactive status because of his alleged failure to contact his employer for a period of one month;

30. And inasmuch as the HO agreed that the aforementioned argument by the Defendant was false, contrary to their own telephone records and other factors that evidently showed that the Plaintiff was in fact in constant contact with his employer;

31. And inasmuch as the HO erred by admitting an "illegitimate" and unsigned document by the Defendant entitled, "RESPONDENT'S MEMORANDUM" in which they outlined their most egregious fabrications and distortions and which largely formed the basis of the HO's negative decision against the Plaintiff, even though she agreed the Defendant had made false statements;

32. And inasmuch as the HO deliberately misrepresented and distorted both the Plaintiff and the Defendant's testimonies without which action she could not have ruled against the Plaintiff;

18

33. And inasmuch as the Plaintiff's own counsel was an accomplice in admitting the "illegitimate" MEMORANDUM document upon which the HO largely based her decision against the Plaintiff;

34. And inasmuch as the Defendant did not mention the specific issues outlined above in their Position Statement but presented their fabricated defense in this "illegitimate" and unsigned MEMORANDUM long after the hearing had commenced;

35. THEREFORE, it is submitted that this "RESPONDENT'S MEMORANDUM" document and any and all other documents that did not form part of the Defendant's original Position Statement or any relevant and authorized document but was introduced long after the case had legally commenced, must be rejected, for doing the reverse would be tantamount to admitting their blatant fabrications and distortions and therefore to a travesty of justice.

## CONCLUSION

In the light of the foregoing reasons, it is submitted that the Defendant's claim that they did not terminate the Plaintiff but only put his file on inactive status and that it was he who had failed to contact his employer for a period of one month be rejected as being totally false and a finding of probable cause for unlawful retaliation against the Plaintiff by the Defendant be entered in this case and that a summary judgment should be given in the Plaintiff's favor.

Dated:  the      day of February 2005

Respectfully submitted,

PLAINTIFF

KOFI ASIMPI

213 Kelton Street
Apt. # G-02
Allston, MA  02134-4384
617-566-2524

Enclosures:

1.  "RESPONDENT'S MEMORANDUM"; marked as Exhibit I.
2.  "RESPONDENT'S ANSWERS TO INTERROGATORIES FROM THE COMPLAINANT", dated 31st day of January, 2000; marked as Exhibit II.  *Phone record attached*
3.  Defendant's Position Statement addressed to Mary Garippo, Investigator, Massachusetts Commission Against Discrimination (MCAD), captioned, "RE: Kofi Asimpi v. Relief Resources, No. 98132570, dated October 30, 1998 and signed by Alan Seewald; marked as Exhibit III.
4.  Hearing Officer's Decision; already submitted to the Court and is also in the Defendant's possession.
5.  Defendant's "Work History" document; marked as Exhibit IV
6.  Petitioner's Rebuttal to Respondent's Position Letter", dated January 15, 1999, and signed by Thomas S. Gildea; marked as Exhibit V.
7.  "Complainant's Answers to Respondent's Interrogatories"; marked as Exhibit VI
8.  Defendant's letter dated May 29, 1998, addressed to the Plaintiff; marked as Exhibit VII).

## CERTIFICATE OF SERVICE

This will certify that a copy of the foregoing document was served on Counsel for the Defendant, Alan Seewald, Esq., Five East Pleasant Street, Amherst, MA 01002-1501, in this case by postage paid, Certified Mail on Tuesday, the 15th day of February 2005.

Kofi Asimpi