COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

No. 98132570

KOFI ASIMPI,
Complainant

v.

RELIEF RESOURCES, INC.,
Respondent

## RESPONDENT'S MEMORANDUM

### STATEMENT OF FACTS

The Respondent, RELIEF RESOURCES, INC., submits that the
following are the relevant and material facts regarding the
above-referenced matter:

1.   The Respondent, RELIEF RESOURCES, is a corporation organized
     under the laws of the Commonwealth of Massachusetts.  It is
     in the business of providing temporary staffing to human
     services organizations.  Its principal place of business is
     in Hadley, Massachusetts, and it has satellite offices in
     Somerville and Worcester, Massachusetts and Providence,
     Rhode Island.  Douglas Hammond is and for all relevant times
     was the President of the corporation.

2.   Relief Resources has 250 - 325 active employees at any given
     time.  Inasmuch as Relief Resources provides temporary
     staffing, it has a high rate of employee turnover
     necessitating the hiring of 500 - 750 employees each year.

3.   In the temporary staffing industry in general, and Relief
     Resources in particular, it is common for employees to
     separate from the agency without notice.  For that reason,

Relief Resources requires "strong lines of communication" with its Field Staff and has a policy by which those who fail to maintain contact are placed on inactive status. See Exhibit A. As a matter of procedure, that policy is carried out by inactivating employees who do not make contact with the agency for a period of one month. That procedure is applied uniformly, without regard to the race or color (or any other classification) of the employee.

4.    Mr. Asimpi was hired by Relief Resources on April 2, 1997, as a member of its Field Staff. He was assigned to staff human service agencies that contracted with Relief Resources for temporary staffing.

5.    When Mr. Asimpi first started his employment, he expressed his desire to work as much as possible. Unfortunately, the agencies to which Mr. Asimpi was assigned began to complain about his performance. Each agency has the right to reject or ban Relief Resources employees, and approximately seven (7) agencies did so during Mr. Asimpi's tenure with Relief Resources. See Exhibit B, attached hereto. In addition, Mr. Asimpi requested not to be assigned to three (3) other agencies. In each case, the complaint against Mr. Asimpi was investigated through the Incident Report Procedure. See Exhibit C, attached hereto. That procedure is uniformly invoked without regard to the race or color (or other classification) of the employee.

6.    During the week of March 7 through March 13, 1998, Mr. Asimpi was assigned to a location known as "Adams Street," which is run by The Center for Mental Health and Retardation

("CMH"). Again, CMH is not affiliated with Relief Resources other than as an agency that contracts with Relief Resources to have temporary staffing provided to it.

7.  On March 13, 1998, the president of Relief Resources, Douglas Hammond, received by fax a copy of letter from Mr. Asimpi to the House Manager of Adams Street, dated March 1, 1998. See Exhibit D. Prior to receiving the fax on March 13, Relief Resources had no knowledge of the existence of the letter or of any the issues between Mr. Asimpi and the client/resident of Adams Street referred to in the letter.

8.  Adams Street was a community home, the residents of which were clinically diagnosed as mentally ill.

9.  Mr. Hammond reviewed the situation, and after considering the allegations contained in the letter he spoke with Mr. Asimpi about the issues raised by it. Among the issues that Mr. Hammond spoke with Mr. Asimpi about included the following

    - That he had committed a serious violation of protocol in writing the letter directly to Mr. Castagnola.
    - That it was completely inappropriate for Mr. Asimpi to hold this resident, who had a clinical diagnosis of mental illness, responsible for the behavior alleged in the letter.
    - That based upon the letter it was clear that Mr. Asimpi was drawing other residents/consumers of Adams Street into the confrontations that he was having with the resident at issue in order for them to be witnesses to the events. Mr. Hammond made quite clear that it was

utterly inappropriate for Mr. Asimpi to involve other consumers/residents at Adams Street in these issues given that the other residents were also suffering from clinically diagnosed mental illnesses.

- That included personal judgments and criticisms in the letter, the very conduct that he was complaining about with regard to the resident at issue.

- That internalizing and personalizing the consumers' behavior toward him was counterproductive.

- That Mr. Asimpi's threat of legal action was premature given that he had not previously informed the organization of the problem and given them a chance to rectify any problem.

10. Based on his conduct and the letter written to the House Manager, CMH requested that Mr. Asimpi not be sent to a CMH site again, effectively banning him from those sites.

11. Mr. Asimpi was assigned the next day to another agency known as "High Street." Mr. Asimpi's two remaining scheduled shifts at Adams Street, March 15 and March 22, 1998, were canceled due to CMH's ban.

12. Relief Resources telephoned Mr. Asimpi on March 15 and March 18, 1998. On March 19, 1998, a representative of Relief Resources spoke with Mr. Asimpi, and he informed his employer that he would contact them when he was available to work. On March 22, 1998, Relief Resources telephoned Mr. Asimpi again, leaving a message for him regarding his availability for work.

13. Mr. Asimpi apparently did call Relief Resources speaking on several occasions with the weekend coordinator. The weekend coordinator had great difficulty placing him on assignment at that time because Mr. Asimpi depended exclusively upon public transportation and because he had been banned from so many of the client sites that were accessible by public transportation.

14. Mr. Asimpi's contacts with the weekend coordinator were not noted or logged, and the human resources department was unaware of them. Given that the weekend coordinator's difficulties in placing him, the records of the human resources department reflected a 30-day period of no contact and, therefore, he was administratively placed on inactive status.

15. Mr. Asimpi was not notified immediately that he was placed on inactive status. However, given the large turnover of field staff, those placed on inactive status were routinely not sent inactivation letters.

16. While Mr. Asimpi was placed on inactive status due to a breakdown in communication between the weekend coordinator and the human resources department, Mr. Asimpi's race and his letter to Mr. Castagnola did not enter into the decision to place him on inactive status.

17. As of June 30, 1998, 37% of the Field Staff was African American. See Exhibit E.

18. Relief Resources is committed to doing business in a socially responsible manner and in promoting corporate

social responsibility.  The following are examples of their actions in this regard:

- Member of Business for Social Responsibility (BSR), an organization dedicated to helping corporations do business in ways that demonstrate respect for ethical values, people, communities and the environment.  Mr. Hammond has been the chair of the Connecticut River Valley Network of the BSR;

- Social Venture Network (SVN), another organization dedicated to helping corporations do business in ways that demonstrate respect for ethical values, people, communities and the environment. Relief Resources is one of eight companies in the United States participating in the New Corporate Vision Project of SVN, a group seeking to establish corporate social audit standards and principles.  Relief Resources is also a participant in the Emerging Venture Institute, a program of SVN assisting entrepreneurs of color in navigating the business world and encouraging minority purchasing programs;

- Member of Business Leaders for a Living Wage, a component of United for Fair Economy, an organization that seeks to remedy the growing wage gap in the United States;

- Relief Resources hosted a discussion for an international exchange program with community leaders from Russia on "Ethics in American Business";

- Relief Resources is a financial supporter of Kudirat Initiative for Democracy, an organization that seeks to strengthen civil society and promote democracy in Africa;

- Relief Resources has created a Community Re-Investment Program through the Calvert Social Foundation enabling Relief Resources investments to be used by micro lenders serving the local and international communities of its field staff;

- In June, 2000, Relief Resources will host the first statewide stakeholder meeting of M-Power, a civil and human rights group representing mental health consumers. This group is assisting the development of The Massachusetts Leadership Academy, a citizen leadership and advocacy training initiative for consumers and ex-patients.

- Relief Resources is developing a partnership project through the National Congress of Neighborhood Women with Ethel Battle Velez, a prominent African-American activist in East Harlem, New York. This project will be a test site for new ownership models that will promote expansion of Relief Resources into inner cities. The project will provide employment and services to the East Harlem community.

The Respondent submits that the Complainant has failed to prove a prima facie case, that the Respondent has proffered a legitimate, non-discriminatory reason for placing the Complainant on inactive status, and that there is no evidence that the proffered reason for inactivating the Complainant is a pretext for discrimination or that the Complainant's race and color played any role in the decision to inactivate him.

## A.    Prima Facie Case

In order to meet his burden of proving a prima facie case, the Complainant must show that: (1) he is a member of a class protected by G.L. c. 151B; (2) he performed his job at an acceptable level; (3) he was terminated; and (4) his employer sought to fill the plaintiff's position by hiring another individual with qualifications similar to the plaintiff's. *Blare v. Husky Injection Molding Systems Boston, Inc.,* 419 Mass. 437, 441 (1995).

The complainant has failed to meet element four, above. There is no evidence to suggest that Relief Resources sought to fill the complainant's position by hiring another individual.

## B.    Legitimate, Non-Discriminatory Reason for Inactivation.

The uncontroverted evidence is that the sole reason that the Respondent placed the Complainant on inactive status was because the director of Human Resources believed that after being banned from all CMH sites, the Complainant failed to contact the Respondent for assignment. Therefore, in adherence to the stated policy contained in the Policy and Procedures Manual, p. 14, the Complainant was inactivated. Although there apparently were calls to the weekend coordinator, the weekend coordinator did not

note those calls, and they were not conveyed to the Human Resources Department.

Inasmuch as Relief Resources provides temporary staffing to human services agencies, it is common for field staff to separate from the agency without notice. For that reason, Relief Resources requires "strong lines of communication" with its Field Staff and has a policy by which those who fail to maintain contact are placed on inactive status. That policy was applied uniformly and without regard to the Complainant's race or color. Surely, in the context of a temporary employment agency like the Respondent, a uniformly applied inactivation policy is a legitimate, non-discriminatory reason for inactivating the Complainant.

C.    Pretext for Discrimination.

While it is evident that the Complainant did call the Respondent during the period after being banned from CMH sites, the Complainant has not tied that lack of communication between the weekend coordinator and the Human Resources Department to his race and color. Nor has he shown that non-African American employees were treated any differently. As the S.J.C. stated in *Ocean Spray*:

> We adopt the approach taken by Federal courts under Title VII that in order to establish that the defendant's stated reasons for terminating him were a pretext, the plaintiff must "identify and relate specific instances where persons similarly situated 'in all relevant aspects' were treated differently." ... The plaintiff must identify other employees to whom he is similarly situated "in terms of performance, qualifications and conduct, 'without such differentiating or mitigating circumstances that would distinguish' their situations."

ARGUMENT

Introduction

The Complainant alleges that he was terminated from his employment with the Respondent on the basis of his race and in retaliation for having complained of racial harassment. The Respondent denies that the Complainant's race or his allegations of racial harassment played any role in his separation from employment with the Respondent.

I.    Racial Discrimination

In a discrimination case under Title VII or under M.G.L. c. 151B, § 4, evidence is taken pursuant to the three-stage order of proof first articulated in *McDonnell Douglas Corp v. Green,* 411 U.S. 792, 802 - 04. *See Wheelock College v. MCAD,* 371 Mass. 130, 134 - 37 & n. 5 (1976). The S.J.C. recently reiterated that process as follows:

> Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of racial discrimination. ... Once the plaintiff meets this burden, unlawful discrimination is presumed. The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its hiring decision,... and to "produce credible evidence to show that the reason or reasons advanced were the real reasons." ... Once the defendant meets its burden, the presumption of discrimination vanishes, and the burden returns to the plaintiff to persuade the court, by a fair preponderance of the evidence, that the defendant's proffered reason for its employment decision was not the real reason, but is a pretext for discrimination.

*Matthews v. Ocean Spray Cranberries, Inc.,* 426 Mass. 122, 128 (1997)(citations omitted). While the burden of production of evidence shifts under the *McDonnell Douglas* framework, the Complainant always maintains the burden of proof of discrimination. *Tate v. D.M.H.,* 419 Mass. 356, 362 (1995).

426 Mass. at 129 (citations omitted). *See also City of Boston v. MCAD*, 47 Mass. App. Ct. 816, 821 - 22 (1999)("No case of disparate treatment under G.L. c. 151B is complete without proof that the plaintiff's termination was a pretext for racial discrimination by showing that similarly situated employees were treated differently.")

The Complainant has not shown that non-African-American field staff were treated any differently with regard to inactivation. The reason for that lack of evidence is because it does not exist. Where the records available to the Human Resources Department show a lack of contact for at least thirty (30) days, field staff are administratively inactivated. That process took place uniformly, without regard to race or color.

Admittedly, the Complainant has pointed out that the Human Resources Department was incorrect in its belief that he had contacted the Respondent and that there was a breakdown in communication between departments (which is understandable in an organization with so many short-term employees who consider this employment to be interim), but he has not shown that the proffered reason is not the real reason that he was inactivated or that it was proffered as a pretext for racial discrimination. In order to sustain its burden of production, the Respondent need not show that the proffered reason was factually correct so long as it is the true reason for the action taken. "'The reasons given for a decision may be unsound and even absurd' and the action may appear 'arbitrary or unwise,' nonetheless the defendant has fulfilled its obligation" of proffering a legitimate, non-discriminatory basis for its action. *Ocean*

*Spray*, 426 Mass. at 128 quoting *Lewis v. Area II Homecare for Senior Citizens, Inc.*, 397 Mass. 761 (1986).

> We reiterate that the employer's burden following a prima facie showing of discrimination is "only a responsibility to produce evidence. Once the employer has proposed a reason and presented supporting facts, the presumption of discrimination is dispelled.... The employer need not persuade the trier that it was correct in its belief" (citations omitted, emphasis in original).... The reasons given for a decision may be unsound or even absurd, but if they are not discriminatory and if the plaintiff does not prove they are pretexts, the plaintiff cannot prevail.

*Lewis, supra,* 397 Mass. at 766.

In addition to his failure to cite any disparate treatment from that applied to non-African American employees, the Complainant has offered no evidence that the proffered reason for inactivation is a pretext to cover an intent to discriminate against him on the basis of race. Among the relevant factors in considering whether an action was discriminatory is "[e]vidence of the employer's general practice regarding the employment of racial minorities...." *Zhang v. Mass. Inst. of Techn.*, 46 Mass. App. Ct. 597, 604 (1999). As of June 30, 1998, the Respondent's field staff consisted of 307 employees, 37% of whom were African-American and a total of 43% of whom were within protected classes under M.G.L. c. 151B.

Moreover, given the extensive record of corporate social responsibility exhibited by this employer, including efforts to promote entrepreneurship by people of color and to locate its business in inner-city African-American neighborhoods, it would be unreasonable to conclude that the alleged inactivation of the Complainant was, in fact, a pretext for the real motive — discrimination on the basis of race and color.

For all the foregoing reasons, and upon the authorities cited, the Respondent submits that the Complainant's allegations of discrimination on the basis of race and color must be rejected and a finding of lack of probable cause entered.

## II. Retaliation

Under both state and federal law, a claim for retaliation is subject to the same *McDonnell Douglas* tripartite shifting of the burden of production as is set forth above. *McMillan v. MSPCA*, 140 F.3d 288(1st Cir. 1998). The Respondent submits that on the record of this case, the Complainant cannot establish a prima facie case, the Respondent has proffered a legitimate, non-discriminatory reason for its action, and the Complainant has not shown that the reason proffered is pretextual. As to the latter two aspects of the *McDonnell Douglas* framework, the Respondent stands on the argument submitted in parts I.A. and I.B., above, focusing here on the issue of a prima facie case.

In order to establish a prima facie case, the Complainant must show that 1) he engaged in protected conduct under federal or state law, 2) he suffered an adverse employment action, and 3) a causal connection between the protected conduct and the adverse employment action. *Id.* In the present context, the Complainant cannot establish a prima facie case in that his letter does not constitute "protected conduct" and there is no causal connection between the letter and being placed on inactivate status.

The letter written by the Complainant objected to certain conduct of a mentally ill resident of a community home managed by an entity that contracts with the Respondent. Nothing in the letter refers to any conduct on the part of the Respondent

employer or any person whose conduct is under the control of the Respondent. This complaint is not "protected conduct" satisfying the first element of the prima facie case because "in order to prove that she engaged in protected opposition, 'the opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual.'" *Folkerson v. Circus Circus Enterprises, Inc.*, 107 F.3d 754 (9th Cir. 1997) quoting *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978).

Moreover, given that the alleged perpetrator of the allegedly discriminatory conduct was mentally ill and resident in a community home for mentally ill adults, he is not legally responsible for his conduct and as a matter of law he is not capable of forming the requisite intent to discriminate. The Respondent could not control the conduct of this mentally ill community home resident and it cannot be held liable for alleged harassment meted out by him.[1]

Beyond the fact that the letter was not protected conduct and that the Respondent cannot as a matter of law be held responsible for the conduct of a mentally ill community home resident over whom it has no control, the Complainant has failed to establish any causal link between the letter and being placed on inactive status. The Complainant suggests a temporal link between the letter and inactivation warranting an inference of retaliatory motive. First, "[t]he mere fact hat one event

---

[1]   Had the Complainant informed the Respondent about the conduct of this resident, he could have opted not to be placed there again. On prior occasions, the Complainant had, in fact, requested not to be placed in other sites.

followed another is not sufficient to make out a causal link.
*MacCormack v. Boston Edison, Co.,* 423 Mass. 652, n. 11 (1996).
In order draw an inference from the time of the events the
alleged retaliatory action must be "unusually suggestive" of
retaliatory motive, *Krouse v. American Sterilizer Co.,* 126 F.3d
789 (7th Cir. 1998), because "[i]t is important to emphasize that
it is causation, not temporal proximity, that is an element of
plaintiff 's prima facie case, and temporal proximity merely
provides an evidentiary basis from which an inference can be
drawn." *Kachmar v. Sungard Data Systems, Inc.,* 109 F.3d 173, 177
(3d Cir. 1997). Given the two-month gap between the Respondent
learning of the letter (March 14, 1998) and inactivation (May 19,
1998), the Respondent's conduct is not unusually suggestive of
retaliatory animus and no such inference may be drawn.

For all the foregoing reasons, and upon the authorities
cited, the Respondent submits that the Complainant's allegations
of retaliation for engaging in protected conduct must be rejected
and a finding of lack of probable cause entered.

## III. Failure to Investigate.

The Complainant suggests that a finding of probable cause
may be based upon an alleged failure to conduct an adequate
investigation of his harassment claim. The Complainant's theory
is misguided. Among the alleged conduct that was the subject of
Complainant's letter was that the resident was being "negative
towards" the Complainant, that he had "physically assaulted" the
Complainant three months earlier, that the resident was
continuing his "verbal assault" on the Complainant by being rude
and confrontational and by saying that the Complainant was "not

EXHIBIT 2

## COMMONWEALTH OF MASSACHUSETTS
## COMMISSION AGAINST DISCRIMINATION

### No. 98132570

| | | |
|---|---|---|
| KOFI ASIMPI | > | |
| Complainant | > | |
| | > | **RESPONDENT'S ANSWERS TO** |
| v. | > | **INTERROGATORIES FROM THE** |
| | > | **COMPLAINANT** |
| RELIEF RESOURCES, INC. | > | |
| Respondent | > | |

1.  Please state your date of incorporation, address and number of employees.

Answer
The Articles of Organization were signed on October 9, 1985.  The effective date of incorporation is available from the Secretary of State.  The principal offices of Relief Resources, Inc. are located at 4 Bay Road, Hadley, Massachusetts.

2.  Please provide a copy of your Articles of Incorporation.

Answer
See Exhibit A, attached.

3.  Please identify your management staff, including officers, managers, supervisors and human resources personnel.

Answer
As of the date of the alleged violation, the management staff was comprised of those individuals shown on Exhibit B, attached.

4.  Please state whether any of the following social service agencies, locations, or entities lodged complaints about Complainant and/or banned him from working therein: League School; River Street; 88 Bedford (Evergreen Center); Germain Lawrence/Claremont Anderson; 808 Memorial (CASCAP); Moody Street (CMH); Clement Street; Norfork; CMH.

Answer
Yes.

5.  If your answer to the preceding interrogatory was in the affirmative as to any agency, location or entity, please state in detail the complaint lodged, the person making the

your response thereto and the reasons alleged for banning
Complainant therefrom.

Answer

| Location | Person Making Complaint | Address | Reason for Complaint | Response to Complaint |
|---|---|---|---|---|
| League School | Tom Montanari | 300 Boston Providence Turnpike, Walpole, MA | Sleeping on shift while providing one-on-one care for children with self-injurious capacity. | I spoke with Mr. Asimpi and instructed him not to sleep on shift. Mr. Asimpi was not sent back. |
| River Street | Liz Algamal at River Street | 163-165 River Street, Waltham, MA | Poor work performance and not working well with the consumers | Bob Lindner spoke with Mr. Asimpi. Bob notified Mr. Asimpi that he could not return. Mr. Asimpi began calling Liz Algamal, who complained to Bob that Mr. Asimpi was harassing her. |
| 808 Memorial Street | Eileen English | 808 Memorial Drive, Apt. 116, B Building, Cambridge, MA | Mr. Asimpi assigned to the wrong floor and had to be escorted out of the building. Given the mental illness of the consumers who witnessed Mr. Asimpi being escorted out, Ms. English thought it best if he not return. | Bob Lindner spoke with Mr. Asimpi and explained the situation to him. |

-2-

| Moody Street | Program Director | 634 Moody Street, Waltham, MA | Mr Asimpi was found sleeping on an awake overnight shift. | Bob Lindner spoke with Mr. Asimpi and told him he could not sleep on shift and could not return to Moody Street. |
|---|---|---|---|---|
| Clement Street | Kari (last name unknown) | 14-16 Clement Street, Malden, MA | Mr. Asimpi committed a medication error. | I spoke with Mr. Asimpi, who admitted his error. Mr. Asimpi asked to be permitted to return, and Mr. Hammond advocated for him and arranged for his return to this site. After another medication error, Mr. Asimpi was banned from this site. |

| Norfolk | Katie Curley, Program Director | 193 Norfolk Street, Cambridge, MA | Requested not to return due to Mr. Asimpi's inability to get along with a consumer's dog. Mr. Asimpi returned to the site because staff was unable to contact him before he returned. At that time, Mr. Asimpi had a confrontation with Katie. He was then banned from all CASCAP programs. (See 808 Memorial, above) | I spoke with Mr. Asimpi at the site on the day he confronted Katie. |
| CMH | Kathy Harper | 1040 Waltham Street, Lexington, MA | See answer to interrogatory 9, below. | See answer to interrogatory 9, below. |

6.    Identify whether Respondent has employees' handbook.

Answer
Yes.

7.    If the answer to the preceding interrogatory was in the affirmative, please provide a copy of said handbook.

Answer
See Exhibit C, attached.

8.    Please state whether Respondent or any of its agents were aware of the incidents involving Complainant and Adam's Street client Mr. Steve Izzi.

Answer
I object to this interrogatory in that it is not specific as to the time in which the Respondent or its agents were aware of the

-4-

incidents at Adams Street.  Without waiving that objection, the
Respondent and its agents became aware of the incidents at Adams
Street involving Mr. Steve Izzi on March 13, 1998, when a fax was
received from Kathy Harper.

9.   If the answer to the preceding interrogatory was in the
     affirmative, please state the date you became aware of said
     incidents, the source of this information, whether you
     investigated the matter, whether any corrective action was
     taken, and the nature of said corrective action.

Answer
On March 13, 1998, Relief Resources, Inc. received a fax from
Kathy Harper at CMH.  The fax was a copy of a letter that Mr.
Asimpi had written to Ray Castagnola, the House manager for Adams
Street, regarding Mr. Steve Izzi.  The letter was dated March 1,
1998.  A true copy of the fax was attached to the Respondent's
Position Statement as Exhibit D. Prior to receiving this fax, the
Respondent and its management agents had no knowledge of any
issues taking place at Adams Street between Mr. Asimpi and Mr.
Izzi, nor did we have any knowledge that the March 1 letter had
been written by Mr. Asimpi.  Upon receipt of this fax, I spoke
with Mr. Asimpi. The following is a synopsis of our conversation:

- I informed Mr. Asimpi that he had committed a serious
  violation of protocol in writing the letter directly to
  Mr. Castagnola.  He acknowledged the inappropriateness
  of doing so, and agreed to send any future letters
  through Relief Resources.
- I informed Mr. Asimpi that it was inappropriate for Mr.
  Asimpi to hold this consumer, who had a clinical
  diagnosis of mental illness, responsible for the
  behavior alleged in the letter.
- I also spoke with Mr. Asimpi about the
  inappropriateness of involving other consumers at Adams
  Street in these issues.
- I pointed out that Mr. Asimpi included personal
  judgments and criticisms in the letter, the very
  conduct that he was complaining about Mr. Izzi.
- I spoke with Mr. Asimpi about not internalizing and
  personalizing the consumers' behavior toward him.
- I informed Mr. Asimpi that his threat of legal action
  was premature given that he had not previously informed
  the organization of the problem and given them a
  chance to rectify any problem.

10.  Please state the last date Complainant worked at an agency
     as your employee.

Answer
March 14, 1998.

11.  Please identify all contacts you had with Complainant
     following his last assignment at an agency as your employee.

Answer

| DATE | |
|------|------|
| 3/18/98 | outgoing call, incoming call |
| 3/19/98 | incoming call |
| 3/20/98 | outgoing call |
| 3/22/98 | incoming call |
| 3/27/98 | incoming call |
| 3/31/98 | incoming call |
| 4/2/98 | incoming call |
| 4/3/98 | incoming call |
| 5/29/98 | incoming call |
| 5/31/98 | incoming call |
| 6/1/98 | incoming call |
| 6/3/98 | incoming call |
| 6/5/98 | incoming call |
| 6/12/98 | incoming call |
| 7/2/98 | written correspondence |

12.  Please identify the date on which you notified Complainant
     that he had been reclassified as "inactive."

Answer
May 19, 1998.

13.  Please state the reason why Complainant was reclassified as
     an "inactive" employee.

Answer
Robert Lindner, Eastern Mass. Regional Coordinator, had not
received a request for assignment from him for a period of thirty
(30) days.

14.  Please identify each and every witness you intend to call to
     testify at the time of hearing on the Complaint.

-6-

Answer

No decision has been made as to who will be called as witnesses at the hearing on this matter.

15.  Identify all persons whom you intend to call as expert witnesses at the time of hearing on the Complaint and for such expert specify:

    a.  the subject matter on which he is expected to testify.
    b.  the substance of the facts and opinions to which he is expected to testify, and;
    c.  a summary of the grounds for each opinion to which he is expected to testify.

Answer

No decision has been made as to expert witnesses to be called to testify at the hearing on this matter.

Signed under the pains and penalties of perjury on this 31st day of January, 2000.

_____
Douglas Hammond
President


As to any objections:

_____
Alan Seewald BBO # 546790
Attorney for Respondent, RELIEF RESOURCES, INC.,
Seewald & Jankowski, P.C.
5 East Pleasant Street
Amherst, MA  01002
(413) 549-0041

-7-

EXHIBIT

# Seewald, Collins & Jankowski, P.C.
## Attorneys at Law

Alan Seewald
James G. Collins
Deborah Tobie Jankowski
Robert J. Spencer

E-mail: rscj@javanet.com

Five East Pleasant Street
Amherst, Massachusetts 01002-1501
(413) 549-0041 (Telephone)
(413) 549-3818 (FAX)

141 Tremont Street
Boston, Massachusetts 02111
(617) 423-1533 (Telephone)
(617) 338-4244 (FAX)

October 30, 1998

Mary Garippo, Investigator
Massachusetts Commission Against Discrimination
One Ashburton Place
Boston, Massachusetts 02108

RE: Kofi Asimpi v. Relief Resources
No. 98132570

Dear Ms. Garippo:

Please accept this letter as the Respondent's Position Statement relative to the above-referenced matter. As a threshold matter, please note that my client is Relief Resources, Inc., and that my client does not do business under the name or style of The Center for Mental Health and Retardation Services, Inc.

My client categorically denies any discrimination against Mr. Asimpi in the course of his employment with Relief Resources. Mr. Asimpi was not terminated, although Relief Resources would have been justified in doing so on the basis of Mr. Asimpi's poor performance. Rather, Mr. Asimpi was placed on inactive status on April 22, 1998 in accordance with Relief Resources' standard procedure because he had failed to contact his employer for a period of a month.

Relief Resources provides temporary staffing to human services organizations. Its principal place of business is in Hadley, Massachusetts, and it has satellite offices in Somerville and Worcester, Massachusetts and Providence, Rhode Island. Relief Resources has 250 - 325 active employees at any given time. Inasmuch as Relief Resources provides temporary staffing, it has a high rate of employee turnover necessitating the hiring of 500 - 750 employees each year. In the temporary staffing industry in general, and Relief Resources in particular, it is common for employees to separate from the agency without notice. For that reason, Relief Resources requires "strong lines of communication" with its Field Staff and has a policy by which those who fail to

Mary Garippo, Investigator
October 30, 1998
Page 2 of 3

maintain contact are placed on inactive status.  See Exhibit A.
As a matter of procedure, that policy is carried out by
inactivating employees who do not make contact with the agency
for a period of one month. That procedure is applied uniformly,
without regard to the race or color (or any other classification)
of the employee.

Mr. Asimpi was hired by Relief Resources on April 2, 1997, as a
member of its Field Staff. He was assigned to staff human
service agencies that contracted with Relief Resources for
temporary staffing.  When Mr. Asimpi first started his
employment, he expressed his desire to work as much as possible.
Unfortunately, the agencies to which Mr. Asimpi was assigned
began to complain about his performance. Each agency has the
right to reject or ban Relief Resources employees, and
approximately seven (7) agencies did so during Mr. Asimpi's
tenure with Relief Resources.  In addition, Mr. Asimpi requested
not to be assigned to three (3) other agencies. Attached hereto
as Exhibit B is summary of Mr. Asimpi's work history.  In each
case, the complaint against Mr. Asimpi was investigated through
the Incident Report Procedure.  See Exhibit C, attached hereto.
That procedure is uniformly invoked without regard to the race or
color (or other classification) of the employee.

During the week of March 7 through March 13, 1998, Mr. Asimpi was
assigned to a location known as "Adams Street," which is run by
The Center for Mental Health and Retardation ("CMH").  Again, CMH
is not affiliated with Relief Resources other than as an agency
that contracts with Relief Resources to have temporary staffing
provided to it.  On March 13, 1998, the president of Relief
Resources, Douglas Hammond, received by fax a copy of letter from
Mr. Asimpi to the House Manager of Adams Street, dated March 1,
1998.  See Exhibit D.  Prior to receiving the fax on March 13,
Relief Resources had no knowledge of the existence of the letter
or of any the issues between Mr. Asimpi and the client/resident
of Adams Street referred to in the letter.  Mr. Hammond spoke
with Mr. Asimpi about the letter and the issues it raised.  Also,
Mr. Hammond expressed his concern that Mr. Asimpi had serious
issues and had written such a letter without notifying his
employer. At that time, CMH requested that Mr. Asimpi not be sent
to a CMH site again, effectively banning him from those sites.

Mr. Asimpi was assigned the next day to another agency known as
"High Street."  Mr. Asimpi's two remaining scheduled shifts at
Adams Street, March 15 and March 22, 1998, were cancelled due to
CMH's ban.  Relief Resources telephoned Mr. Asimpi on March 15
and March 18, 1998.  On March 19, 1998, a representative of
Relief Resources spoke with Mr. Asimpi, and he informed his
employer that he would contact them when he was available to

Mary Garippo, Investigator
October 30, 1998
Page 3 of 3

work.  On March 22, 1998, Relief Resources telephoned Mr. Asimpi
again, leaving a message for him regarding his availability for
work.  He never returned that call, and Relief Resources heard
from Mr. Asimpi only once after March 19 when, on July 2, 1998,
Relief Resources received a letter from Mr. Asimpi requesting a
copy of his personnel file.  A true copy of the file was sent to
Mr. Asimpi on that date.  See Exhibit F.

Mr. Asimpi was placed on inactive status due solely and
exclusively to his failure to contact his employer for a period
of one month.  While Relief Resources had more than sufficient
reason to terminate Mr. Asimpi, they continued to work with him
in an attempt to find an appropriate placement.  It was Mr.
Asimpi's failure to follow-up that precipitated his placement in
inactive status.

Mr. Asimpi's status as an African-American had nothing whatever
to do with any decision to place him on inactive status.
Similarly, his allegation that he was terminated in retaliation
for complaining about racism is wholly devoid of merit.  Relief
Resources has a proud history of maintaining a diverse work
force.  As of June 30, 1998, 37% of the Field Staff was African
American.  See Exhibit F. Had Relief Resources harbored any
racial animus toward Mr. Asimpi, it could have terminated him for
performance issues. Instead, the employer continued to work with
Mr. Asimpi in finding new placements for him.

Even if Mr. Asimpi's complaint makes out a *prima facie* case for
discrimination, Relief Resources has proffered a good faith
business justification for placing him on inactive status
(inactivation where no contact for one month).  That
justification is not a pretext, but is the actual reason that Mr.
Asimpi was inactivated.  Relief Resources therefore requests that
after investigation of this complaint the Commission enter a
finding of lack of probable cause.

Thank you for your attention to this matter.  Should you have
need for any further information, please contact me at my Amherst
office.

Very truly yours,

Alan Seewald

AS/A
xc:  Relief Resources, Inc.
     Kofi Asimpi



# Relief Resources, Inc.
### STAFFING SOLUTIONS FOR HUMAN SERVICES

## KOFI ASIMPI

**Date of hire**:      April 2, 1997
**Date of inactivation**:      April 22, 1998
**Reason**:      No contact for over 1 month.

## Work history

| Week of | Worked at | # hrs | Date of incident, Reason and outcome |
|---|---|---|---|
| 4/2-4/4 (1997) | N/A | N/A | |
| 4/5-4/11 (1997) | N/A | N/A | |
| 4/12-4/18 (1997) | All background checks done and eligible to begin working. | 0 | |
| 4/19-4/25 (1997) | Available for M-F overnight shifts but did not work. | 0 | |
| 4/26-5/2 (1997) | Worked 4/27 & 5/2 @ Bedford St (Evergreen Ctr) and 4/28 @ River St (CMH) | 24 | |
| 5/3-5/9 (1997) | Did not work | 0 | |
| 5/10-5/16 (1997) | Worked 5/10 & 11 @ River St (CMH), 5/13 @ League School, 5/14 @ Renaissance School | 25 | 5/13/97- Sleeping during a day shift at the school while attending to 1 student. Banned. (DOUG) |
| 5/17 – 5/23 (1997) | *Worked* 5/19 @ Palfrey, 5/21 @ Grove, 5/22 @ Bedford, 5/23 @ Fay Rd. *Sicked* out of 5/18 @ Fay Rd and 5/22 @ Grove | 26 ¾ | |
| 5/24 – 5/30 (1997) | Worked 5/24 & 25 @ Prospect, 5/29 & 30 @ River (CMH) | 34 | It was discussed with Kofi that he cannot sleep during 3-11 and awake overnight shifts at River St. |

104 Russell Street, P.O.Box 538 Hadley, MA 01033 • 1-800-639-5094 • Tel: 413-584-7667
FAX: 413-586-7754 • E-MAIL: relief@javanet.com • MEMBER OF BUSINESS FOR SOCIAL RESPONSIBILITY ✸

Kofi Asimpi Work History – Page 2

| Week of | Worked at | # hrs | Date of incident, Reason and outcome |
|---|---|---|---|
| 5/31 – 6/6 (1997) | Worked 5/31 @ Fine House, 6/4 @ Margarite Terrace (CMH), Attended Med Cert training | 21 | |
| 6/7 – 6/13 (1997) | Attended Med Cert and 1st Aid/CPR training. | 0 | |
| 6/14 – 6/20 (1997) | Worked 6/15 @ Fay Rd, 6/16 & 20 @ River St (CMH), attended Med Cert training | 21.5 | |
| 6/21 – 6/27 (1997) ? No | *Worked* 6/21 & 23 @ RiverSt(CMH) *Sicked* out of 6/22 @ ? Prospect Sunday ? | 18 | |
| 6/28 – 7/4 (1997) | Worked 6/29, 7/3 & 4 @ Bedford, 7/4 @ River | 23 | |
| 7/5 – 7/11 (1997) | Worked 7/5 @ River (CMH), 7/7 & 11 @ 88 Bedford (EvergreenCtr) | 31 ½ | 7/11 – Kofi doesn't want to work at 88 Bedford. He felt that staff were not appreciative of his work. (DOUG) |
| 7/12 – 7/18 (1997) | Worked 7/12 @ Walden Square, 7/13& 14 @ River (CMH), 7/15 @ Moody (CMH), 7/17 @ Palfrey | 43 | |
| 7/19 – 7/25 (1997) | Worked 7/19 & 23 @ River (CMH), 7/21 @ Claremont-Adams (Germ Lawrence), 7/22 @ Adams (CMH) | 29 | 7/23 – Banned from River Street (CMH) due to poor work performance & he was not working well with the consumers. Kofi was agitated about this "claim" & repeatedly contacted Liz, the program director, to the point where she felt badgered and did not want to have any contact with Kofi at all. (BOB) |
| 7/26 – 8/1 (1997) | Worked 7/26 & 30 @ Moody (CMH), 7/26 & 29 @ Adams (CMH) | 36 | |
| 8/2 – 8/8 (1997) | Worked 8/3 @ Moody (CMH), 8/5 @ Claremont – Anderson (Germ Lawrence), attended Med Cert training. | 13 | 8/5 – Kofi doesn't want to work at Germain Lawrence (Claremont–Anderson) due to an incident. He was asked to work w/a student who was in need of restraining (and he was not restraint trained). It was a long drawn out incident. (DOUG) |