| Week of | Worked at | # hrs | Date of incident, Reason and outcome |
|---|---|---|---|
| 8/9 – 8/15 (1997) | Worked 8/9, 10 & 15 @ Moody (CMH), 8/9 & 14 @ Adams (CMH), 8/13 @ Broadway | 60 ½ | |
| 8/16 – 8/22 (1997) | *Worked* 8/16 @ Adams (CMH), 8/20 @ Norfolk (CASCAP), 8/22 @ Brown. *Sicked* out 8/21 @ 808 Memorial (CASCAP). | 39 | 8/21 – Kofi is banned from 808 Memorial. He was scheduled to work on 1 of the 2 floors in the house. He was sent to the wrong floor and the consumers were not expecting someone to come work and they were afraid. They called security (they were MH consumers) and security escorted him out of the building. He felt that he was singled out due to his race rather than the fact that they were MH consumers who were not expecting a worker and were afraid. (BOB) |
| 8/23 – 8/29 (1997) | Worked 8/23 @ Adams (CMH)(late), 8/25 & 29 @ 161 Hampshire, 8/27 @ PelhamRd, 8/28 @ Prospect, 8/29 @ 1751 Washington | 51 | |
| 8/30 – 9/5 (1997) | Worked 8/30 & 9/4 @ Banks (CMH), 8/31 @ Adams (CMH), 9/2 @ Norfolk (CASCAP), 9/3 @ Prospect | 49 | |
| 9/6 – 9/12 (1997) | Worked 9/6 @ 161 Hampshire, 9/8, 10 & 11 @ Banks (CMH), 9/9 @ Adams (CMH), 9/12 @ Lee St | 44 | |
| 9/13 – 9/19 (1997) | Worked 9/13 & 14 @ Banks (CMH), 9/15 & 16 @ Adams (CMH), 8/19 @ Lee St | 45 | |
| 9/20 – 9/26 (1997) | Worked 9/20 @ Banks (CMH), 9/21 @ 161 Hampshire, 9/22, 23 & 24 @ Adams (CMH) | 48 | |
| 9/27 – 10/3 (1997) | Worked 9/27 @ Lee St, 9/28 @ Moody (CMH), 9/29 & 30 @ Adams (CMH), 10/2 @ Clement (Tri-CityMH) | 47 | |

| Week of | Worked at | # hrs | Date of incident, Reason and outcome |
|---|---|---|---|
| 10/4 – 10/10 (1997) | Worked 10/4 & 6 @ Adams (CMH), 10/5 @ Moody, 10/7 & 8 @ Clement | 50 | 10/5 – Banned from Overnight shifts at Moody St (CMH). 10/8 – Banned from Clement St. due to medication errors. (DOUG) |
| 10/11- 10/17 (1997) | Worked 10/13, 14 & 15 @ Brown (CMH), 10/13 @ Mt. Auburn, 10/14 @ Meriam | 40 | |
| 10/18–10/24 (1997) | Worked 10/18, 20 & 21 @ Adams (CMH), 10/22 @ Banks (CMH), 10/22 @ Brown (CMH) | 44 ½ | |
| 10/25-10/31 (1997) | *Worked* 10/25, 26 & 27 @ Adams (CMH), 10/30 @ Highland, 10/31 @ Broadway. *Sicked* out of 10/28 @ Adams (CMH). | 35 | |
| 11/1 – 11/7 (1997) | Worked 110/, 3, 4, 5 & 7 @ Adams (CMH) | 40 | |
| 11/8 – 11/14 (1997) | Worked 11/10, 11, 12 & 14 @ Adams (CMH) | 45 | |
| 11/15-11/21 (1997) | Worked 11/15, 17, 18, 19 & 21 @ Adams (CMH) | 40 | |
| 11/22–11/28 (1997) | Worked 11/22, 24, 27 & 28 @ Adams (CMH), 11/23 @ Banks (CMH) | 51 | |
| 11/29 – 12/5 (1997) | *Worked* 11/29, 12/1, 4 & 5 @ Adams (CMH), 12/2 @ Prospect, 12/3 @ Hampshire. *Sicked* out of 11/30 Banks (CMH) | 53 | |
| 12/6-12/12 (1997) | Worked 12/6, 7, 8, 11, 12 @ Adams (CMH) | 46 | |
| 12/13–12/19 (1997) | Worked 12/13, 15, 16 & 19 @ Adams (CMH), 12/13 @ Prospect | 47 | |
| 12/20-12/26 (1997) | Worked 12/20, 21, 22, 24 & 26 @ Adams (CMH) | 56 | |

| Week of | Worked at | # hrs | Date of incident, Reason and outcome |
|---|---|---|---|
| 12/27/97 – 1/2/98 | Worked 12/27, 1/1 & 2 @ Adams (CMH), 12/28 @ Prospect, 12/30 @ Hammond, 12/31 @ Norfolk | 46 | 12/31/98 – Banned from Norfolk because he was confrontational with Katie (program director). Katie had called before the shift and asked that Kofi not be sent because he and one of the consumer's dogs did not get along. We tried to call him but we couldn't reach him before the shift. He showed up and the person we scheduled to replace him showed up. Kofi said that he did not have a problem with the dog and felt that he should be able to work. At that point, he became very confrontational with Katie (feeling that there was some other issue and the dog issue was really just a plot to get him out of there). The other Field Staff (who was there to replace Kofi) expressed that it was a very heated discussion and that he wanted to leave asap because he didn't want to be any part of the discussion. As a result of 2 situations at 2 different CASCAP programs, Kofi was banned from ALL CASCAP programs. (BOB) |
| 1/3 – 1/9 (1998) | Worked 1/3, 4 & 7 @ Adams (CMH) | 25 | |
| 1/10 – 1/16 (1998) | Worked 1/10, 12, 13, 14 & 16 @ Adams (CMH) | 35 | |
| 1/17-1/23 (1998) | Worked 1/17, 18 & 22 @ Adams (CMH) | 30 | |
| 1/24 – 30 (1998) | Did not work. Stated that he was not feeling well. | 0 | |
| 1/31-2/6 (1998) | Worked 1/31 & 2/1 @ Adams (CMH) | 18 | |
| 2/7 – 2/13 (1998) | Worked 2/13 @ Adams (CMH) | 10 | |
| 2/14-2/20 (1998) | Worked 2/14, 15, 16 & 18 @ Adams (CMH) | 48 | Kofi stated that he did not want to work @ Marg Terrace because it is too far & dangerous. |
| 2/21 – 2/27 (1998) | Worked 2/21 & 27 @ Adams | 16 | |
| 2/28 – 3/6 (1998) | Worked 3/1 & 6 @ Adams (CMH). Sicked out of 3/5 @ Adams. | 16 | |

Kofi Asimpi Work History – Page 6

| Week of | Worked at | # hrs | Date of incident, Reason and outcome |
|---|---|---|---|
| 3/7 – 3/13 (1998) | Worked 3/7 & 8 @ Adams (CMH) | 18 | 3/13 – We received fax from CMH and they requested that he not be sent to any CMH programs. Banned from CMH. |
| 3/14-3/20 (1998) | Worked 3/14 @ High Street (Tri-City). Removed from Adams shift on 3/15 (CMH) | 10 | 3/19 – Kofi said that he would call us with the dates and times he is available for work. |
| 3/21-3/27 (1998) | Removed from 3/22 shift @ Adams St | 0 | 3/22 – We left a message for Kofi regarding when he was available to work. We did not hear back from him. |
| 3/28-4/3 (1998) | No contact | | |
| 4/4-4/10 (1998) | No contact | | |
| 4/11-4/17 (1998) | No contact | | |
| 4/18-4/24 (1998) | No contact so his file was inactivated. | | |

Bob = Robert Lindner, Regional Coordinator

# THOMAS S. GILDEA
## ATTORNEY AT LAW


EXHIBIT VI

76 CANAL STREET
SUITE 302
BOSTON, MASSACHUSETTS 02114

PHONE/FAX: (617) 367-3453

January 15, 1999

Mary Garippo, Investigator
Massachusetts Commission Against Discrimination
One Ashburton Place
Boston, Massachusetts 02108

Re: Kofi Asimpi v. Relief Resources
No. 98132570

Dear Ms. Garippo:

Please accept this letter as the Petitioner's Rebuttal to Respondent's Position Letter dated October 30, 1998 relative to the above-referenced matter.

The Respondent's contention in its Position Statement that Petitioner was placed on inactive status, because he failed to contact his employer for a month, is false. Petitioner was in contact with his employer on numerous occasions during the time period of March 1998 to May 1998. Petitioner was repeatedly told that someone from the Respondent's office would return his calls. Respondent, in its Position Statement, admits that Petitioner "expressed his desire to work as much as possible." (Respondent Position Statement, p.2) This fact never changed. Only the Respondent's acknowledgment of this fact has changed.

Respondent relies upon its assertion that "Mr. Asimpi was placed on inactive status due solely and exclusively to his failure to contact his employer for a period of one month." (Respondent Position Statement, p.3) Petitioner was in constant contact with Respondent. He phoned Respondent on 3/19/98, 3/22/98, 4/3/98, and 5/3/98 and was told that someone would call him back. No one ever did. Additionally, Petitioner requested an employment letter from Respondent in late March 1998. Respondent sent to the Petitioner (addressed "To Whom It May Concern" – see attached) an employment letter dated March 31, 1998. As Petitioner periodically made these requests to maintain his housing, the fact that the Respondent sent this letter shows that Petitioner was, in fact, in contact with the Respondent. These employment verification letters were produced for the Petitioner only upon request. Therefore, the existence of the 3/31/98 letter is conclusive evidence that Petitioner was in contact with Respondent.

While the Respondent Claims that the sole reason for the Petitioner's inactivation was his failure to maintain contact with the Respondent, the Respondent has also seen fit to throw in some character assassination to bolster its position. The fact that Petitioner never knew of his alleged "poor performance" until he read the Respondent's Position Statement would lead one to conclude that it never existed. The fact that Respondent continued to employ Petitioner would indicate that the alleged "poor performance" is a fabrication. Petitioner disputes the allegation that he was banned from "approximately seven agencies". (Respondent's Position Statement, p.2)

1

Since Petitioner was not aware of these allegations until Respondent's Position Statement of October 31, 1998, it is difficult to respond. Respondent has provided no information or reports regarding these alleged incidents other than what is contained in its position statement and attachment entitled "Work History". The "Work History" document has obviously been prepared in preparation for legal action. This document was not included in Petitioner's personnel file and contains only remarks detrimental to the Petitioner. In addition, while this "Work History" purports to be a contemporaneous log of Petitioner's hours and locations, it is written in past tense. For example, the very last entry on the "Word History" document (p.6) reads "No contact so his file was inactivated." While not trying to pick apart every little grammatical structure, this reads as if it was written well after the dates on the log.

While Respondent claims that Petitioner was placed on inactive status and not terminated, the result is the same. Respondent's letter of 5/29/98 refers to Petitioner as a "former employee". Petitioner was no longer an employee of Respondent.

This is a simple case. The Petitioner complained of being racially harassed. Within a couple days, Respondent began refusing to return phone calls and placing the Petitioner in assignments. Within a month and a half, Respondent placed Petitioner on official, inactive status. (see attached Affidavit)

The Petitioner is a well-educated, hard-working man. He has a PhD in Theology and exemplary references. The contention that he failed to maintain contact with the Respondent for a one-month period merely shows how an employer can attempt to sidestep the law.

Sincerely,

*Thomas S. Gildea*

Thomas S. Gildea

Copy: Alan Seewald, Esq.
    Attorney for Relief Resources, Inc.
    Kofi Asimpi, Petitoner

2

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

No. 98132570

| | |
|---|---|
| **KOFI ASIMPI** ) | |
| Complainant ) | |
| ) | **Complainant's Answers to** |
| ) | **Respondent's Interrogatories** |
| v. ) | |
| ) | |
| **RELIEF RESOURCES** ) | |
| Respondent ) | |

The Complainant, KOFI ASIMPI, by and through his attorney, pursuant to 804 CMR 1.13 (7) and MCAD Standing Order 98-1, does hereby answer under oath the Interrogatories set forth by Respondent on March 29, 1999.

1. Please state your full name, age, occupation, home and business address, and social security number.
   Kofi Asimpi
   59 years old
   Minister
   213 Kelton St, Apt #G-02, Allston, MA, 02134
   SS#460 55 2502

2. Please state the date and time of every telephone contact that you had with the Respondent on or after March 19, 1998, and state the name and title of the person with whom you spoke and the substance of each and every such conversation.

**Saturday, 14 March 1998**: The last day I worked for Relief Resources, when Ms. Genie Bush, Coordinator for Eastern Massachusetts, assigned me to a Tri-City facility in West Medford. This followed my discussion with her the day before after I had called and told her my shift for Adams Street had been cancelled and she promised to assign me to facilities other than CMH's, should she receive any new requests from those places, **including CASCAP's**.

**Thursday, 19 March 1998**. I called and spoke to Ms. Genie Bush concerning my work status and she said she would talk with Mr. Doug Hammond and call me back. But she didn't.

**Sunday, 22 March 1998**: I called Mr. Castagnola and asked whether they (i.e., CMH) didn't want me back again since I wasn't asked to report to work as originally scheduled. He replied that Ms. Catherine Harper decided that I wasn't wanted back because of the letter I had written to him reporting Steve's negative attitude towards me. He also said that he

1

added his 'input' during the discussion of my letter with Ms. Harper, but the decision was hers.

I called Ms. Genie Bush and reported to her what Ray had told me. She said she'd talk with Mr. Hammond, the President, the next day about the case and let me know immediately.

*I waited for several days* BUT SHE DIDN'T CALL. *Thus I called the office again on 3rd April.*

**Friday, 27 March 1998**: I called Robin O'Farrell and requested an employment verification letter.

**Friday, 3 April 1998**: Since Mr. Hammond indicated in our telephone conversation on Friday, 13th March that he'd later call me back after talking with Mr. Castagnola but didn't do so, I called the head-office and specifically asked to speak to Mr. Hammond. He wasn't available, so the receptionist told me. Therefore I asked for Ms. Bush instead. She informed me that Ms. Harper had called 30 minutes earlier and confirmed that she didn't want me back to work *not only* at Adams Street but at *all* of The Center's (CMH's) facilities because of the letter I had written to Ray. I asked her whether she read my letter and whether in her opinion I was wrong in writing it, given Ms. Harper's negative response and dramatic action to it. She said she had read the letter and she expressed her sympathy for me, indicating that she understood my frustration. Genie again indicated that she would assign me to facilities other than CMH's whenever she received new requests.

**Wednesday, 15 April 1998**: I received a call from Ms. Kerri Lee of Relief Resources Cambridge office, asking me whether I would be available to help give an orientation to newly employed field staff. I agreed to do so and she said she would pay me $8.00 an hour. She then added that she would get back to me later to give me the details. But she did not. I therefore called a couple of times or so to follow-up, leaving her messages on her answering machine (because there was no response when I called) to confirm my availability and willingness to help.

**Sunday, 3 May 1998**: I called Ms. Bush again to inquire whether there was an assignment for me. (This was because although she pledged to assign me to different facilities, she didn't call me). She asked for my telephone number, which I gave her, and said she'd call me back the first thing Monday morning, the 4th. But again she did not.

**Friday, 29 May 1998**: Because I wasn't given any assignments since my last one on Saturday, 14th March, I called Ms. Robin O'Farrel, Director of Human Resources (Relief Resources, Inc.) and asked her to write a letter for me indicating this fact so I could inform my landlord about my employment status with the company. She agreed to do so.

**Sunday, 31 May 1998**: I called Ms. Bush again and asked why she didn't call me back as she had promised the last time I spoke to her. She indicated she had wanted to call to give me an assignment but couldn't find my schedules file, and that she suspected Mr. Robert Lindner, Regional Coordinator, might have removed it. Therefore, she said, she'd talk with him the following day to find out. She again pledged to call me back as soon as she talked with Mr. Lindner. Again she failed to call.

2

**Monday, 1 June 1998**: I've received the requested letter, dated May 29, 1998, from Ms. Robin O'Farrel. In her brief, two-sentence letter, I was stunned to read that Ms. O'Farrel referred to me as *'a former employee of Relief Resources, Inc.'* and that my *'file was placed on inactive status as of April 22, 1998.'* I therefore immediately called and asked to speak to Mr. Hammond. I was told he was at a meeting; so I asked for Mr. Bob Lindner instead. I asked him about my current work status with Relief Resources, but he in turn asked me whether I hadn't received Robin's letter addressed to me. I answered in the affirmative, adding that the letter referred to me as 'a former employee' of the company. Then he said, **'Well, so far as I'm aware, you're no longer working for the company.'** I expressed surprise and asked why, if that was the case, none of them informed me until now. He replied that he didn't know, so he asked me to speak to Mr. Hammond to find out. But then he immediately added that Mr. Doug Hammond was at a meeting and therefore I couldn't talk with him at that time, and so I should call back later.

**Friday, 5 June 1998**: I called and told the receptionist I wanted to speak to Mr. Hammond, but she put me through to Jonathan, one of the coordinators, even though she agreed to connect me with Doug and asked me to hold on. Jonathan told me Doug wasn't available, whereas the receptionist indicated he was. He asked me why I wanted to speak to Doug and I told him I had spoken to Bob on Monday and he advised me to talk with Doug. He then said he would speak to Bob first and then call me back. He did not call either that day or any other day. Having waited for Jonathan's call for a long time, I called again some hours later and was again connected with Jonathan who told me again that Doug wasn't available in the office.

**Friday, 12 June 1998**: I called Relief Resources office again and asked to speak to Doug and again the receptionist connected me with Jonathan instead. I again told Jonathan that it was Doug I wanted to speak to and not him. Jonathan then told me that Doug was busy and so I couldn't speak to him. Having gone through all this, I was forced to conclude that they didn't want me to speak to Doug, or that Doug didn't want to speak to me. For that reason, I left a message and my telephone number with Jonathan and asked him to tell Doug to call me back as soon as possible. BUT NEITHER DOUG NOR ANYONE ELSE FROM RELIEF RESOURCES DID.

3. Please identify each and every document that evidences, documents or memorializes each and every telephone conversation provided in your answer to the preceding interrogatory and attach a copy of each such document to your answers to these interrogatories.

   see attached shorthand notes on Boston University, School of Theology letterhead (highlighted portions are the relevant entries)

4. Please state each and every fact that you rely on, or that you will rely on, or that you will rely on at the time of hearing in this matter, to support your allegation that Respondent discriminated against you in violation of state and federal law.

   Complainant objects to this interrogatory. Work Product Privilege and Attorney Client Privilege in preparation and anticipation of litigation.

5. Please state whether any of the following social service agencies, locations or entities lodged complaints about you with Respondent and/or banned you from working therein:

League School; River Street; 88 Bedford (Evergreen Center); Germain Lawrence/Claremont Anderson; 808 Memorial (CASCAP); Moody Street (CMH); Clement Street; Norfolk; CMH.

Yes, River Street, Clement Street and CMH. Complainant has no actual knowledge of the other alleged bans.

6.   If your answer to the preceding interrogatory was in the affirmative as to any agency, location or entity, please state in detail the complaint lodged, your response thereto and the reasons alleged for banning you therefrom.

**River Street:** On Thursday, July 24, 1997, I did receive a call from Robert Lindner who told me that he had received a report from Liz, Manager of River Street (CMH), saying that she didn't want me back there again. According to Mr. Lindner, Liz's reasons were (1) that I had used the telephone extensively for personal calls the day before and (2) that I didn't spend time with the clients. I explained to Mr. Lindner that these charges came to me as a shock, because the only telephone call I had made in the afternoon of the previous day was to them at Relief Resources office in order to get a confirmation for my next shifts. In addition, the only other times I "used" the phone was when I received incoming calls for Liz herself and for Erica Scott, the afternoon shift manager. About the second complaint that I didn't spend time with the clients, I explained to Mr. Lindner that I felt uncomfortable going to the living/TV-room again, because he himself would recall that this same Liz had earlier reported that while in the living-room with the clients on an earlier occasion, I had asked them—two females and one male, the only ones who used this particular living-room (the other was used by the rest of the clients who smoked a lot and therefore it was almost always covered with smoke)—whether they wanted to watch news on the TV, and they were offended as a result and allegedly made a report to Liz. (The clients themselves didn't say anything to me). I also pointed out to Mr. Lindner that Liz herself, like the clients, never asked me anything before making the report to them at Relief Resources and that I felt Liz didn't like me. Mr. Lindner then explained that sometimes one may go to a program where the manager may like a Relief staff and at another may not do so, adding, "That's the way it is."

That evening I called Liz and asked her about her alleged report about me to my employer. But having first denied that she made the report about me, she admitted them after I had pointed out to her that it was Mr. Lindner who had told me. She then indicated that she had acted upon the day's report written by a staff in the daily log. Since it was only Erica Scott and I who remained on duty after Liz had left around 7:00 p.m, I logically concluded that Liz must have been referring to Erica. I found it difficult, however, to believe that Erica had done so, because if I had used the telephone as Liz claimed, Erica would have known. Erica also knew that several calls came in that night for both Liz and Erica and it was I who received them. Besides, Erica also saw me counseling one of the clients (Lloyd) who came to me in the office and I spent an extended period of time with him, as I had done repeatedly on my previous shifts.

Since I was after the truth, I decided to check up with Erica whether it was true that she had written the alleged report about me, but I couldn't get her until after mid-August, 1997. In my conversation with her, she categorically denied ever writing any such report about me. Thus, on Thursday, August 21, 1997, I called and reported back to Mr. Lindner my conversations with Liz and Erica and told him that I wanted them to investigate the matter to find out the truth. So he told me that Doug Hammond would talk with Liz to follow-up and let me know later. But I never

4

heard anything again about the matter, even though I reminded Mr. Hammond himself again about a couple of weeks later and he said he was still planning to call Liz.

In all my conversations with Mr. Lindner and Mr. Hammond on this matter, never once did either of the two mention my "poor work performance" and my "not working well with the consumers"——at River Street. Secondly, I spoke to both Liz and Erica only once each. The charge that I "repeatedly contacted Liz ... to the point where she felt badgered and did not want to have any contact with [me] at all" is therefore a complete concoction.

The statement that "[i]t was discussed with Kofi that he cannot sleep during 3-11 and awake overnight shifts at River St." is misleading. Fact is, it was I myself who inquired when first given the night shift at River Street whether it was an "awake" or "sleep" overnight shift since I hadn't worked there before.

**Clement Street:** That I was banned from Clement Street in Malden following my work there on Wednesday, October 8, 1997 is true. But even so the medication error was not entirely mine. It's due to Tri-City's own non-enforcement of the medication administration rules whereby they allow the clients themselves to go for their medications. And what happened this day was that when all the clients came to the office at the same time and went straight for their medications after I had opened the medications cabinet, by the time I was about to serve one of them, he told me he had already taken his own without having waited for me to check them beforehand. In that process, he omitted one. This was the problem. When I told the clients to wait for me so that I personally dose the medications for them one by one, they showed little respect for me. They insisted and said, "This is the way we do it here."

It should be noted that in this particular case, unlike the others, Robert Lindner called me on Thursday, October 9, 1997, and informed me that Kerri Rosen, the Assistant Manager, had told him that because of the above-mentioned medication omission, I shouldn't be sent back there. Upon hearing that I called Kerri and asked about the nature of the problem and she explained it to me, indicating that the above-referenced client didn't receive one of his medications. She also confirmed that she had decided that I not be sent back to Clement Street for that reason.

**Germain Lawrence:** The statement that I didn't want to work at Germain Lawrence School (in Arlington) on Tuesday, August 5, 1997, is only a half truth while the rest of the statements are grossly misleading and, again, calculated to hurt me. The truth is that I did work here on Monday, July 21, 1997. Upon my return home, I called and reported to Doug Hammond that I had gone to the correct hall that I was scheduled to work, but then had been sent to a different hall where the young lady in charge, Sellina, gave me little respect and embarrassed me before the students. I explained to Mr. Hammond that she made me work as if I was a laborer and what embarrassed me more than anything else was that at supper time she called me in the presence of the students (all girls, ranging in age from 12 to 18) and instructed me that after supper I should wash the cooking pots and the dishes and then mop the kitchen floor. I did the assignments, but I told Mr. Hammond that I wouldn't want to work in that particular hall again when sent another time. I'd prefer being sent to another hall and wouldn't want the hall to be changed again when I arrived there. Mr. Hammond sympathized with and assured me that he would make sure to tell the school authorities not to send me to that particular hall again. He also assured me that he would ask them to send me to the exact hall that requested our service.

Thus, when I was sent again on Tuesday, August 5, 1997, I was to work in a different hall. But as soon as I reported at the office from where I was to be sent to my place of assignment, a student who was said to have had suicidal tendencies and had run away had been caught and brought back to the office. So the young female receptionist in the office asked me to watch the girl so that she wouldn't run away again. But about fifteen minutes later, the girl stood up and headed towards the exit door. The receptionist then called and asked her to come back, but the girl didn't respond. So the receptionist asked me to follow her and I did. Once she got out of the building, the girl took off and I also ran until I caught up with her. When she stopped running and began to walk again, I started talking to her, trying to persuade her not to leave. She told me she was walking home to Somerville and didn't want to live on campus any longer and therefore I should leave her alone. When she was about to get out of the campus to enter the public road, I got hold of her right arm trying to prevent her from going out. But because she was very huge and much taller than me, she was able to get out. At this stage, she told me that she was now on public property and therefore I couldn't legally prevent her from leaving. All this time, I was shouting, calling for help, because I was afraid that she would throw herself in front of the cars passing by, aware that she was said to be suicidal.

Then a lady, by the name of Allison, ran to us and gave me a helping hand. Strangely enough, however, the first statement Allison made to me was, "You shouldn't have touched her" when she saw that I was holding her. She then took hold of the girl's two arms but she couldn't control her because the girl was stronger than her. Then, surprisingly, while holding the girl's right arm she asked me also to hold the other and we dragged her to the nearest hall. At this juncture, another lady came in to help. When Allison asked the girl to sit down on a chair but she refused, using one of her legs, she threw the girl down on the floor. Because Allison had already told me I shouldn't have touched the girl, I stood by watching the two ladies attempting to get the girl under control. Still, both were having a hard time controlling her. So Allison again asked me to help hold the girl down and I did. Then Allison tied both hands of the girl behind her while the girl was crying. As we were in this process, a gentleman also came in to help. At this stage, Allison told me I could now go back to the office, so I left.

Some thirty minutes later, after the girl had been taken care of, Allison came to the office and said she wanted to talk with me. Then she repeated her earlier statement that I shouldn't have touched the girl when she was running away, even though she had asked me twice before to help hold the girl. Next, she asked me if I had received restraint training and I said "No". At that she said I should go home and she would pay me only for the one-and-a-half hours that I had worked the shift. I told her that she confused me when she asked me not to touch the girl while she herself held her and even asked me twice to hold her. For this reason, even if I received restraint training, I wouldn't like to go back to the Germain Lawrence School again.

The next day (Wednesday, August 6, 1997), I called Relief Resources office and reported the whole incident to Doug Hammond. But more importantly, I told him that given my earlier negative experience at this same school, I wouldn't want to go back there again. Then Mr. Hammond said to me, "Allison told you you shouldn't have touched the girl and yet asked you to hold her arm?" And I said "Yes." This was the whole truth in connection with my work at Germain Lawrence School.

**CMH:** Complainant's only information regarding a ban at CMH facilities stems from the March 1, 1998 letter that he wrote to Mr. Castagnola regarding concerns for his safety and the racial harassment at Adam's Street from a CMH client. Complainant was told by Respondent that because of the letter, he was banned at CMH facilities.

6

7.  For each and every act of discrimination that you allege to have been committed against you by Respondent, please state the date on which you became aware of the act alleged.

   June 1, 1998

8.  Please itemize in detail any and all damages that you allege to have suffered as a direct and proximate result of any alleged discrimination against you by Respondent.

   Lost Wages from March 15, 1998 to present
   Emotional Distress
   Humiliation
   Outrage

9.  Please identify each and every person known to you to have information regarding the allegations made in the Complaint.

**Mr. Ray Castagnola** of The Center for Mental Health & Retardation Services (CMH), 107 Adams Street, Waltham.

**Ms. Genie Bush**, Eastern Mass Coordinator, Relief Resources, Inc., Hadley, MA.

**Mr. Doug Hammond**, President of Relief Resources, Hadley, MA.

**Ms. Kerri Lee** of Relief Resources, Cambridge, MA.

**Ms. Robin O'Farrel**, Director of Human Services, Relief Resources, Hadley, MA.

**Mr. Robert Lindner**, Regional Coordinator, Relief Resources, Hadley, MA.

**Jonathan**, Eastern Massachusetts Coordinator, Hadley, MA.

**Luke** (a Nigerian student) of Relief Resources, Hadley, MA.

**Mr. Mark Larson**, Manager, The CMH, 634 Moody Street, Waltham.

**Mr. Fran Blue** [eu], Asst. Manager, CMH, 634 Moody Street, Waltham.

**Catherine**, House Supervisor, Evergreen, 88 Bedford Street, Waltham.

**Ms. Jennifer Evans**, Program Director, CASCAP, 808 Memorial Drive, Cambridge, MA.

**Ms. Sharon Wyman** (former employee of Relief Resources), Waltham.
        Curley
**Katie**, Program Director, CASCAP, 193 Norfolk Street, Cambridge, MA.

**Ms. Erica Scott**, formerly of CMH, 163 River St., Waltham.

**Liz**, formerly House Manager, CMH, 163 River Street, Waltham.

**Steve Izzi**, CMH client at Adam's Street

7

**Elaine Farash**, clinical worker, Adam's Street

**Maria Battaglia**, staff member, Adam's Street

**Charles LaCava**, CMH client, Adam's Street

**Debra Appel**, CMH client, Adam's Street

**Louis Brilante**, CMH client, Adam's Street

**Paul Vecchi**, CMH client, Adam's Street

*Eileen* [handwritten above] **Ilene Hiltz**, CMH client, Adam's Street

10. Please identify each and every statement taken by you, or anyone on your behalf, relative to the allegations made in the Complaint.

> Complainant objects to this interrogatory. Work Product Privilege and Attorney Client Privilege in preparation and anticipation of litigation.

11. Please identify each and every document you intend to introduce at the time of hearing on the Complaint.

> No decision has been made. Complainant will supplement as this information becomes available.

12. Please identify each and every witness you intend to call to testify at the time of hearing on the Complaint.

> No decision has been made. Complainant will supplement as this information becomes available. See answer #9.

13. Identify all persons whom you intend to call as expert witnesses at the time of hearing on the Complaint and for each such expert specify:

> a. the subject matter on which he is expected to testify;
> b. the substance of the facts and opinions to which he is expected to testify, and;
> c. a summary of the grounds for each opinion to which he is expected to testify.

> No decision has been made. Complainant will supplement as this information becomes available.

14. Please identify all other experts consulted or engaged by you, your attorney, or you agents relative to the allegations contained in the Complaint.

> Complainant objects to this interrogatory. Work Product Privilege in preparation and anticipation of litigation.

Signed and sworn to this 5th day of May 1999.

_____
Kofi Asimpi, Complainant

Certificate of Service
This will certify that the foregoing document was served on counsel of record by regular mail on 5/7/99.

_____
Thomas S. Gibba

8



# Relief Resources, Inc.
STAFFING SOLUTIONS FOR HUMAN SERVICES

May 29, 1998

RE:   Kofi Asimpi
      213 Kelton Street, Apt G02
      Allston, MA 02134

To Whom It May Concern:

Kofi Asimpi is a former employee of Relief Resources, Inc. He worked his last shift on March 14, 1998 and his file was placed on inactive status as of April 22, 1998.

Sincerely,

Robin O'Farrell
Dir. Human Resources

Copy: Personnel File

104 Russell Street, P.O. Box 538 Hadley, MA 01033 • 1-800-639-5094 • Tel: 413-584-7667
FAX: 413-586-7754 • E-MAIL: relief@javanet.com • MEMBER OF BUSINESS FOR SOCIAL RESPONSIBILITY