UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------

KOFI ASIMPI )
    PLAINTIFF )
 )
   v )       CIVIL ACTION NO. 04-10117-DPW
 )
RELIEF RESOURCES, INC. )
    DEFENDANT )

------------------------------------------

## SUPPLEMENT TO PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

I.        Now comes the Plaintiff, Kofi Asimpi, who moves that the Court admit this supplement to his "MOTION FOR SUMMARY JUDGMENT" document which he forwarded to the Court by certified mail on Wednesday, 16 February 2005.

II.    **FACTS OF THE CASE**

        In his "MOTION FOR SUMMARY JUDGMENT" brief, the Plaintiff, Kofi Asimpi (hereinafter "Plaintiff"), a citizen of the United States and resident of Allston, Massachusetts, contends that the defendant Relief Resources, Inc. (hereinafter "Defendant"), have no genuine defense in response to the Plaintiff's complaint of unlawful retaliation by the Defendant who summarily terminated him after he had complained in a personal letter he had written to his supervisor about racially motivated harassment and assault on him at his work place. The Plaintiff further contends that whatever defense the Defendant claim to have had and still have is a completely blatant fabrication and that the Plaintiff lost both his case and its appeal with the Massachusetts Commission Against Discrimination (MCAD) only because his former counsel, Thomas S. Gildea, Esq., in

collaboration with the Hearing Officer, Ms. Helene Horn Figman of the MCAD, consciously and calculatively aided and abetted the Defendant in many and varied ways that made it possible for the Plaintiff to lose the case. The Plaintiff therefore moves that the court dismiss the Defendant's fabricated and distorted defense and rule in the Plaintiff's favor.

III.     THOMAS GILDEA'S ACTS OF COMMISSION AND OMISSION

The following are specific examples of Tom S. Gildea Esq.'s acts of commission and omission which he deliberately executed to ensure a ruling by the HO against his own client, the Plaintiff:

**Acts of Commission**

(1).     As stated in the Plaintiff's MOTION FOR SUMMARY JUDGMENT document, the Plaintiff's former counsel Thomas S. Gildea admitted the HO's deliberately distorted and fabricated versions of both the Defendant and the Plaintiff's testimonies, even though the Plaintiff had drawn his counsel's attention to and several times reminded him of them. By so distorting and fabricating the recorded testimonies the way she did, the HO found it easier and plausible to issue a ruling against the Plaintiff. In short, the Plaintiff's counsel connived and condoned the HO's actions without which the latter could not have ruled against the Plaintiff.

(2)     Contrary to the MCAD's requirement that parties in a dispute appear in person for conciliation, Plaintiff's counsel deliberately excluded the Plaintiff from all the negotiating discussions with the Defendant and from some of the meetings presided over by the HO. According to Commissioner Douglas T. Schwarz, Esq., "[r]esolution is difficult ... without the presence of the decision-makers." Therefore, he indicates, the Commission "requires

that parties appear in person for conciliation." (Please see Investigating Commissioner Schwarz's letter captioned, "Re: Kofi Asimpi v. Relief Resources, No 98-13-2570" and addressed to Thomas Gildea, Esq. and Alan Seewald, Esq.; marked as Exhibit I; also MCAD's "Facts About the Initial Investigative Conference" and marked as Exhibit II). In spite of this requirement, the Plaintiff's counsel refused to allow the Plaintiff to participate in the conciliation discussions the counsel had held with the Defendant and their counsel. By so excluding the Plaintiff from those discussions, counsel denied him the opportunity not only to gain first-hand knowledge of what actually transpired at but to be personally involved in those crucial discussions. That the mediation discussions to resolve the complaint failed can largely, if not totally, be attributed to the Plaintiff's counsel's exclusion of the Plaintiff from those discussions. But more importantly, by deliberately excluding the Plaintiff from participating in those discussions, counsel gave the impression, rightly or wrongly, that he did not want the Plaintiff to be privy to the negotiations.

(3)     Even though the Commissioner found probable cause to credit the Plaintiff's allegations of retaliation, while finding "lack of probable cause ... regarding the issue of disparate treatment based on race and color", for which reason this portion of the Plaintiff's complaint was dismissed, counsel raised no objection when both the HO and the Defendant's counsel right from the commencement of the proceedings at the Public Hearing (PH) shifted focus almost entirely onto the racial discrimination rather than onto the retaliation aspect of the complaint. By thus conniving and condoning this action by the HO and the Defendant's counsel, the Plaintiff's counsel made it much easier for the HO to give a negative decision against the Plaintiff, which was actually the case.[1] (Please see Exhibit I).

---

[1] Although the HO stated in her decision that "retaliation" was the issue she considered, yet the fact remains, as the recorded proceedings show, that her focus was rather almost entirely the "racial discrimination" and the Plaintiff's alleged "poor work performance" aspects of the case. In a sense, then, the Plaintiff was rather the one put on trial. That the HO stated that "retaliation" was the issue she considered represents, therefore, a blatant misrepresentation of the facts by her.

(4)     The Plaintiff's counsel deliberately suppressed evidence in the Plaintiff's favor by expunging several crucial parts of his testimony from documents he filed with the MCAD on the Plaintiff's behalf. These parts of the Plaintiff's testimony challenged and contradicted, by and large, the Defendant's fabrications and distortions. By thus suppressing evidence, the Plaintiff's counsel helped the Defendant to maintain their fabrications and distortions without which they could not have won the case against the Plaintiff in the first place. The following are examples of answers the Plaintiff gave in response to some of the Defendant's most egregious fabrications and distortions, but which answers the Plaintiff's counsel had deliberately expunged from documents (e.g., the Plaintiff's "PETITION FOR REVIEW") he filed on the Plaintiff's behalf;  counsel thus suppressed evidence in the Plaintiff's favor and made it possible for him to lose the case:

(a)     **808 Memorial Drive, Cambridge, CASCAP:** The Defendant falsely asserted that the Plaintiff had been banned from this facility because the clients were "afraid" of him. (Please see Defendant's "Work History" document on the Plaintiff, p. 3). But how could the clients have been afraid of the Plaintiff when he never saw them and vice-versa? The Plaintiff had been misdirected to the wrong floor where he saw only two women and not those he had been sent to serve. The Defendant's allegation that security personnel escorted the Plaintiff out of the building was another apparent fabrication.[2] Jeniffer Evans, the program manager of this facility,

---

[2] In their efforts to improve upon their fabrications, the Defendant have now amended their "Date of Incident, Reason and Outcome" section of their "Work History" document (p. 3) to read: "Mr. Asimpi assigned to the wrong floor and had to be escorted out of the building. Given the mental illness of the consumers who witnessed Mr. Asimpi being escorted out, Ms. English thought it best if he not return". (Please see p. 2 of the Defendant's "RESPONDENT'S ANSWERS TO INTERROGATORIES FROM THE COMPLAINANT" document, dated 31st day of January, 2000 and signed by both Mr. Douglas Hammond and Mr. Alan Seewald, the Defendant's president and counsel, respectively; and marked as Exhibit V). The most significant problem of this fabrication for the Defendant is that the supposed lady, Eileen English, who is mentioned here as the "Person Making [the] Complaint" did not exist. There is, however, Elaine Farash, Clinical Director, who works for The Center for Mental Health. Besides, the 808 Memorial Drive facility, where the lady supposedly worked, is a CASCAP's program located in Cambridge. Both the CMH and CASCAP are two distinct human services organizations under two distinct administrations. Therefore "Eileen English" could not have made a report about the Plaintiff, let alone ban him from this CASCAP facility. At any rate, the Plaintiff was unaware of this lady's alleged report until he read it in the Defendant's "RESPONDENT'S ANSWERS TO INTERROGATORIES FROM THE COMPLAINANT"

would have testified to the contrary, but not only did the Plaintiff's counsel fail to invite her to testify at the Public Hearing (PH), he also expunged this very crucial information when filing the Plaintiff's appeal document with the MCAD's Full Commission for review. (Please see "PETITION FOR REVIEW" document, marked as Exhibit III, which was largely the HO's decision against the Plaintiff but which, curiously, counsel actually submitted to the MCAD's Full Commission; also another "PETITION FOR REVIEW" document, marked as Exhibit IV, about which counsel lied to the Plaintiff, falsely assuring him that he had submitted the true and correct version of this to the Full Commission for review. (Please see a copy of e-mail correspondence the Plaintiff and his counsel had exchanged between February 15 and February 18, 2003, marked as Exhibit VI).[3]

(b).    **634 Moody Street, Waltham, CMH:** The Defendant fabricated a story stating that the Plaintiff had been banned from overnight shifts here. (Please see the "Work History" document, p. 4). In fact, the Plaintiff repeatedly told his counsel that he was the sole staff on duty throughout the night in question; no one else worked with him that night and no one reported him about his work that night. In fact, the Defendant mentioned no name and gave no reason why he was allegedly banned. However, after the "Work History" had been prepared and submitted as part of their Position Statement to the Plaintiff and the MCAD, the Defendant now fabricated a reason, namely, that "Mr. Asimpi was found sleeping on an awake overnight shift." The Defendant's "Response to the Complaint" section, also another fabrication, is

---

brief. **This is a glaring evidence of the Defendant's numerous fabrications about the Plaintiff's work performance and character.**

[3] It should be noted in particular that in his e-mail message of February 15, 2003 to the Plaintiff, counsel Tom Gildea's reference to "the appeal brief" that he asks Plaintiff to review and send back to him is to Exhibit IV. It is the same document he promises in his February 18, 2003 message to "make changes to ... (using most of your input)". He further promises to mail a copy of the final version of this document to the Plaintiff. The fact, however, is that counsel did not make use of this document at all; he instead used for the "PETITION FOR REVIEW" document the Hearing Officer's negative decision against the Plaintiff (already submitted to the court but is marked here as Exhibit III and entitled "PETITION FOR REVIEW"), making only innocuous changes here and there). He thus ignored the Plaintiff's "comments/corrections/additions" that he himself had asked for.

stated as: "Bob Lindner spoke with Mr. Asimpi and told him he could not sleep on shift and could not return to Moody Street." (Please see the above-referenced "RESPONDENT'S ANSWERS TO INTERROGATORIES" document).

The Program Manager and his assistant there were ready to testify to the contrary. Also the Daily Incident Log-book would have shown otherwise, i.e., a good work performance report written about the Plaintiff. The Plaintiff earnestly urged his counsel to subpoena the daily log-book, but not only did he ignore him, he also intentionally suppressed this information.[4] By so suppressing the Plaintiff's testimony, his counsel helped the Defendant's case, which he indeed won.

(c)    **193 Norfolk Street, CASCAP, Cambridge:** The Plaintiff maintained, and still maintains, that the Defendant's allegation that the former had been banned from *all* CASCAP facilities and not only from this small Norfolk Street one, which was under Katie Curley's management in Cambridge, was a total lie. (Please see "Work History", p. 5). The Defendant did not mention the name of the one who issued the ban, as they did in the case of The Center for Mental Health (CMH) where the Plaintiff had indeed been banned due to a letter he had written to his supervisor in which he complained about verbal and physical harassment at his workplace. Though they mentioned no name of the one who had banned the Plaintiff, the Defendant created the false impression that it was Curley. The Plaintiff pointed out that with the exception of this small facility which she managed, Curley had absolutely no authority and power to ban the Plaintiff or anyone else from *all* CASCAP facilities, as the Defendant alleged. The only person who could have banned any staff from *all* CASCAP facilities was the Executive Director of CASCAP, or someone who was likewise in or near a top position in the company. But, as he emphatically told his counsel and testified, nothing like that ever

---

[4] Indeed, both the Plaintiff's counsel Gildea and the HO behaved as if they were scared of the truth being revealed, so in order not to expose it, they both intentionally failed to appropriately and adequately cross-examine the Defendant's President on this and others, leaving so many questions unanswered.

happened. The Plaintiff pointed out that *if it was true that he had been banned, no one ever told him about it and that he read about it only in the Defendant's hurriedly composed "Work History" on him, not the original, as Mr. Hammond admitted under oath at the MCAD PH?* The Plaintiff also indicated that the Defendant had given no evidence in support of this alleged ban from all CASCAP programs. The Defendant also lied by stating that the Plaintiff was rejected, while his colleague (i.e., another field staff) was retained to work when both of them were inadvertently sent to the same shift at this facility under Katie Curley on the day in question. In fact, Bob Lindner, one of the Defendant's regional coordinators, admitted having made a scheduling error and so sent both staff to the same shift. In other words, the Plaintiff's colleague was also *not* retained to work there that day as the HO alleged; both were sent away. Mr. Lindner, even apologized to the Plaintiff for his scheduling error and even promised they would pay the Plaintiff at least his transport fare. The Plaintiff also reminded his counsel that the alleged "dog incident" the Defendant attributed to the Plaintiff was also totally false, adding that there was absolutely no dog incident. He insisted that the so-called "dog incident" was a distortion the Defendant incorporated in their "Work History" document only to portray the Plaintiff negatively.

(d)     Indeed, the Plaintiff testified that Lindner himself had told him that the Defendant had received a letter from Curly who indicated that another Field Staff had indicated he was afraid of dogs, so Curly must have confused this staff with the Plaintiff.[5] The Plaintiff reminded his counsel of all these points—points that would

---

[5] It should be noted that the Defendant did not mention in either their "Work History" or in the "RESPONDENT'S ANSWERS TO INTERROGATORIES" documents that Lindner had told the Plaintiff that Katie Curly must have confused the Plaintiff with another Field Staff who Curly said was afraid of dogs and therefore he should not be allowed back to work at this facility.

It should also be noted that the Defendant have made elaborate efforts in their "RESPONDENT'S ANSWERS TO INTERROGATORIES" to "improve upon" what they have already stated in their "Work History" document by fabricating more stories. Please compare the entries for "Date of Incident, Reason and Outcome" column of the "Work History" document (p. 5) with the "Reason for Complaint" section of the "RESPONDENT'S

have exposed and weakened the Defendant's fabrications and distortions—and urged him to touch on all when cross-examining the Defendant's representative. Apparently, in his attempt to protect the Defendant, counsel deliberately failed to touch on these aspects of the Plaintiff's testimony in his cross-examination; indeed, counsel had completely expunged them from the Plaintiff's "PETITION FOR REVIEW" document that he filed on the Plaintiff's behalf. By thus deliberately suppressing these aspects of the Plaintiff's testimony, his counsel increased the Defendant's chances of winning the case, which indeed was the case.

(e)    **163-165 River Street, Waltham, CMH:** The Plaintiff reminded his counsel that the Defendant totally lied when they stated that the Plaintiff had been banned from this facility because: (i) of his alleged "poor work performance"; (ii) he allegedly used the work telephone extensively and (iii) he allegedly "was agitated about this 'claim' & [that he] repeatedly contacted Liz [Algamal, Program Manager,] to the point where she felt badgered and did not want to have any contact with Kofi at all." (Please see "Work History" document, p. 2). Owing to the Defendant's fabrications here, the Plaintiff urged his counsel to subpoena both the program manager for cross-examination and the River Street telephone records and the Daily Log-book, all of which would prove false the Defendant's charges. But as in almost every other case, not only did counsel fail to heed the Plaintiff's urging, he had completely expunged this aspect of the Plaintiff's testimony from the "PETITION FOR REVIEW" document he filed with the MCAD's Full Commission and thus suppressed evidence in the Plaintiff's favor and so paved the way for the Defendant to win the case.[6]

---

ANSWERS TO INTERROGATORIES" document section, p. 4 and the Defendant's desperate attempts to "improve upon" their fabrications.

[6] It should be observed that unlike in their "Work History" document where more information is given under the "Date of Incident, Reason and Outcome" column with regard to their report on River Street (p. 2), in their "improved" version of their "RESPONDENT'S ANSWERS TO INTERROGATORIES" document, the "Reason for Complaint" is simply stated as: "Poor work performance and not working well with the consumers" — whatever these mean! (p. 2).

(5)    Counsel deliberately condoned the Defendant's travesty of justice when he raised no objection but allowed the Defendant to introduce fresh fabrications and distortions in a new, unsigned document entitled, "RESPONDENT'S MEMORANDUM", dated June 9, 2000. (Please see the Plaintiff's "MOTION FOR SUMMARY JUDGMENT" document, already submitted to the court). The Defendant, in fact, introduced this and other fabricated and distorted points only at the last and final Public Hearing on March 26, 2002. Most of the issues the Defendant raised in this document were not in their Position Statement. But because of the Plaintiff's counsel's complicity in a conspiracy against the Plaintiff, he did not see anything legally amiss when the Plaintiff raised with him this issue of the Defendant introducing such a completely new document at this late stage of the case. Indeed, counsel even had the guts to tell the Plaintiff that the whole case would have ended in the Defendant's favor had their counsel initially introduced this point, making the Plaintiff to feel lucky that the Defendant had made a mistake by introducing this document at this late stage of the hearing.

**Acts of Omission**

(1)    The Plaintiff's counsel deliberately failed to invite or subpoena the Plaintiff's potential witnesses to testify at the PH about what they knew about the Plaintiff and his work performance, action that would have exposed the Defendant's numerous lies and distortions. In his determination to suppress the truth, counsel invited not even a single witness on the list of the numerous names the Plaintiff had given him. Counsel only played weird game with the Plaintiff, consistently but disingenuously assuring him that he was going to invite or subpoena the witnesses, even though it was apparent that he had no intention whatsoever to do so. Even as late as two hours prior to the commencement of the PH proceedings in the morning of December 10, 2001, counsel still wanted the Plaintiff to believe that it was still possible to subpoena some of the witnesses to report at the MCAD

premises that day to testify. He told the Plaintiff that he called that morning and left a message for one of the Plaintiff's most important potential witnesses who had said she would testify if invited. This, despite the fact that the MCAD required that a list of the witnesses' names must have been submitted to the Commission well ahead of the commencement of the PH proceedings.

(2)    Although counsel himself had asked for and secured a letter from the Plaintiff's Primary Care Physician (PCP), Dr. Irene Gavras, which letter testified to the Plaintiff's health conditions, counsel deliberately failed to utilize the letter at the PH; neither did he invite the doctor to personally testify to what impact the Defendant's sudden retaliation against the Plaintiff may or may not have had on the latter. (The Defendant's counsel argued at the PH on behalf of his client that the Plaintiff's termination had caused him no emotional distress because he had not seen a psychiatrist or go to the hospital immediately following his "termination". The PCP and/or her letter would have proved the Defendant's counsel's argument otherwise).

(3)    The Plaintiff's counsel intentionally ignored all the reports of the Plaintiff's good work performance for which the Defendant themselves had often praised him. In fact, the Plaintiff reminded his counsel that it was precisely because of his good work performance that Ms. Keri Lee of the Defendant's Cambridge office had invited him to help give orientation and training to newly employed field staff in the first place. As he testified, Miss Genie Bush, Eastern Regional Coordinator, who was based at the Defendant's headquarters, remarked in the presence of Ms. Lee about how everyone at the head-office in Hadley, i.e., the coordinators, including Mr. Hammond and Mr. Lindner, had often favorably talked about the Plaintiff, saying, e.g., that he was a good and reliable worker. As Ms. Bush joyously and contentedly expressed it when both she and the Plaintiff met in

person for the first time at the Defendant's Cambridge office: "Oh, you're *the* Kofi! Everybody in the office loves you. They're always saying good things about you."[7]

(4)     Counsel deliberately failed to raise objection to and challenge with available evidence the Defendant's false claim that the Plaintiff was a "poor worker". The Plaintiff asked his counsel about the relevance of this point, when the Defendant all along denied ever terminating the Plaintiff and instead adamantly insisted that it was solely and exclusively due to his failure to contact them within 30 days that led to their inactivation of his schedules file. But as in other cases, counsel was deaf to all the Plaintiff's entreaties and took no action to let the truth out.

(5)     Counsel deliberately failed to draw attention at the PH to the fact that the Defendant deliberately excluded the Plaintiff's "Work History" document from the contents of his personnel file sent to him at his request. The Defendant's statement that "a complete copy of the contents of your personnel file" was being forwarded to the Plaintiff was, therefore, totally false. (Please see Relief Resources' letter of July 2, 1998, addressed to Kofi Asimpi and signed by Robin O'Farrell, Director of Human Resources; marked as Exhibit VII).

(6)     Counsel deliberately failed to pursue the issue of the Plaintiff's salary increment to expose the Defendant's fabrication that the Plaintiff's "work performance" was "poor". The Plaintiff asked his counsel to pose in his cross-examination to Mr. Hammond some specific questions regarding the Plaintiff's work and character. In other words, if the Plaintiff's work and character were as bad as they suddenly decided to portray them, why did the

---

[7]It should be noted that this and everything positive ever said about the Plaintiff are conspicuously "absent" from both the Defendant's "Work History" and from the "RESPONDENT'S ANSWERS TO INTERROGATORIES" documents. In other words, that nothing positive is said about the Plaintiff regarding his employment with the Defendant gives the false impression that he never did anything good and he was never commended for anything throughout his whole work period with the Defendant; yet the Defendant's president, Mr. Doug Hammond, testified under oath during the Public Hearing that both he and his staff, on the one hand, and the Plaintiff, on the other, had maintained a good working relationship. But how could a cordial relationship, like the one Mr. Hammond described, have existed between an employer and an employee if the latter's character was so bad and he was so incompetent in his work performance?

Defendant: (i) see fit to give him a pay raise at least twice?[8] (ii) continue to keep him and even increase his work hours well over and above the regular 40 hrs.per week schedule, something the Plaintiff himself had asked for?[9] (iii) ask such a "bad" employee to help give orientation and to teach newly recruited field staff? (iv) Mr. Doug Hammond, the President of the Defendant, specifically asked the Plaintiff to contact his local (Presbyterian) church to request for its fellowship hall for a proposed conference of the entire international staff of the Defendant? (Although this conference did not materialize, Mr. Hammond did make the request of the Plaintiff).

(7)     Plaintiff's counsel deliberately failed to raise objection when the Defendant's counsel at the PH unfairly lifted from the Plaintiff's three-page personal letter of 1 March 1998, addressed to his former supervisor of Adam's Street, only a sentence or two that he considered negative, referring to those sentences as "the tone of the letter." So also the HO. (Please see the letter, already submitted to the court). By so selectively reading the Plaintiff's letter (i.e., by focusing on only negative sounding statements in the letter about the abusive client while ignoring the positive), the Defendant's counsel completely took them out of context and thus distorted their very spirit, especially when he gave the false impression that the whole letter was negative. If the Defendant's counsel really wanted the PH to listen to the *true* tone of the letter, he would have read it in its entirety. Yet the Plaintiff's counsel refused to raise objection to this. In other words, he approved of this travesty of justice.

(8)     Plaintiff's counsel deliberately failed not only to call the Plaintiff's potential witnesses but also to serve the MCAD with a list of the witnesses' names, their day time telephone

---

[8]In response to this question, the Defendant's president alleged at the PH that the pay increases were cost of living allowances (COLAs) given to every staff. In their circular informing staff about the pay increases effective December 13, 1997, however, there's no mention of COLA. (Please see, for example, the attached circular entitled, "Relief Resources, Inc.", para 1, that reads, "CONGRATULATIONS, Eastern Massachusetts and Central Massachusetts Field Staff, we have raised your pay!!!!!!", marked as Exhibit VIII).

4[8]Please see the Defendant's "Work History", pp. 3, 4, 5 (already submitted to the court)..

numbers and a summary of what each witness knew about the Plaintiff's case. Of the list of the numerous names of potential witnesses the Plaintiff had furnished him, counsel listed only three, viz., Maria Battaglia, Sharon Wyman and Fran Bleu, none of whom he invited, anyway. (Please see the "JOINT CERTIFICATION MEMORANDUM" document signed by Thomsa S. Gildea and Alan Seewald, and marked as Exhibit IX).

(9)     It should be noted that the Plaintiff's counsel filed this "Joint Certification Memorandum" document on the Plaintiff's behalf neither with his knowledge nor his approval. Thus, the statement that "Complainant is willing to settle the matter for $7500.00" (item 8, p. 2) is totally false.[10] The claim amount the Plaintiff and his counsel had agreed on and for which

---

[10]Having carefully considered all the pertinent aspects of the case, counsel Gildea advised the Plaintiff to settle for nearly $32,000.00 (thirty-two thousand dollars). This amount, according to him, comprised, inter alia, the total salary the Plaintiff would have earned up to the date he filed the case with the MCAD had the Defendant not wrongfully terminated him, plus emotional distress he suffered as a result. And the Plaintiff concurred.

As indicated, the Plaintiff's counsel however deliberately mishandled the case and completely prevented him from participating in the negotiating meetings with the Defendant. The result was that both parties did not settle the case. Indeed, as stated, before the Plaintiff was aware, counsel had already filed in conjunction with the Defendant's counselt a claim amount of $7,500.00 without the Plaintiff's prior knowledge and consent. Thus, the so-called failed attempt to settle the case was entirely the creation of Mr. Gildea's. Indeed, from the time when the settlement issue arose, the Plaintiff began to gain the impression that for some reason counsel was no longer conducting the case in the Plaintiff's interest but in the Defendant's and, therefore, indirectly against the Plaintiff. The following explains why.

First, attorney Gildea suddenly stopped talking about how easily we were going to win the case, something he had been confident about initially; instead he would every now and then express his "doubt" about a positive outcome of the case by saying, "If we lose ...", without explaining the reason why, once we reached the conciliation stage with money involved. This tactic was ostensibly to prepare the Plaintiff psychologically for the "fact" that we were surely going to lose. Second, on several occasions Mr. Gildea would remark that the Defendant's counsel did not like him. When the Plaintiff asked him why, he would say he did not know. Ironically, however, from the Plaintiff's personal observation, the two counsel were becoming increasingly intimate. So, the Plaintiff sensed that he had concocted a lie solely designed to throw dust into his eyes. Third, counsel Gildea no longer had any serious discussions with the Plaintiff in connection with the case. Counsel would only make his own decisions and if it pleased him inform the Plaintiff about them and would expect him to merely endorse them. For instance, following a discussion he said he had held with the Defendant's counsel, Mr. Gildea called and informed the Plaintiff that he had decided to reduce the proposed claim of approximately $32,000.00 to only less than half of that amount, i.e., to $15,000.00. He then again later reduced this figure to $12,000.00, then still further to $9,500.00. Worst of all, he again told the Plaintiff that he actually had filed for $7,500.00, but the Plaintiff later discovered that this too was a lie, for counsel admitted that the figure he had in mind was actually $6,200.00. This followed the Plaintiff's request for a breakdown of this amount. It should be pointed out that counsel Gildea did all this without seeking the Plaintiff's view first, let alone his approval, and without giving him any tangible and valid explanation for his weird actions.

As indicated, the Plaintiff later realized that both his counsel Gildea and that of the Defendant's had indeed already filed a "JOINT CERTIFICATION MEMORANDUM" with the MCAD in which Gildea actually put down $7,500.00 as our proposed claim, falsely claiming that the Plaintiff had consented to it. As he put it,

counsel told his client he had actually filed was approx. $32,000.00—an amount counsel himself had proposed to the Plaintiff and he concurred. It was later on that the Plaintiff discovered that his counsel had lied to him about the amount. Upon that discovery, the Plaintiff expressed his disappointment with and displeasure at the way and manner in which his counsel had handled the issue; counsel therefore promised the Plaintiff he would go back to the MCAD offices to amend the figure to the original figure both of them had initially agreed upon. The counsel however failed to do so.

(10)     Plaintiff's counsel deliberately failed to react one way or the other when the Defendant falsely accused the Plaintiff of—and the HO upheld and cited it as a reason for her decision against the Plaintiff—having written a letter of complaint directly to his manager instead of to the Defendant. Even though the Plaintiff explained to counsel that his letter was a personal one meant only to prompt his manager to take action—as he had done in a previous case involving a female client and him—about his complaints of verbal and

---

"Complainant is willing to settle the matter for $7500.00. Respondent has offered to settle the matter for $2500.00." He then told the Plaintiff that the Defendant said the maximum amount they were willing to pay was $6,000.00. This followed the Plaintiff's rejection earlier of $4,000.00 which he first said the Defendant had offered.

That the Plaintiff's counsel had filed the above-referenced memo in which he lied that the former was willing to settle for $7,500.00 before he told him about it actually shocked and disturbed him a great deal. This was partly because he still offered the Plaintiff no tangible reason for his unusual decision and partly because he was no longer involving him in the decision-making process; it was he alone who held discussions with the Defendant and he hardly asked for the Plaintiff's input. He would not allow the Plaintiff to be involved in those negotiations. In fact, from this time onwards the Plaintiff began to feel as though his counsel was treating him like a stupid and ignorant illiterate man. Yet the Plaintiff held his peace throughout.

As the Plaintiff thought about his counsel's whole conduct of the case and his attitude, in particular about the information he gave the Plaintiff concerning the $7,500.00 that he falsely claimed the Plaintiff was willing to accept and his failure to seek his input first, the Plaintiff agonized over them a lot. The Plaintiff thus telephoned him and asked why he so drastically reduced our proposed amount. But his only response was that from his discussions with the Defendant's counsel, he gained the understanding that they could pay only $2,500.00, which, however, they raised to $4,000.00 and finally to $6,000.00. Mr. Gildea finally explained that this was their maximum and final offer. He also explained that any claim more than this $6,000.00 would bankrupt the Defendant. Therefore he urged the Plaintiff to accept it. Yet, strangely enough and, as indicated, he had already put down $7,500.00 as our claim in the above-referenced joint memo.

When Mr. Gildea gave the Plaintiff the breakdown of the $7,500.00, which actually turned out to be only $6,200.00, the Plaintiff told him we should revert to originally proposed claim of approx. $32,000.00, but he insisted that it was too much. He falsely explained that this figure was only an arbitrary figure he had initially suggested. He apparently forgot that he himself had given the Plaintiff a breakdown of this figure and that it was not arbitrary. It was only at this stage that he indicated he had not included in the $6,200.00 punitive damages against the Defendant.

physical abuse by one of the male clients had been visiting upon him, he said nothing. But more important, he explained to counsel that the time he should have made a written complaint to the Defendant had not yet come and that he had accurately followed the laid-down official policy by first documenting his complaints in the Daily Incident Log-book and finally followed up by addressing the personal letter to his manager. Yet the Defendant and the HO falsely contended that the Plaintiff should have directly reported the incident to the Defendant rather than to his manager, even when he insisted that he unofficially (i.e., verbally) reported the problem to Mr. Bob Lindner, but that Lindner showed no interest in it; he merely ignored him. By suggesting that the Plaintiff should have reported directly to his employer, the Defendant and the HO were asking him, in effect, to violate the laid down policy and procedures. By thus ignoring his Plaintiff and not acting upon this crucial information, counsel Gildea allowed this false accusation to be successfully used by the HO in her decision against the Plaintiff.

(11)   When it came time for him to cross-examine Mr. Hammond, the Plaintiff's counsel started all right but after having asked only a couple of questions or so, he stopped abruptly and said, "I have nothing more to say". Expecting him to cross-examine the Defendant's president to discover the truth after the latter's counsel had finished leading him in evidence, the Plaintiff reminded his counsel through notes he had exchanged with him about the lies Mr. Hammond continued to tell even under oath, but the Plaintiff's counsel refused to make use of the opportunity. Apparently, counsel did not want the truth revealed, lest the Plaintiff would win the case. (Please see a copy of some of the notes the Plaintiff and his counsel exchanged, marked as Exhibit X).

(12)   Likewise, contrary to the HO's permission in response to the Plaintiff's request to make some crucial comments as a follow-up to his testimony, counsel refused to lead the Plaintiff back in evidence immediately after the Defendant's counsel had cross-examined the Plaintiff. By thus failing to appropriately cross-examine Mr. Hammond, counsel indeed

ensured that the whole truth never came out. By this act of omission, counsel badly hurt the Plaintiff's case. It is not surprising, therefore, that with the HO's fabrications and distortions, the decision went against the Plaintiff—a result his counsel apparently had intended to achieve.

(13)    Later when the Plaintiff asked for a review of the case, counsel immediately retorted, "We don't have a chance [to win]". He agreed, however, to file the petition. But again he deliberately expunged those important parts that would have strengthened the Plaintiff's case, for the truth would then have been revealed. And even when the Plaintiff this time protested their expunction and entreated counsel to include them, he merely ignored him and sent the petition without incorporating those crucial points, even though counsel lied to the Plaintiff he had done so.[11]

(14)    As indicated, although they often praised the Plaintiff and said positive things about him from time to time, nothing in the Defendant's "Work History" document indicates this. This again demonstrates that the Defendant did abandon their original "Work History" document and hurriedly composed a fresh one altogether, with all the fabrications and distortions meant to cast the Plaintiff's good image in a negative light. Although the Plaintiff's counsel was well aware of all this, his treatment of this was very casual and of no consequence, because he clearly wanted the Plaintiff to lose the case.

(15)    Is it not abnormal and a travesty of justice that the HO, who had apparently been so much biased against the Plaintiff and had indeed unjustly ruled against him, was again curiously made a member of the appeal panel who also ruled against him, while the Plaintiff was not similarly given the opportunity to present his case to this panel? In fact, the appeal panel

---

[11]Having been curious about counsel's mishandling of the case and especially the lies he had told the Plaintiff, the latter requested from the MCAD a copy of the true copy that his counsel had filed with the Commission. And lo, and behold! The Plaintiff's suspicions was accurate: counsel had indeed submitted quite a different document, i.e., the HO's negative decision against the Plaintiff.

(Full Commission) merely adopted the HO's negative decision. Again, the Plaintiff's counsel took no action with regard to this apparent miscarriage of justice, because he did not seem to have found anything morally, ethically and legally wrong with it. Counsel's complete silence about this apparently connotes his total approbation.

## IV.    THE HEARING OFFICER'S DELIBERATE DISTORTIONS AND FABRICATIONS AND THE AQUESCENCE OF THE PLAINTIFF'S COUNSEL

Below are examples of the Hearing Officer's fabrications and distortions of the Plaintiff and Defendant's testimonies, without which fabrications and distortions she could not have ruled against the Plaintiff:

(1)    "Complainant testified that during his year of employment with the Respondent, there were one or two sites where he chose not to be reassigned. These included the Evergreen Center [at 88 Bedford Street, Waltham], which he believed was unappreciative of his work and where he felt he did more work than other staff" (HO's Decision, p. 5; also "Work History", p. 2). The Plaintiff, in fact, did not testify that he believed the Evergreen Center was unappreciative of his work; it was rather the Defendant who concocted this. Nor did the Plaintiff say that he felt he did more work than other staff; it is the HO's own fabrication. What the Plaintiff testified was that a false complaint had been made about him to the supervisor. When the staff member who allegedly made the report was asked, he denied it, saying the supervisor had misunderstood him, that he did not talk about the Plaintiff specifically but about the training offered by the Defendant in general compared with that by the Evergreen Center. At this juncture, the supervisor apologized to the Plaintiff, who made it known to Mr. Hammond that if such a false report could be made about him just like that, then he would not want to work there again. This, in a nutshell, was what the Plaintiff told his counsel, but he did nothing to address it,

so the HO successfully used her fabricated and distorted version against the Plaintiff.

(2)    "Complainant testified that he had a difficult experience there restraining a suicidal runaway since he had not been trained in the use of physical restraints." (HO's Decision, p. 5).This is another distortion and fabrication by the HO as she discusses the report of the Plaintiff's experience at the Germain Lawrence School in Arlington. What the Plaintiff testified, in fact, was that the courses a staff member should or should not take were determined by the Defendant and not by staff themselves. The Defendant also paid the required fees for the courses. In other words, the Defendant never asked the Plaintiff to take a restraint training course, for it was not among their required courses. Any suggestion that the Plaintiff failed to receive restraint training is totally false. Indeed, by putting it the way she did, the HO gave the false impression that the Plaintiff was at fault because he had failed to take this course. The Plaintiff did not say anything like that in his testimony. Yet the Plaintiff's counsel took no action on this, allowing the HO to get away with this twisting of fact.

(3)    In reporting the Plaintiff's testimony about how the client at Adams Street one day harassed him while the former was on duty, the HO writes: "The resident also commented on Complainant's use of the T.V. asserting that the T.V. was for clients and not for staff. Later that evening, the resident questioned Complainant's use of the phone and disconnected the phone from the outlet" (HO's Decision, p. 6). By reporting this the way she has, the HO has created the false impression that staff could not sit in the living-room and watch the TV and that the Plaintiff was guilty of that. It was quite the opposite; in fact, staff were encouraged to be with the clients, "to sit where they sat", and this was usually in the living-room where the TV was placed. Similarly, while staff could and did use the office telephone, the clients were prohibited from doing so. The clients had or were, where necessary,

supposed to have their own separate telephones apart from the official ones. Thus the Plaintiff violated no policy and procedures in this connection, unlike the opposite impression the HO has created and based her ruling on that. Again, although the Plaintiff's counsel was aware of these facts, he took no action to correctly them addressed.

(4)    "Complainant concluded that the resident's behavior towards him was racially motivated because there were no other Blacks in the shift." The Plaintiff gave no such testimony. The Plaintiff did say that he believed the client's behavior towards him was racially motivated. But that was not the issue here at all. The issue was retaliation and retaliation only, as the MCAD had already ruled. The Plaintiff's counsel was well conversant with this but, again, he did nothing about it.

(5)    About the Plaintiff's background information, the HO writes: "The complainant, Kofi Asimpi (hereinafter "Complainant") is an African male who was born and raised in Ghana. He studied theology and business at the University of Ghana and served as Ghana's director of the national campaign for Christ. Complainant holds Doctor of Ministry and Doctor of Philosophy degrees from Southern Methodist University and Boston University." (Decision, p. 1). In fact, what the Plaintiff testified was that he studied theology at Trinity Theological Seminary and served in Ghana as National Representative of Campus Crusade for Christ, International, and also as Minister of Religion under the auspices of the Evangelical Presbyterian Church, Ghana. The Plaintiff added that he holds Doctor of Ministry and Doctor of Philosophy degrees from Southern Methodist University, Dallas, Texas, and Boston University, respectively. The Plaintiff also reminded his counsel that he is an ordained Presbyterian minister.

(6)    This was the full information the Plaintiff gave his counsel about his advanced academic education. Counsel however deliberately failed to make the necessary corrections in his "PETITION FOR REVIEW" document and instead submitted the HO's corrupt version, even though he assured the Plaintiff that he had made the necessary corrections before submitting the document to the Full Commission for review. But this was the counsel's total lie for, as indicated, counsel merely reproduced the HO's edition and submitted it to the Full Commission with only some slight changes here and there. Clearly, that counsel could do this to his own client means that he had an unenlightened agenda.

(7)    These represent only a few of the examples the HO's deliberately concocted and distorted versions of our testimonies. All the testimonies, written and oral, were available to her. She therefore had no excuse for her distortions and fabrications, unless she was determined to rule against the Plaintiff, as she in fact did. And this was possible only because of the Plaintiff's active complicity in a gross miscarriage of justice

V.    CONCLUSION

In the light of all the above, that the Plaintiff lost the above-referenced retaliation case was entirely due to the way and manner in which the Plaintiff's counsel calculatively mishandled it. Counsel deliberately engaged in a number of acts of commission and omission throughout the hearing, designed to ensure the Defendant's victory and thus the Plaintiff's defeat. The Plaintiff's counsel withheld many pieces of crucial evidence from the MCAD and its Hearing Officer, Helene Horn Figman, who apparently upheld or merely ignored many of counsel's anomalies. Counsel made decisions for the Plaintiff without his prior knowledge and consent, all of which he, no doubt, calculated to be detrimental to the Plaintiff's case.

Secondly, although it was the said HO who had first ruled that the Defendant "did not engage in unlawful retaliation [against the Plaintiff] in violation of M.G.L. c. 151B, s.4 (4)", yet she again formed a part of the Full Commission who merely adopted her original decision and who also ruled against the Plaintiff by dismissing his case. While the HO was the one who presented her decision to the Full Commission, the Plaintiff was not similarly given an opportunity also to appear before it to present his version of the case. The Plaintiff's counsel apparently saw nothing amiss with all that and so took no action to have the problem corrected.

Thirdly, it is interesting to note that while the HO apparently informed the Full Commission that she had ruled against the Plaintiff regarding his complaint of "unlawful retaliation" against the Defendant, yet during the hearings over which she presided, the issue of retaliation was hardly mentioned, let alone discussed, as both the HO and the Plaintiff's counsel allowed focus to be shifted almost entirely to the Plaintiff's "poor work performance" and the "racial discrimination" aspects of the case that had been dismissed. This gave the wrong impression that the Defendant had argued that they had terminated the Plaintiff because of his alleged "poor work performance". In fact, the Defendant even vehemently denied throughout the hearings that they had terminated the Plaintiff at all. To the contrary, they falsely argued, it was the Plaintiff himself who did not call their office to schedule work assignments. Whatever other additional reasons they gave for the Plaintiff's termination they strangely introduced only after several months into the case proceedings. And this received both the Plaintiff's counsel and the HO's blessing.

Finally, not only did the HO rule against the Plaintiff; she fabricated and deliberately distorted both the Plaintiff's testimony and that of the Defendant's in favor of the latter. Apparently, only this way did she find it legally plausible to give a decision against the

Plaintiff. And she was able to do this only due to the complete acquiescence, connivance and condonation of the Plaintiff's attorney.

In the light of the above reasons, the Defendant have no genuine defense to present for the Plaintiff's complaint of unlawful termination against them in the above-referenced case. In other words, whatever defense the Defendant claim to have are mostly fabrications and distortion of facts, and assisting them to accomplish this were the Plaintiff's own counsel and the MCAD's HO, without both whom the Defendant's case would have long collapsed. Therefore the Plaintiff moves that the court issue a judgment in the Plaintiff's favor.

Respectfully submitted,

Kofi Asimpi
213 Kelton Street, # G-02
Allston, MA 02134-4384
Tel.: 617-566-2524

Enclosures

1.  Investigating Commissioner Schwarz's letter captioned, "Re: Kofi Asimpi v. Relief Resources, No 98-13-2570" and addressed to Thomas Gildea, Esq. and Alan Seewald, Esq.; marked as Exhibit I.

2.  MCAD's "Facts About the Initial Investigative Conference" and marked as Exhibit II).

3.  "PETITION FOR REVIEW", marked as Exhibit III, which was largely the HO's Decision against the Plaintiff but which, curiously, counsel actually submitted to the MCAD's Full Commission.

4.  "PETITION FOR REVIEW", marked as Exhibit IV.

5.  Defendant's "RESPONDENT'S ANSWERS TO INTERROGATORIES FROM THE COMPLAINANT" document, dated 31st day of January, 2000 and signed by both Mr. Douglas Hammond and Mr. Alan Seewald, the Defendant's president and counsel, respectively; and marked as Exhibit V).

6.  E-mail correspondence the Plaintiff and his counsel exchanged between February 15, 2003and  February 18, 2003, marked as Exhibit VI).

7.  Relief Resources' letter of July 2, 1998, addressed to Kofi Asimpi and signed by Robin O'Farrell, Director of Human Resources; marked as Exhibit VII).

8.  Circular entitled, "Relief Resources, Inc.", para 1, that reads, "CONGRATULATIONS, Eastern Massachuesetts and Central Massachusetts Field Staff, we have raised your pay!!!!!!", marked as Exhibit VIII).

9.  "JOINT CERTIFICATION MEMORANDUM", marked as Exhibit IX.

10. Copy of some of the notes the Plaintiff and his counsel exchanged, marked as Exhibit X).


## CERTIFICATE OF SERVICE

I, Kofi Asimpi, hereby certify that on this 28th day of February, 2005, I did send a copy of the above-referenced document, by postage prepaid, first class mail, upon Counsel for the Defendant, Alan Seewald, Esq., Five East Pleasant Stree, Amherst, MA 01002-1501.

Kofi Asimpi