

THE COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION
ONE ASHBURTON PLACE, BOSTON, MA 02108-1518



Argeo Paul Cellucci
Governor

Jane Swift
Lieutenant Governor

Andrew S. Natsios
Secretary

Charles E. Walker, Jr.
Chairman

Douglas T. Schwarz
Commissioner

Dorca I. Goméz
Commissioner

Thomas Gildea, Esq.
*Attorney at Law*
29 Sheafe Street, Suite 3
Boston, MA 02113

Alan Seewald, Esq.
Seewald, Collins & Jankowski
141 Tremont Street
Boston, MA 02111

Re: Kofi Asimpi v. Relief Resources
No: 98-13-2570

Dear Parties:

You are hereby notified that I have found **probable cause** to credit the allegations of retaliation. A copy of the disposition is enclosed.

Under Massachusetts General Laws, Chapter 151B, Section 5, the Commission's policy is to attempt to bring about compliance with the Commonwealth's anti-discrimination laws without resort to a public hearing. To this end, *parties and counsel* are required to attend a conciliation conference at the Commission offices on _MON 9-25-00 /01 00 AM_ to explore the possibility of a voluntary settlement.

We strongly suggest that the Complainant's counsel send a written proposal of settlement to the Respondent's counsel not fewer than 10 days prior to the scheduled meeting. We also require that the parties confer not fewer than five (5) days prior to the conciliation date to discuss settlement.

Resolution is difficult at best, and may be impossible, without the presence of the decision-makers. The Commission therefore requires that parties appear in person for conciliation. In the case of a corporate party, the officer designated to appear must fully be able to evaluate the claims and offer an appropriate settlement. Be prepared to spend one to two hours at the session. Respondent's failure to attend this meeting may result in immediate certification to public hearing. Complainant's failure to attend may result in dismissal of the case.

If you have any questions, or are unable to attend, please call Myrna Solod at (617) 727-3990 extension 259. Failure to attend by either party will result in this case being immediately certified to public hearing.

We wish to resolve this matter as promptly and amicably as possible, and thank you in advance for your cooperation.

# MEMORANDUM

**TO:**   Case File
**FR:**   Attorney Assisted Unit
**RE:**   **Kofi Asimipi v. Relief Resources**
**DOCKET:**   98-13-2570
**EEOC No:**   16C983153
**INVESTIGATOR:**   J. Lynn Milinazzo-Gaudet, Esq.

---

On August 18, 1998, Complainant filed a complaint with this Commission alleging that he was subjected to discrimination on the basis of his race and color (Black, Non-Hispanic) and retaliation when he was denied work assignments and placed on "inactive" employment status after he complained about a racially hostile work environment in violation of Massachusetts General Laws, chapter 151B, §4, paragraphs 1 and 4 and Title VII of the Civil Rights Act of 1964, as amended.

## Summary of Findings:

Respondent is a temporary staffing agency that provides staffing for human services organizations in Massachusetts. Complainant was hired on or about April 2, 1997, as a member of the field staff. Complainant alleges that from Autumn 1997 to Spring 1998, he was verbally harassed and physically abused by a client/resident of a mental health facility at which he was assigned. Complainant alleges that he advised his supervisors of the incidents of harassment. Complainant further alleges that on March 1, 1998, he sent a letter to the manager of the mental health facility complaining of the racial harassment. Complainant alleges that on or about March 13, 1998, Respondent met with Complainant after the manager of the mental health facility forwarded him a copy of the letter. Complainant alleges that following his meeting with Respondent, he received no further work assignments and was placed on "inactive" status effective April 22, 1998.

Respondent admits receiving a copy of Complainant's letter, on or about March 13, 1998. Respondent denies, however, retaliating against Complainant because of his complaint. Respondent alleges that Complainant ceased contact with them on or about March 19, 1998 and was placed on inactive status because he failed to contact Respondent for a period of one month. Respondent contends that placing Complainant on inactive status was in accordance with Respondent's standard policy and procedures.

## Investigation Revealed:

### Retaliation:

Complainant has established a prima facie case for retaliatory discharge. Complainant participated in a protected activity when he wrote the letter alleging racially motivated work place harassment. It is undisputed that Respondent had knowledge of said letter. Complainant has established that he was subjected to an adverse employment action when Respondent failed to offer him work assignments and placed Complainant on inactive status. The Complainant has also established that the timing of his complaint and the adverse employment action were such that retaliation may be inferred.

# MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

## Facts About The Initial Investigative Conference

### 1. What Is It?

The Initial investigative conference is a brief meeting with the complainant and the respondent held by the MCAD investigating commissioner assigned to the complaint of discrimination. The MCAD schedules these conferences soon after a complaint is filed. The conference is held at the MCAD office and can last anywhere from a few minutes to one-half hour. During the conference the complainant and respondent may bring an attorney and may make a brief statement concerning their position. The investigating commissioner will usually preside over the conference and may be assisted by MCAD staff. The investigating commissioner may ask questions of each party.

The purpose of the conference is to allow the investigating commissioner to better plan the course of the investigation. Complainants and respondents will be asked to identify persons whom they believe the investigator should speak to and identify documents which they believe will be helpful to the investigation.

The investigating commissioner may, during the course of the conference, suggest that the parties meet to discuss mediation to informally resolve their complaint. In order to facilitate settlement, it may be helpful for both complainants and respondents to think ahead of time about what they would be willing to do to voluntarily resolve the complaint..

### 2. Should I bring Witnesses and Documents?

#### a. Witnesses - Bring a Witness list

It is not necessary to assemble all of your witnesses and documents for this conference. If you do have witnesses you believe the Commission to interview, it would be helpful if you prepared and brought to the conference a list showing the name, day time phone number and a summary of what the witness knows about the dispute. If you have affidavits or written statements from witnesses, bring those documents to the conference.

#### b. Documents - Bring a copy of important documents

If you have an important document you would like the investigator to see, please make a copy and bring it to the conference. If documents are not available to you, please bring a list of those documents and information about where they are located.

COMMONWEALTH OF MASSACHUSETTS
COMMISSIONS AGAINST DISCRIMINATION

MASSACHUSETTS COMMISSION
AGAINST DISCRIMINATION AND
KOFI ASIMPI
      Complainant

v.                                                        Docket No. 98-BEM-2570

RELIEF RESOURCES, INC.,
      Respondent

## PETITION FOR REVIEW

Now comes the Complainant, Kofi Asimpi, and petitions the Commission to review the Decision of the Single Commissioner, dated January 15, 2003 (hereinafter "Decision"), dismissing his complaint against Respondent, Relief Resources.

FACTS OF THE CASE

1.     The Complainant, Kofi Asimpi (hereinafter "Complainant") is an African male who was born and raised in Ghana. He studied theology and business at the University of Ghana and served as Ghana's director of the national campaign for Christ. Complainant holds Doctor of Ministry and Doctor of Philosophy degrees from Southern Methodist University and Boston University.

2.     The Respondent, Relief Resources, Inc. (hereinafter "Respondent") is in the business of providing temporary staffing services to human services organizations.

7.  In May 1997, Complainant was assigned to the League School, which was both a day and residential program for children with autism. Hammond testified that the principal of the League School called Hammond to complain that Complainant had fallen asleep, leaving the children unsupervised. As a result, he would not allow Complainant to be reassigned to the facility. (*Id*) However, Complainant testified that the alleged report was false and that he had no knowledge of being banned from that facility.

8.  Hammond also received a complaint from the River Street facility, run by CMH (hereinafter "Center for Mental Health"). The program manager reported that Complainant had dozen during his afternoon shift. Hammond testified that he urged the program manager to allow Complainant to work there again and she agreed. On another occasion, the manager contacted Hammond indicating she no longer wanted Complainant assigned to her facility due to what she termed as poor performance. Hammond testified that Complainant was upset to learn this as he enjoyed his work at River Street. (*Id at 3-4*) However, Complainant testified that he was surprised about the program manager's alleged complaints. He admitted that he had dozed because he had taken his medicine before going to work that afternoon, but denied any poor performance.

9.  Hammond testified that the Clement Street facility also asked that Complainant not return to work there. Hammond spoke with Complainant and then asked the facility to allow him to work there again. Notwithstanding Hammond's efforts to assign Complainant to this facility, Complainant was banned from Clement Street due to a second error involving dispensing of meditation. (*Id at 4*) Complainant testified that he was indeed banned from the facility but the error in question was a result of the clients at Clement Street taking the medicines for themselves when he was attending to another client.

13.    Complainant testified that during his year of employment with the
       Respondent, there were one or two sites where he chose not to be reassigned.
       These included the Evergreen Center, which he believed was unappreciative
       of his work and where he felt he did more work than other staff. The other
       was the Germain Lawrence School, a residential program for adolescent girls,
       where Complainant was allegedly not treated well by the director.
       Complainant testified that he has a difficult experience there restraining a
       suicidal runaway since he had not been trained in the use of physical
       restraints. The sites to which Complainant could be sent were further limited
       by the fact that he did not drive and depended on public transportation. (*Id at
       p.5*)

14.    Among the sites where Complainant was assigned to work on a temporary
       basis was Adams Street, a community home for mentally ill adults in
       Waltham, Massachusetts. A predictable number of hours and accessibility to
       public transportation combined to make Adams Street a good fit for
       Complainant. Complainant testified that, of all the facilities to which he was
       assigned, Adams Street was one of the best because of the positive
       relationship he had with the facility's supervisor. Despite Complainant's
       positive feelings about this facility, he testified that while working at Adams
       Street he was subjected to verbal and physical harassment by one of the
       mentally ill residents, who on one occasion kicked Complainant's leg. This
       resident also called the Complainant "unintelligent" and accused Complainant
       of eating residents' food, watching television while on the job, and failing to
       change clothes. I credit the Complainant's testimony that the resident made
       these statements and accusations. (*Id*)

15.    Complainant testified that the resident did not treat Caucasian staff on his shift
       in the same disparaging manner. Complainant acknowledged that the resident
       never made any express references to the Complainant's race or national

mentally ill patient. She stated that Complainant was to be instructed not to return to the Adams Street site. (*Id at p.6-7*)

18.  Following his discussion with Harper, Hammond called Complainant. Hammond testified that he was concerned that the situation at the Adams Street facility had not been reported directly to Respondent. The Complainant testified that Hammond was already aware of these issues. Hammond testified that he had no knowledge of the issues addressed in the letter prior to March 13. Hammond expressed his concerns about some of the allegations in the letter, specifically Complainant's threat to sue the Adams Street resident.

19.  Hammond took issue with the reference in Complainant's letter that he involved other residents in the dispute. Hammond testified that he had concerns about Complainant's lack of empathy for mentally ill residents. He further testified that Complainant's letter to the facility manager was inappropriate, not merely because of threat to sue the consumer (which Hammond felt was premature), but because it was a breach of protocol and did not allow Respondent to intervene, mediate and diffuse the situation. Hammond testified that, if Hammond had been made aware of the issues earlier, Complainant could have been coached and redirected to help him manage the situation with the resident. (*Id*)  However, Complainant testified that he had made Hammond aware of these issues but was ignored. Complainant testified that he had made Lindner aware but was ignored. Complainant also testified that he sent the letter directly to his supervisor because no action had been taken on his verbal complaints and incident reports.

20.  The following day, March 14, 1998, Complainant was assigned to the High Street facility in West Medford. The High Street assignment was not an

24. Hammond testified that once an employee is not placed, he/she is "inactivated". Hammond testified that Complainant remained employed but was notified on May 19, 1998 that he had been reclassified as "inactive". This reclassification allegedly took place because the regional coordinator had not received a request for assignment from him for a period of thirty days. However, Respondent's records show that outgoing calls to Complainant were made on 3/18/98 and 3/20 and that incoming calls from Complainant were received on 3/19, 3/27, 3/31, and 4/2. After this reclassification, Complainant placed calls to Respondent on 5/29, 5/31, 6/1, 6/3, 6/5, and 6/12. (*Id at p.8-9*)

25. Further, staff at Respondent's Cambridge office contacted Complainant on 4/15/98 asking Complainant if he would conduct an orientation for newly employed field staff. The details were never provided to Complainant and his calls to the Cambridge office, regarding this opportunity, were not returned. (*Id at p.8*)

26. The Respondent's employee handbook clearly states that field staff who fail to maintain contact will be notified by mail of inactivation. Complainant received a letter dated May 29, 1998 stating that his file was placed on inactive status as of April 22, 1998.

ARGUMENT

M.G.L. ch.151B, sec. 4(4) prohibits employers from discharging, expelling or otherwise discriminating against a person who has opposed any practice prohibited by Chapter 151B or who has filed a complaint alleging a violation of Chapter 151B. In order to establish a prima facie case of retaliation, a Complainant must show that, (1) he was engaged in a protected activity; (2) that the employer was aware of the protected activity; (3) he subsequently was subject to an adverse employment action; and (4) evidence

Respondent claims in its Position Statement of 10/30/98 that "Mr. Asimpi was placed on inactive status due <u>solely and exclusively to his failure to contact his employer for a period of one month.</u>" Complainant claims that he was in contact with Respondent throughout the alleged "failure to contact" time period and that his calls were not returned.

In fact, the Cambridge office of Respondent contacted Complainant on 4/15/98 asking Complainant to conduct an orientation for newly employed field staff. Complainant agreed and was told that details would be forthcoming. Details never came and repeated calls to the Cambridge office went unreturned. Respondent claims that it would have been justified in terminating Complainant because of his poor work performance. Yet Respondent's branch office offered this allegedly "poor" employee a job training new field staff during the period Complainant was allegedly not in contact with them. Obviously, Respondent's claims that Complainant performed poorly are a pretext solely for the purposes of opposing this action.

Additionally, Respondent claims that "Mr. Asimpi was placed on inactive status on April 22, 1998 <u>in accordance with relief resources standard procedure</u> because he had failed to contact his employer for a period of one month."

According to Respondent's employee handbook: "Field Staff who do not maintain contact with us and/or who do not accept and/or complete assignments on a consistent basis will be <u>notified by mail of inactivation.</u>" Complainant requested and received a letter dated 5/29/98 reflecting his "inactive" status as of 4/22/98. Respondent failed to follow its own stated procedures by not sending Complainant an inactivation letter until a month later and only after requested by Complainant.

A comparison of dates shows that in fact (by Respondent's own admission), Complainant was in contact with Respondent during the time period Respondent claims he was not. Respondent's Answers to Interrogatories from Complainant show that

documented complaints entered into evidence detailing this poor performance or showing the "alleged" banning from work sites.

Complainant notes that the Respondent provides "temporary" services. Complainant was always available for temporary employment, even if intermittent. Therefore, it is apparent that the Respondent fabricated these allegations of poor performance just as it fabricated the "no contact" defense.

Additionally, Respondent stated that it is very active in providing immigrants, such as Complainant, with employment. Yet the truth is, Respondent needs low-wage labor to work in these positions. The fact that it employs immigrants in these positions is less (is less) of a public service than it is a reality of business. The fact that 60 to 64% of Respondent's employees are minorities does not mean that Respondent is incapable of discriminating against them. In the Complainant's case, he was treated as expendable. It is a reality that immigrants are more vulnerable to unlawful practices of employers as Complainant discovered…complain and be terminated.

CONCLUSION

Complainant was terminated because he complained of being harassed at his workplace. Throughout the proceedings in this matter, the Respondent has presented defenses solely developed to meet the law. Respondent's first defense was proven, by its own admission, to be blatantly false. Respondent's second defense is solely based on unsupported and contradicted oral evidence. Based upon Respondent's inconsistent and obviously false defense of "no contact", this Commission should give less veracity to the defenses that follow and reverse the decision of the Hearing Officer dated January 15, 2003, dismissing the claim of the Complainant. Complainant requests this Commission to access damages and award attorney's fees and costs against the Respondent.

## COMMONWEALTH OF MASSACHUSETTS
## COMMISSIONS AGAINST DISCRIMINATION

MASSACHUSETTS COMMISSION
AGAINST DISCRIMINATION AND
KOFI ASIMPI

     Complainant

    v.                                                    Docket No. 98-BEM-
        2570

RELIEF RESOURCES, INC.,
     Respondent

### PETITION FOR REVIEW

    Now comes the Complainant, Kofi Asimpi, and petitions the Commission to review the finding of the Hearing Officer, dated January 15, 2003, dismissing his complaint against Respondent, Relief Resources, Inc.

FACTS OF THE CASE

1. The Complainant, Kofi Asimpi (hereinafter "Complainant") is an African male who was born and raised in Ghana. He studied theology at **Trinity Theological Seminary (formerly Trinity College) and served in Ghana as National Representative of Campus Crusade for Christ, International, and also as Minister of Religion under the auspices of the Evangelical Presbyterian Church, Ghana.** Complainant holds **Doctor of Ministry and** Doctor of Philosophy **degrees from Southern Methodist University, Dallas, Texas, and** Boston University, **respectively.** (What's in bold characters here reflects my

time period, 1997 to 1998, 50% of the field staff was comprised of immigrants from Africa. Respondent has strong connections to the Nigerian community in Rhode Island. Complainant heard about the job opportunity with the Respondent from Esther Tambe, **a Cameroonian** immigrant employee. (All in bold letters above and below are my amendments or additions).

5. As a member of the field staff, Complainant's duties included **administering** medication, **cooking, cleaning** and counseling the residents at the facilities to which he was assigned. Complainant stated that he enjoyed the position because he liked working with people, **preferred to stay in the Boston area**, and was comfortable with the nature of the temporary assignments. (At the interview, the prospective employee was never told that **cooking and cleaning** were included in the job description. I don't know how significant is the phrase, "**[he] preferred to stay in the Boston area**" attributed to the Complainant, but I don't remember saying that. In fact, there was no need for me to say so, because there weren't other choices, anyway).

6. In May 1997, Complainant was assigned to the League School, which was both a day and residential program for children with autism. Hammond testified that **the male principal** of the League School called Hammond to report that Complainant had **dozed while supervising a child.** *As a result, he would not allow Complainant to be reassigned to the facility.* (So far as I can well remember, Hammond didn't testify, either in his written statement or at the hearing, with regard to this last italicized sentence).

office telephone extensively and finally that he didn't spend time with the clients in one of their TV rooms was totally false. He was surprised about the program manager's alleged complaints, adding that the telephone calls that he received on his shift that afternoon were all meant for the manager, Liz Almaz, and that the only telephone call he made was a very brief one to the Respondent to inquire about the Complainant's next shift. Complainant testified that although he dozed because he had taken his medicine before going to work that afternoon and that that had made him doze.

He testified, however, that the report that his work performance was poor was a complete concoction and that he was surprised about the program manager's alleged complaint. According to Bob Lindner, one of the Respondent's Field Coordinator's, the manager allegedly reported that the Complainant had used the office telephone extensively, that he didn't spend time with the clients in one of their TV rooms and finally that his work performance was poor. He testified further that when he expressed surprise about the manager's alleged complaints, Lindner told him that that was the nature of the work, adding that sometimes a staff and a manager would cope well and sometimes they wouldn't. He should therefore not worry. (I'm not aware that Hammond testified that he urged the program manager to allow me to work there again and that the manager agreed to do so. I recall that the only time Hammond testified that he had pleaded on my behalf to be allowed to return to work at a particular program was when I was assigned to Clement Street in Malden).

*different field staff worker. Complainant did not receive any communication from Respondent prior to reporting to work again at Norfolk Street. He was angry to find out that he was being replaced and engaged in a heated discussion with staff at Norfolk Street. After that incident, Respondent received a request that Complainant not be assigned to work at any of the CMH facilities.* (There are lots of inaccuracies in this section. For instance, Hammond didn't testify that I was involved in an incident with a client's dog. **It was the hearing officer who twisted the facts that way**).

**Hammond further testified that the Respondent had assigned the Complainant to the Norfolk Street facility in Cambridge, but the manager called on the day of the shift to inform the Respondent that this particular shift had been cancelled; however, before the Respondent could reach the Complainant at his home to inform him about this development, he had already left for Cambridge. Hammond testified further that the manager (Katie Curley) later called to inform the Respondent that she had decided to ban the Complainant not only from her Norfolk facility but from all other CASCAP CONCAP (?) facilities because he was afraid of dogs. Besides, the Complainant was "confrontational" when the manager informed him about her decision.**

**However, the Complainant testified that he coincidentally arrived with a coworker who had also been assigned to the same shift on the date in question. Upon entering the office, the manager informed them both that they had not been assigned to her Norfolk facility that day. The Complainant**

her attention to the fact that she personally had even seen me play with that dog on my last previous shift, she denied it. Of course, I wasn't amused when she blatantly lied that it was I who feared dogs and we both argued about it. I at no time insisted that she must allow me to work there, as the Respondent falsely testified.

Indeed, the Complainant further testified that he knew nothing about the Respondent's allegation that in addition to having been banned from working further at the Norfolk facility, Curley also banned him from working at all ~~CONCOCAF~~ CASCAP (?) facilities. (Please note: This company, which is as large as CMH, is quite distinct from CMH and is under a totally different administration. The impression the Respondent created that the facilities in Cambridge and CMH are one and the same is false. Likewise, their claims that facilities where I could be sent were limited and that Katie Curley had banned from working at all those Cambridge facilities are also false, for they themselves had sent me numerous times to many facilities in Cambridge. Curley is a junior employee in charge of one small facility; she's not one of the top administrative staff at the company headquarters, who make such a big decision like banning someone from working for the entire company. Any such claim is simply ridiculous!).

11 ███ The business agreement between Respondent and its facilities provides that Respondent will honor an agency's request that certain field staff not be ██████

██████████████████████████████    ██████

████████████████████████

and *where he felt he did more work than other staff.*

13. The other was the Germain Lawrence School, a residential program for adolescent girls, where Complainant was allegedly not treated well by the director. *Complainant testified that he* had *a difficult experience there restraining a suicidal runaway since he had not been trained in the use of physical restraints. The sites to which Complainant could be sent were further limited by the fact that he did not drive and depended on public transportation.*

14. Among the sites where Complainant was assigned to work on a temporary basis was Adams Street, a community home for mentally ill adults in Waltham, Massachusetts. A predictable number of hours and accessibility to public transportation combined to make Adams Street a good fit for Complainant. Complainant testified that, of all the facilities to which he was assigned, Adams Street was one of the best because of the positive relationship he had with the facility's manager. Despite Complainant's positive feelings about this facility, he testified that while working at Adams Street he was subjected to verbal and physical harassment by one of the residents, who on one occasion kicked Complainant's leg. This resident also called the Complainant "unintelligent" and accused Complainant of eating residents' food, watching television while on the job, and failing to change clothes. **I credit the Complainant's testimony that the resident made these statements and accusations.**

15. Complainant testified that the resident did not treat Caucasian staff on his shift in the same disparaging manner. Complainant acknowledged that the resident never

residents to witness this heated discussion. At the conclusion of the letter, Complainant threatened to sue the resident if the harassing behavior did not cease.

17. On March 13, 1998, Respondent received a copy of this letter via facsimile from Kathy Harper of the Center for Mental Health. After Hammond reviewed the letter, he spoke with Kathy Harper. Her clinical concern was the inappropriate involvement of other residents in a dispute between Complainant and a resident. She stated that Complainant was to be instructed not to return to the Adams Street site.

18. Following his discussion with Harper, Hammond called Complainant. Hammond testified that he was concerned that the situation at the Adams Street facility had not been reported directly to Respondent. The Complainant testified that Hammond was already aware of these issues. Hammond testified that he had no knowledge of the issues addressed in the letter prior to March 13. Hammond expressed his concerns about some of the allegations in the letter, specifically Complainant's threat to sue the Adams Street resident. I find that prior to its receipt of Complainant's letter to the Adams Street facility, Respondent was not aware that Complainant felt he was the victim of discriminating treatment by a resident. **(But Complainant did report to his Adams Street Manager. That was the proper procedure)**.

19. Hammond took issue with the reference in Complainant's letter that he involved other residents in the dispute. Hammond testified that he had concerns about



faced with a narrow population within the groups of mentally ill residents with whom Complainant could work. Hammond testified that once the Adams Street site was no longer available to Complainant, few, if any other placements, were possible. **(Remember, they never said these things initially, but only lately!)**

22. In March 1998, Hammond was in the process of removing himself from the role of "Field Coordinator". He testified that he needed to take a stronger management role, as many of the field staff did not know he was the owner of the company, because he was a placement person for the organization. He decided that he would no longer take calls from staff and had his calls redirected to the coordination staff. Hammond testified that this was not a measure directed against Complainant. **(Then why was it that no one in his office returned my numerous calls? And remember, they denied that I ever called the office to request an assignment, despite their own telephone record to the contrary).**

23. Complainant spoke to a female Coordinator (Jeanie Bush) who informed him that CMH had rendered their decision that Complainant would no longer be placed in any CMH facility. Hammond testified that he spoke to Jeanie Bush and understood that she would continue to try to find other placements for Complainant.

24. Hammond testified that once an employee is not placed, he/she is "inactivated". Hammond testified that Complainant remained employed but was notified on

establish a prima facie case of retaliation, a Complainant must show that, (1) he was engaged in a protected activity; (2) that the employer was aware of the protected activity; (3) he subsequently was subject to an adverse employment action; and (4) evidence existed sufficient to establish a retaliatory motive or the adverse employment action followed the protected activity within such time as a retaliatory motive can be inferred. Richards v. Bull HN Information Systems, Inc. 16 MDLR 108, 1639 (1996). To succeed on a claim of retaliation, "the plaintiff must prove that the reasonably and in good faith believed that the employer was engaged in wrongful discrimination, that he acted reasonably in response to his belief and that the employer's desire to retaliate against him was a determinative factor in its decision to terminate his employment." Abramian v. President & Fellows of Harvard College, 432 Mass. 107 (2000) quoting Tate v. Department of Mental Health, 419 Mass 356, 364 (1995).

The Hearing Officer found that retaliation is a separate claim from discrimination, "motivated, at least in part, by a distinct intent to punish or to rid a workplace of someone who complains of unlawful practices." Kelly v. Plymouth County Sheriff's Department, 22 MDLR 208, 215 (2000). The Complainant reasonably believed that he was being subjected to harassment based upon his race and/or national origin. On March 1, 1998, he wrote a letter to the manager of the Adams Street facility, detailing what he believed to be harassment, based upon his race. On March 13, 1998, Respondent received a copy of said letter. On March 14, 1998, Complainant worked his last shift for Respondent. Respondent alleges that there is no causal connection between the Complainant's letter and his being placed on inactive status. However, the Complainant has shown that there

with them. Obviously, Respondent's claims that Complainant performed poorly are a pretext solely for the purposes of opposing this action.

Additionally, Respondent claims that "Mr. Asimpi was placed on inactive status on April 22, 1998 in accordance with relief resources standard procedure because he had failed to contact his employer for a period of one month."

According to Respondent's employee handbook: "Field Staff who do not maintain contact with us and/or who do not accept and/or complete assignments on a consistent basis will be notified by mail of inactivation." Complainant requested and received a letter dated 5/29/98 reflecting his "inactive" status as of 4/22/98. Respondent failed to follow its own stated procedures by not sending Complainant an inactivation letter until a month later and only after requested by Complainant. No other "inactivation" letter was in Complainant's personnel file as received by both Complainant and his counsel.

A comparison of dates shows that in fact (by Respondent's own admission), Complainant was in contact with Respondent during the time period Respondent claims he was not. Respondent's Answers to Interrogatories from Complainant show that Complainant called Respondent on 3/22/98, 3/27/98, 3/31/98, 4/2/98, and 4/3/98. This hardly represents no contact for a period of one month.

Additionally, a letter dated 3/31/98 from Respondent refers to Complainant as "a current employee". All the while, Respondent claims that Complainant was "solely and

alleged dissatisfaction with Complainant's performance", the Complainant was offered a position training new field staff. The Hearing Officer determined that Respondent had legitimate, non-discriminatory reasons for terminating the Complainant. However, the Complainant's testimony clearly contradicted Respondent's claim of poor performance at numerous facilities.

The Respondent, throughout the proceedings, created defenses to suit its needs. First, it was the Complainant's failure to contact. Then, it was the Complainant's poor work performance. Yet, the evidence shows that Complainant was offered a training position, at least until the Respondent realized that it wanted to get rid of the Complainant. The only evidence offered by the Respondent that Complainant was a poor performing employee was the testimony of Hammond. There were no written or documented complaints entered into evidence detailing this poor performance or showing the "alleged" banning from work sites.

Complainant notes that the Respondent provides "temporary" services. Complainant was always available for temporary employment, even if intermittent. Therefore, it is apparent that the Respondent fabricated these allegations of poor performance just as it fabricated the "no contact" defense.

Additionally, Respondent stated that it is very active in providing immigrants, such as Complainant, with employment. Yet the truth is, Respondent needs low-wage labor to work in these positions. The fact that it employs immigrants in these positions is

CERTIFICATE OF SERVICE

I, Thomas S. Gildea, hereby certify that on this ___ day of February 2003, I did send a

copy of the above document, by postage prepaid, first class mail, upon Counsel for the

Respondent, Alan Seewald, Esq., 5 East Pleasant Street, Amherst, MA 01002-1501.


_____

Thomas S. Gildea, Esq.

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

No. 98132570

| | | |
|---|---|---|
| KOFI ASIMPI | > | |
|       Complainant | > | |
| | > | RESPONDENT'S ANSWERS TO |
| v. | > | INTERROGATORIES FROM THE |
| | > | COMPLAINANT |
| RELIEF RESOURCES, INC. | > | |
|       Respondent | > | |

1.  Please state your date of incorporation, address and number of employees.

Answer
The Articles of Organization were signed on October 9, 1985.  The effective date of incorporation is available from the Secretary of State.  The principal offices of Relief Resources, Inc. are located at 4 Bay Road, Hadley, Massachusetts.

2.  Please provide a copy of your Articles of Incorporation.

Answer
See Exhibit A, attached.

3.  Please identify your management staff, including officers, managers, supervisors and human resources personnel.

Answer
As of the date of the alleged violation, the management staff was comprised of those individuals shown on Exhibit B, attached.

4.  Please state whether any of the following social service agencies, locations, or entities lodged complaints about Complainant and/or banned him from working therein: League School; River Street; 88 Bedford (Evergreen Center); Germain Lawrence/Claremont Anderson; 808 Memorial (CASCAP); Moody Street (CMH); Clement Street; Norfork; CMH.

Answer
Yes.

5.  If your answer to the preceding interrogatory was in the affirmative as to any agency, location or entity, please state in detail the complaint lodged, the person making the

| | | | | |
|---|---|---|---|---|
| Moody Street | Program Director | 634 Moody Street, Waltham, MA | Mr Asimpi was found sleeping on an awake overnight shift. | Bob Lindner spoke with Mr. Asimpi and told him he could not sleep on shift and could not return to Moody Street. |
| Clement Street | Kari (last name unknown) | 14-16 Clement Street, Malden, MA | Mr. Asimpi committed a medication error. | I spoke with Mr. Asimpi, who admitted his error. Mr. Asimpi asked to be permitted to return, and Mr. Hammond advocated for him and arranged for his return to this site. After another medication error, Mr. Asimpi was banned from this site. |

incidents at Adams Street. Without waiving that objection, the Respondent and its agents became aware of the incidents at Adams Street involving Mr. Steve Izzi on March 13, 1998, when a fax was received from Kathy Harper.

9.   If the answer to the preceding interrogatory was in the affirmative, please state the date you became aware of said incidents, the source of this information, whether you investigated the matter, whether any corrective action was taken, and the nature of said corrective action.

Answer
On March 13, 1998, Relief Resources, Inc. received a fax from Kathy Harper at CMH. The fax was a copy of a letter that Mr. Asimpi had written to Ray Castagnola, the House manager for Adams Street, regarding Mr. Steve Izzi. The letter was dated March 1, 1998. A true copy of the fax was attached to the Respondent's Position Statement as Exhibit D. Prior to receiving this fax, the Respondent and its management agents had no knowledge of any issues taking place at Adams Street between Mr. Asimpi and Mr. Izzi, nor did we have any knowledge that the March 1 letter had been written by Mr. Asimpi. Upon receipt of this fax, I spoke with Mr. Asimpi. The following is a synopsis of our conversation:

- I informed Mr. Asimpi that he had committed a serious violation of protocol in writing the letter directly to Mr. Castagnola. He acknowledged the inappropriateness of doing so, and agreed to send any future letters through Relief Resources.
- I informed Mr. Asimpi that it was inappropriate for Mr. Asimpi to hold this consumer, who had a clinical diagnosis of mental illness, responsible for the behavior alleged in the letter.
- I also spoke with Mr. Asimpi about the inappropriateness of involving other consumers at Adams Street in these issues.
- I pointed out that Mr. Asimpi included personal judgments and criticisms in the letter, the very conduct that he was complaining about Mr. Izzi.
- I spoke with Mr. Asimpi about not internalizing and personalizing the consumers' behavior toward him.
- I informed Mr. Asimpi that his threat of legal action was premature given that he had not previously informed the organization of the problem and given them a chance to rectify any problem.

10.  Please state the last date Complainant worked at an agency as your employee.

-5-

**Answer**

No decision has been made as to who will be called as witnesses at the hearing on this matter.

15. Identify all persons whom you intend to call as expert witnesses at the time of hearing on the Complaint and for such expert specify:

   a. the subject matter on which he is expected to testify.
   b. the substance of the facts and opinions to which he is expected to testify, and;
   c. a summary of the grounds for each opinion to which he is expected to testify.

**Answer**

No decision has been made as to expert witnesses to be called to testify at the hearing on this matter.

Signed under the pains and penalties of perjury on this 31st day of January, 2000.

_____
Douglas Hammond
President


As to any objections:

_____
Alan Seewald BBO # 546790
Attorney for Respondent, RELIEF RESOURCES, INC.,
Seewald & Jankowski, P.C.
5 East Pleasant Street
Amherst, MA 01002
(413) 549-0041

-7-

Subj:  **Re: The appeal**
Date:  2/18/2003 1:19:38 PM Eastern Standard Time
From:  tkgildea@yahoo.com
To:    asimpik@aol.com
*Sent from the Internet (Details)*

Kofi-

I have received all of your comments/corrections/additions and am going through them. I will make the changes to my brief (using most of your input) and mail it tonight. I will mail you a copy of the final version. Thanks for putting in all the time to supplement my brief.

Tom

—————————————————————asimpik@aol.com wrote:—————————————————————
Hi Tom!

Thank you for your efforts. I've been working hard on the appeal, since I received it last Saturday night. I stayed on the computer throughout last night, trying to finsih it, but I haven't yet. I'll attempt to send it back to you this afternoon. I've seen some inaccuracies here and there; so I want to state what I thought to be the facts as I remember them.

If you're around and happen to open this mail immediately and you feel I should send you right away those that I've done wso far, I'll be glad to do so.

Thank you once again for all your help.

Cheerio!

Kofi
—————————————————————————————————————

Subj:  The appeal
Date:  2/15/2003 6:18:07 PM Eastern Standard Time
From:  tkgildea@yahoo.com">tkgildea@yahoo.com
To:    <asimpik@aol.com">asimpik@aol.com
File:   kofi.doc (51200 bytes) DL Time (49333 bps):
1 minute
Sent from the Internet (Details)

Kofi-

I have attached the appeal brief. Please review it and add suggestions as you see fit. In particular, I am
looking for you to add to the section relating to your testimony. I have left a couple spaces (in BOLD..."However, the
Complainant testified...") for you. Please add 1 or 2 sentences that summarizes your testimony. Be short and to the
point.

This is not the final version. I will be making a
few changes before I send
it in.

I want to mail it Monday sometime. So please get it back to me as soon as possible.

Tom



# Relief Resources, Inc.
STAFFING SOLUTIONS FOR HUMAN SERVICES

July 2, 1998

Kofi Asimpi
213 Kelton St, Apt #G-02
Allston, MA 02134

Dear Kofi,

Enclosed is a complete copy of the contents of your personnel file, forwarded to you per your request.

Sincerely,

Robin O'Farrell
Dir. Human Resources

Copy: Personnel File



# Relief Resources, Inc.

STAFFING SOLUTIONS FOR HUMAN SERVICES

**CONGRATULATIONS, Eastern Massachusetts and Central Massachusetts Field Staff, we have raised your pay!!!!!!**

Good news, effective December 13, 1997, we raised your base pay to $7.25. We have also implemented a training certificate program that allows anyone with a certificate(s) in the training listed below to get an increased wage as indicated.

Another incentive we now offer is *"premiums"*, look for our monthly list of *premiums* in the RELIEF RESOURCES NEWSLETTER, which is distributed every month with your first paycheck of the month. These *premiums* offer $.50 to $1.00 per hour additional for the sites listed. Call your coordinator for more information @ 1-800-639-5094.

## CERTIFICATE PROGRAM & PAY RATE INCREASE
Eastern Mass: Base rate increase to $7.25
Central Mass: Base rate increase to $7.25

| Training | Increase per hour | # hours worked (minimum) |
|---|---|---|
| First Aid/CPR | .05 | 100 |
| Med Cert | .10 | 100 |
| Restraint | .10 | 100 |

Notes: All the same stipends apply for 1:1 and overnights. You must have worked 100 hours total before the certificate program increase will go into effect. *If your certificate expires your wage will be decreased accordingly.* If you have any questions you can contact Dale Jones @ 1-800-639-5094.



104 Russell Street, P.O. Box 538, Hadley, MA 01035 ♦ 1-800-639-5094 ♦ TEL: 413-584-7667
FAX: 413-586-7754 ♦ E-MAIL: relief@shaysnet.com ♦ MEMBER OF BUSINESS FOR SOCIAL RESPONSIBILITY ®

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

KOFI ASIMPI,
     COMPLAINANT     )
                         )
v.                     )           DOCKET NO. 98 BEM 2570
                         )
RELIEF RESOURCES,
     RESPONDENT       )



RECEIVED

MAR 1 4 2001

COMMISSION AGAINST
DISCRIMINATION

JOINT CERTIFICATION MEMORANDUM

1.    Thomas S. Gildea              Alan Seewald
     Attorney for Complainant     Attorney for Respondent
     29 Sheafe Street, Suite 3       5 East Pleasant Street
     Boston, MA 02113           Amherst, MA 01002-1501
     (617) 367-3453               (413) 549-0041
     Fax: (617)-367-3453          (413) 549-3818
     Email: tsgildea@att.net        Email: alan.seewald@seewaldjankowski.com

2.    Complainant is from Ghana and is in a protected class based upon his race and national origin.

     Complainant is a former employee of Respondent.

3.    The parties to this action agree that Complainant was employed by the Respondent commencing

     April 2, 1997 until the Spring of 1998. The parties agree that Complainant's last day of

     work for Respondent was March 14, 1998. On March 13, 1998, Respondent received by

     fax from Katherine Harper a copy of a letter dated March 1, 1998, written by

     Complainant to Ray Castagnola, House Manager of the Adams Street facility operated by

     the Center for Mental Health. The letter addressed Complainant's concerns regarding his

     work environment at the Center for Mental Health.  The individual about whom the

     Complainant was complaining in the letter was a resident of the Center for Mental

Fran Blue, Boston, MA

Genie Bush, Atlanta, GA;

Robin O'Farrell, address unknown;

Tom Montanari, Walpole, MA;

Liz Amagal, Waltham, MA;

Eileen English, Cambridge, MA;

Program Director, Mood Street,

Waltham, MA;

Kari, Clement Street, Malden, MA;

Katie Curley, Cambridge, MA;

Kathy Harper, Lexington, MA;

Ray Castagnola, Waltham, MA

Steve Izzi, Waltham, MA.

The parties reserve the right to supplement this list upon reasonable notice.

10.    Proposed Exhibits;

Complainant:

Letter of March 1, 1998 from

Complainant to Ray Castagnola;

Respondent's Position Statement;

Letter of May 29, 1998 from Respondent

to Complainant;

Letter of March 31, 1998 from Respondent

Re: Kofi Asimpi;

Respondent's Answers to Complainant's

Interrogatorries;

Respondent:

Complainant's Employment File;

Letter of March 1, 1998 from

Complainant to Ray Castagnola;

Fax Cover dated March 13, 1998 from

Catherine Harper to Doug Hammond

Bob Lindner;

Relief Resources Employment Manual.

2001 (?) 3

Moody St. Sleeping?
Who told them I was
sleeping? I never heard
of these things until this
case. Please try to not
allow this to get your
blood pressure high.
I told you this would
happen. Thanks.

If he's telling the truth
why would he forget
the details?

These are other lies!
~~But~~ I didn't redirect.
9/1 ~~We were~~

real issue. Copy for defense

They are not. This is a
legal argument - the ~~is~~ are
trying to satisfy the requirem
for the defense ... and draw
attention from the main
issues.

These are lies. I never ~~begged~~
to go back. I understand
~~This is exactly what I said they~~
will do to avoid the ~~most~~ MAIN
issues.

Not evening - during day
rather. There were only
~~??~~ two women at the wrong
place. Second, no one
escorted me away.
These are unimportant details
I will address some that will
not waste time on responding
to each and every one.

only because he
needs the cheap
labor

Correct! Exhibitor
Itself. The capacities
pay Rula for an event
yes more than $30. If
we were paid only $6
per each ...
$730 per...
A lot of these Africans
were students & some
could not work