```
             UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS

                                      C.A. No. 04-10117-DPW


                   KOFI ASIMPI,
                    Plaintiff

                        v.

               RELIEF RESOURCES, INC.,
                    Defendant
```
---
**AFFIDAVIT OF DOUGLAS HAMMOND**
---

The undersigned, Douglas Hammond, first being duly sworn, on oath, deposes and states the following:

1. My name is Douglas Hammond. I am and for all relevant times I have been the President of the Relief Resources, Inc. Relief Resources is a corporation organized under the laws of the Commonwealth of Massachusetts. It is in the business of providing temporary staffing to human services organizations. Its principal place of business is in Hadley, Massachusetts, and it has satellite offices in Somerville and Worcester, Massachusetts and, until recently, in Providence, Rhode Island.

2. At the time that the plaintiff was employed by Relief Resources, it had 250 – 325 active employees at any given time. As is common in the temporary employment industry, Relief Resources has a high rate of employee turnover. At

    the time in question, Relief Resources hired approximately 500 – 750 employees each year.

3. The plaintiff was hired by Relief Resources on April 2, 1997, as a member of its Field Staff.  He was assigned to staff human service agencies that contracted with Relief Resources for temporary staffing.

4. Relief Resources employs many dozens of native Africans, and utilizes a "word-of-mouth" network among the native African community in the Boston area.  In fact, the plaintiff learned of Relief Resources through another native African employee, Esther Tambe.

5. Beginning in May, 1997, the agencies to which the plaintiff was assigned began to complain about his performance.

6. On May 13, 1997, the plaintiff was found sleeping during a day shift at a facility for mentally ill adults known as River Street, and he was given a warning.

7. In May 1997, the plaintiff was alleged to have slept during a day shift at a facility known as the League School. The plaintiff was asked not to be returned to this facility.

8. On July 23, 1997, the plaintiff was asked not to return to River Street due to alleged poor work performance.  The plaintiff contacted the program director at River Street several times, and she complained of feeling badgered and asked that the plaintiff not contact her again.

9. In August 1997, the operator of a facility known as 808 Memorial Drive asked that the plaintiff not return due to a mixup in which the plaintiff arrived when no staff was expected, and the mental health consumers who observed him being escorted out were frightened by the experience.

10. On October 8, 1997, the plaintiff was banned from Clement Street, a facility for mentally ill adults, due to a second medication error.

11. On December 31, 1997, the plaintiff was banned from Norfolk Street, a facility for mentally ill adults operated by CASCAP, because he did not get along with a consumer's dog. The director of Norfolk Street informed Relief Resources that the plaintiff was not to return until it was too late to contact the plaintiff, and when he arrived and was told that he was not going to be allowed to work the shift he became confrontational with the program director and raised his voice to her.

12. After each time the plaintiff was banned from a site, I or Bob Lindner, Eastern Regional Coordinator for Relief Resources, counseled the plaintiff as to the appropriate way to conduct himself while on site as a Relief Resources employee. Management at Relief Resources spent an inordinate amount of time dealing with these incidents and trying to find a site that was a good match for The plaintiff.

13. In addition, there were several sites to which the plaintiff asked that he not be sent, including the Evergreen Center (unappreciative of his work), Germain Lawrence School (not treated well by director and bad experience in restraining a suicidal runaway), and Marguerite Terrace (too far from public transportation).

14. The sites to which the plaintiff could be sent was further limited by the fact that he did not drive and depended on public transportation.

15. The agencies with which the defendant contracts use the defendant's services in two different ways. Some use the defendant to staff shifts at a facility on a regular, on-going basis. In essence, those agencies out-source a portion of the staffing needs to the defendant. Other agencies use the defendant to fill in staffing needs on an emergency basis. Those agencies use the defendant's services more intermittently.

16. Given the number of sites from which the plaintiff had been banned, those from which he opted out of being assigned, and the necessity that the site be accessible by public transportation, the available sites that provided regular, on-going employment for the plaintiff was severely limited.

17. The last existing "on-going" site to which the defendant could assign the plaintiff on a regular basis was a facility

    known as Adams Street, a Center for Mental Health facility for mentally ill adults.

18. Unbeknownst to Relief Resources, one of the consumers living at Adams Street, known as Steve, had allegedly been verbally harassing the plaintiff, saying things such as "you don't change your clothes," "you eat other people's food," and "you are not intelligent." In addition, Steve blocked the plaintiff's view of the television, disconnected the phone cord while the plaintiff was speaking on the telephone, and, on one occasion, allegedly assaulted the plaintiff.

19. On March 13, 1998, Catherine Harper of CMH, faxed to me a copy of a March 1, 1998, letter that the plaintiff had written to Ray Castagnola, the manager of Adams Street. A true copy of Ms. Harper's fax is attached hereto as Exhibit 1. No one at Relief Resources knew of the letter or of the allegations of racial harassment contained in the letter until I received that fax.

20. My first reaction to the letter was that the tone was inappropriately hostile, including the threat to sue Steve; that the plaintiff had crossed boundaries by drawing other mental health consumers into the conflict he was having with Steve, thereby fomenting dispute among the residents, and; that the plaintiff's attempt to hold this mentally ill

consumer to the same standard of conduct that one would expect of a mentally healthy person was troublesome.

21. I spoke with both Ms. Harper and the plaintiff about the letter and the issues it raised in the plaintiff's dealings with Steve.

22. In my conversation with Ms. Harper, she stated that the plaintiff was no longer welcome at Adams Street.

23. Adams Street was the last available client that regularly used Relief Resources services to which the plaintiff could be assigned. Although the plaintiff was assigned to a facility known as High Street on March 14, 1998, High Street was not an on-going, regular customer of Relief Resources, and its requests for temporary employment services was intermittent. The plaintiff's scheduled shifts at Adams Street after March 13, 1998 were cancelled because he was banned from the site.

24. Although one of the Coordinators, Genie Bush, continued to attempt to place the plaintiff, she was unsuccessful in doing so.

25. Relief Resources' policy was (and is) to inactivate all field staff who had not been assigned a placement for a period of thirty (30) days. In accordance with that policy, which was uniformly applied, the plaintiff, along with numerous other field staff, was inactivated by the Human

     Resources Office on April 22, 1998, because the plaintiff had not been assigned a shift since March 14, a period of more than thirty (30) days.

26. The failure to assign the plaintiff after March 14, 1998, was due to the inability to find an ongoing placement at a site that had not banned the plaintiff, as to which the plaintiff had not voluntarily opted out, and that was accessible by public transportation.  The failure to assign the plaintiff was not in any way motivated by or in retaliation for any attempt that the plaintiff may have undertaken to secure his civil rights.

27. The inactivation of the plaintiff in April 1998 was due to the mechanical application of the inactivation policy and not in any way motivated by or in retaliation for any attempt that the plaintiff may have undertaken to secure his civil rights.  No individualized consideration of the plaintiff's employment status was undertaken, beyond the fact that he had not been assigned to a shift for a period of more than thirty (30) days.

28. I make this Affidavit on my personal knowledge, and it is true and accurate to the best of my knowledge.  I am competent to testify as to the facts set forth herein.

Signed under the pains and penalties of perjury on this day of February, 2005.

**/s/ Douglas Hammond**
_____
**Douglas Hammond**