UNITED STATES DISSTRICT COURT
DISTRICT OF MASSACHUSETTS

KOFI ASIMPI )
   PLAINTIFF )
 )
V. )
 ) C. A. NO. 04-10117-DPW
RELIEFF RESOURCES, INC. )
   DEFENDANT )

## PLAINTIFF'S STATEMENT AS TO MATERIAL FACTS NOT IN GENUINE DISPUTE

1. The Plaintiff, KOFI ASIMPI, is a resident of Allston, Suffolk County, Massachusetts, and a citizen of the United States. The Plaintiff is a former employee of the Defendant.

2. The Defendant, RELIEF RESOURCES, INC., is a human services organization located in Hadley, Massachusetts, with satellite offices in Cambridge/Somerville and in Worcester, Massachusetts, as well as in Providence, Rhode Island.

3. The Plaintiff was employed by the Defendant effective April 02, 1997, to the Spring of 1998. The Plaintiff's final day of work for the Defendant was Saturday, March 14, 1998. The Defendant received from Catherine Harper of The Center for Mental Health a faxed copy of letter dated March 1, 1998, written by the Plaintiff and addressed to Ray Castagnola, Manager of the Adam's Street facility operated by The Center for Mental Health. The letter addressed the Plaintiff's concerns about his work environment at The Center for Mental Health. The person about whom the Plaintiff complained in his letter was a resident of the Adam's Street facility. The resident's diagnosis was schizophrenic affective disorder.

4. The Plaintiff made a complaint in a letter he addressed to his supervisor dated March 1, 1998, of being verbally and physically attacked at The Center for Mental Health because of his race. The Defendant retaliated by summarily terminating the Plaintiff in violation of Title VII of the Civil Rights Act of 1964 and of M.G.L. c. 151B.

5. The Plaintiff filed a complaint with the Massachusetts Commission Against Discrimination (MACD) of unlawful termination against the Defendant on August 18, 1998.

1

6. The Defendant in their Position Statement relied upon their assertion that *"Mr. Asimpi was placed on inactive status due solely and exclusively to his failure to contact his employer for a period of one month."*.

7. To bolster their claim that the Plaintiff's file "was placed on 'inactive' status due *solely and exclusively* to his failure to contact his employer for a period of one month", the Defendant prepared a document called "Work History", purposely designed to clearly and significantly demonstrate that the Plaintiff had indeed failed to contact his employer for a period of one month. On the first page of the "Work History" document, under "KOFI ASIMPI", the following entries, *inter alia*, are made:

   [a.] "Date of hire:     April 2, 1997
   "Date of Inactivation: April 22, 1998

   "Reason: No contact for over 1 month."

   [b.] For the week of 3/14 – 3/20 (1998) and under the sub-title, "Date of Incident, Reason and outcome", a it is falsely, thus: "3/19 – Kofi said that he would call us with the dates and time he is available for work", p. 6.

   [c.] For the week of 3/21 - 3/27, the reason given for the Plaintiff's alleged failure to work is given: "3/22 – We left a message for Kofi regarding when he was available to work. We did not hear back from him."

   [d.] For the weeks of 3/28 – 4/3 (1998), 4/4 – 4/10 (1998), and 4/11- 4/17 (1998), the reason the Plaintiff did not work is said to be: "No contact"; "No contact"; "No contact", respectively.

   [e.] Then finally for the week of 4/18 - 4/24 (1998), the reason the Plaintiff did not work is said to be his failure to contact the Defendant: "No contact so his file was inactivated."

   [f.] Please see the Defendants' Position Statement captioned, "RE: Kofi Asimpi v. Relief Resources, No. 98132570, signed by Mr. Alan Seewald and addressed to Mary Garippo, Investigator, Massachusetts Commission Against Discrimination (MCAD), dated October 30, 1998, and marked as Exhibit III; also "Work History" document; marked as Exhibit IV).

10. As indicated, the Defendants' own telephone record has clearly shown that the Plaintiff was indeed in contact with his employer during the period. This fact was acknowledged by the MCAD Hearing Officer (HO) in her decision when she made the following observations:

> Hammond testified that once an employee is not placed, he/she is "inactivated." Hammond testified that [Plaintiff] remained employed but was notified on May 19, 1998 that he had been reclassified as "inactive." This reclassification allegedly took place because the regional coordinator had not received a request for assignment from him for a period of thirty days. However, Respondent's records show that outgoing calls to [Plaintiff] were made on 3/18/98 and 3/20 and that incoming calls from [Plaintiff] were received on 3/19, 3/27, 3/31, and 4/2. After this reclassification, [Plaintiff] placed calls to Respondent on 5/29, 5/31, 6/1, 6/3, 6/5, and 6/12. (Exhibit C-5 Respondent's Answers to Interrogatories from the [Plaintiff]). Further, staff at Respondent's Cambridge office contacted [Plaintiff] on 4/15/98 asking [Plaintiff] if he would conduct an orientation for newly employed field staff. The details were never provided to [Plaintiff] and his calls to the Cambridge office, regarding this opportunity, were not returned. I find that [Plaintiff] did attempt to stay in contact with the Respondent, that he was no longer called for work, and was thus terminated for all practical purposes (p. 9).

8. The Defendants belatedly changed their position, saying that the Plaintiff was in contact with his employer on numerous occasions during the time period of March 1998 to May 1998. From the Defendants' own telephone records, it was clear that the Plaintiff was indeed in constant contact with the Defendant, including the following dates: 3/18/98, 3/19/98, 3/20/98, 3/22/98, 3/27/98, 4/2/98, 4/3/98, 5/3/98, 5/31/98, 6/1/98, 6/5/98 and 6/12/98. (For the Defendants' telephone record, please see "RESPONDENT'S ANSWERS TO INTERROGATORIES FROM THE COMPLAINANT", dated 31st day of January, 2000, p. 6 and marked as Exhibit II).

9. Indeed, whereas they categorically stated in their "Work History" document, Position Statement and elsewhere that the Plaintiff had failed to contact his employer for a period of one month and so his file was placed on "inactive" status, the Defendant later shifted their position, at long last admitting in a secretly[1] introduced and unsigned document entitled "RESPONDENT'S MEMORANDUM", that the Plaintiff did, in fact, contact them on "several occasions". This document was written one-and-a-half years following the filing of the

---

[1] "Secretely" because it was not officially admitted into evidence and marked as an exhibit, like all the documents that were formally and legally admitted. Indeed, the Plaintiff never knew anything about the existence of this document until after the HO had issued her decision. The Hearing Officer and the Plaintiff's former counsel were, however, aware of it and did in fact accept it.

3

Defendants' Position Statement and eight months after the hearing at the MCAD had begun. It is to be noted also that this document is simply entitled, "RESPONDENT'S MEMORANDUM", unlike all the Defendants' documents, without indicating specifically what it is about. Nor was it marked as an exhibit.

10. On January 15, 2003, the HO ruled against the Plaintiff stating "that the [he] has failed to establish that the [Defendant] engaged in unlawful retaliation. [Therefore, the Plaintiff's] case must be dismissed" (HO's Decision, p. 12).

11. The Plaintiff appealed to the Full Commission (a three-member panel, including the HO who presented the case she had already decided on to the Commission), which similarly dismissed the case on June 12, 2003 (Full Commission' Decision, p. 2).

12. On January 16, 2004, the Plaintiff filed a complaint with the United States District Court, District of Massachusetts, Boston, following the receipt of a "right-to-sue" notice from the U. S. Equal Employment Opportunity Commission (EEOC). The Plaintiff alleged that he was unlawfully terminated after complaining about verbal and physical abuse based on his race.

13. The Defendant fabricated stories of bans that were allegedly placed on the Plaintiff. The alleged banned sites, according to the Defendant, were:

(i) League School in Newtonville on "5/13/97 [for] [s]leeping during a day shift at the school while attending to 1 student. Banned"[2]. No name is, however, given as the one responsible for the alleged ban. Nor did the Plaintiff know anything about this alleged ban until he had filed this case with the MCAD and read about it for the first time in the Defendants' Position Statement.

(ii) Moody Street, Waltham, on 10/5/97: "Banned from Overnight shifts at Moody St (CMH)." In the Defendants' "Work History" document, no reason is given for the alleged ban and no name of the one responsible for the ban is supplied. But they

---

[2] Please note that the HO deliberately exaggerated this to make it sound even worse when she stated that "The principal of the League School called Hammond to complain that Complainant had fallen asleep, leaving the children unsupervised. As a result, he would not allow Complainant to be reassigned to the facility." (HO's Decision, p. 3).

4

fabricated a new position in their RESPONDENT'S ANSWERS TO INTERROGATORIES FROM THE COMPLAINANT[3] document, stating that "Mr. Asimpi was found sleeping on an awake overnight shift." In the Response to Complaint column of this document, they fabricated the statement that "Bob Lindner spoke with Mr. Asimpi and told him he could not sleep on shift and could not return to Moody Street." But still, this document also makes no mention of the name of the person who allegedly found the Plaintiff sleeping. Interestingly enough, the Plaintiff was the only person who worked the night shift on this date in question, as he had done many times previously.[4] In addition, the Plaintiff knew nothing about this ban until he read about it in the Defendants' Position Statement, i.e., after he had lodged a complaint against the Defendant in this case.

(iii)   **Norfolk Street, Cambridge, on 12/31/97**: In their "Work History" document, the Defendant fabricated the statements that the Plaintiff was "[b]anned from Norfolk because he was "confrontational" with Katie (program director). ... As a result of 2 situations at 2 different CASCAP programs, Kofi was banned from ALL CASCAP programs. (BOB)". Here again, the Defendant mentions no name as the one who banned the Plaintiff from ALL CASCAP sites and no evidence was produced to back their false claim. Secondly, whatever the two specific situations at two different CASCAP programs were are not mentioned[5]; nor are they noted

---

[3] Please note that this document was prepared on January 31, 2000, one-and-a-half years after the Defendant had filed with the MCAD their Position Statement in response to the Plaintiff's complaint against them and eight months after the hearing of the case at the MCAD had begun.

[4] A good work performance report at Moody Street had been written about the Plaintiff who asked his counsel to invite the manager and his assistant as witnesses to testify about his work performance in general and about this alleged ban specifically, but he failed to do so, even though the two men were willing to testify. Counsel also failed to subpoena the Daily Incident Log-book which would have exposed the Defendants' fabrications. Not only did the Plaintiff's former counsel fail to invite these two officials to testify at the hearing, but he failed to invite any and all of the numerous potential witnesses whose names the Plaintiff had furnished him long before the hearing started.

[5] CASCAP, like the CMH, is a very large organization from whom the Defendant contracted and any such ban as alleged here by the Defendant can be effected only by action from its headquarters. No program manager at a small site like Norfolk Street has the power and authority to ban a staff from the entire company any more than the Adams Street manager can ban any staff from the entire CMH sites. Unlike the CMH programs where the Plaintiff is alleged to have been banned, the president of the Defendant did not speak to the Plaintiff about this alleged ban. In fact, the Plaintiff knew nothing about this ban until he read about it in the Defendants'

5

anywhere else in the "Work History" document. Like most of the alleged bans, the Plaintiff was unaware of them until he read about them in the Defendants' Position Statement. Indeed, these are all clearly fabrications calculated only to tarnish as a "poor" worker the good image of the Plaintiff and so to win the case. (Please see Mr. Thomas S. Gildea's letter dated January 15, 1999, which is "the Petitioner's Rebuttal to Respondent's Position Letter", marked as Exhibit V).

(iv) **808 Memorial Drive.** The operator of this facility asked that [t]he Plaintiff not return due to a mixup in which the plaintiff arrived when no staff was expected, and the mental health consumers who observed him being escorted out were frightened by the experience. This is how the Defendant put it in their "Work History" document: "8/21 – Kofi is banned from 808 Memorial. He was scheduled to work on 1 of the 2 floors in the house. He was sent to the wrong floor and the consumers were not expecting someone to come work and they were afraid. He felt that he was singled out due to his race rather than the fact that they were MH consumers who were not expecting a worker and were afraid. (BOB)").

(v) **Clement Street.** The Plaintiff denied that he personally made a medication error. He also denied that Lindner or Hammond advocated for the Plaintiff's return. As already pointed out, it was rather a client who took his own medicine without telling the Plaintiff first. The Plaintiff was not aware of the allegation that Lindner or Hammond advocated for his return to this site. The Plaintiff made his denials clear in the Dep., p. 61, ln 12 through p. 63.

(vi) In their "Work History" document, the Defendant fabricated the story that on December 31, 1997, the Plaintiff was banned from Norfolk Street "because he did not get along with a consumer's dog", that "he became confrontational with [Katie Curley], the program director," that he engaged in a heated discussion with her and finally that "...as a result of 2 situations at 2 different CASCAP programs, Kofi was

---

Position Statement. This alleged ban is obviously another example of the Defendants' numerous and blatant lies.

banned from ALL CASCAP programs."[6] Here again, the Defendant mentions no name of the one who allegedly banned the Plaintiff from ALL CASCAP sites and no evidence is introduced to back their claim. Secondly, what does it mean to say that the Plaintiff "did not get along with a consumer's dog"? This is meaningless. Thirdly, whatever the two specific situations at two different CASCAP programs were are not mentioned[7]; nor are they noted anywhere else in the Defendants' "Work History" document. Like most of the alleged bans, the Plaintiff was unaware of this CASCAP ban also until he read about it in the Defendants' Position Statement after filing his complaint with the MCAD. Obviously, all these are fabrications calculated only to tarnish the good image of the Plaintiff as a "poor" worker and so to win this case. (Please see Mr. Thomas S. Gildea's letter dated January 15, 1999, which is "the Petitioner's Rebuttal to Respondent's Position Letter", marked as Exhibit V).[8]

14. Indeed, the Defendants' own letter to the Plaintiff dated May 29, 1998, and signed by Ms. Robin O'Farrell, human resources department director, testifies to this undeniable truth by

---

[6] It's interesting to note that where the Plaintiff clearly denies anything in the Dep., the Defendants' Motion for Summary Judgment cleverly avoids specific reference to those pages most of the time. (Dep. 64, ln 5 through p. 66, ln 22). Please see, e.g., p. 66, ln 3 through 22 for the Plaintiff's clear denials.

[7] CASCAP, like the CMH, are two large and separate organizations owned and operated by two distinct proprietors/administrations altogether and are headquartered in Hadley and Cambridge (both in Massachusetts), respectively, from which the Defendant contracted. And any such ban by CASCAP as alleged by the Defendant here can be effected only by action from its headquarters. No program manager at a small site like Norfolk Street has the power and the authority to ban a staff from the entire company any more than the Adams Street manager could ban any staff from the entire CMH sites. Unlike the CMH programs from where the Plaintiff is said to have been banned, the president of the Defendant did not speak to the Plaintiff about this alleged ban. In fact, the Plaintiff knew nothing about this ban until he read about it in the Defendants' Position Statement, following his sudden termination. This alleged ban is obviously another example of the Defendants' numerous and blatant fabrications.

[8] Please note finally on this point that in spite of the Plaintiff's denial that most of these alleged bans took place, the MCAD HO merely accepted the Defendants' concocted versions as facts and used them as one of her reasons for her decision against the Plaintiff. The HO made no effort whatsoever either by cross-examining or by making use of any other means available to her to determine the truth.

referring to the Plaintiff as a "former employee". As a former employee, therefore, Ms. O'Farrell's letter says, the Plaintiff's file was placed on inactive status. Thus the term, "terminated" and the sentence "[his] file was placed on inactive status" are synonymous, contrary to the Defendants' vehement denial that the Plaintiff was terminated; they insisted instead that only his file had been placed on inactive status. (Please see copy of Ms. O'Farrell's letter, marked as Exhibit VII).

15. The Plaintiff also spoke to Mr. Bob Lindner, Regional Coordinator, about assignments, but he bluntly told the Plaintiff that so far as he was aware, the Plaintiff was no longer working for the company, i.e., Relief Resources, Inc. The Plaintiff had been terminated.

16. In fact, the reason Ms. Bush gave the Plaintiff for not assigning the Plaintiff was that his schedules file had been removed. At no time did Ms. Bush tell the Plaintiff that she was having difficulty finding him an assignment because of his lack of a means of transport for the Plaintiff exclusively depended on public transport. In fact, as indicated, there is nothing in the Defendants' Position Statement to that effect. It is thus a fabrication. The problem of public transportation in the Boston Metroplex was never an issue.

17. Whereas the Defendants' initial and sole reason for allegedly placing the Plaintiff's file on inactive status, according to their "Work History" document, was that the Plaintiff failed to contact his employer for one month period, in the above-referenced RESPONDENT'S MEMORANDUM, another fabricated reason is said to have been that "the director of Human Resources Department believed that after being banned from all CMH sites, the [Plaintiff] failed to contact the [Defendant] for assignment." The statement adds: "Therefore, in adherence to the stated policy contained in the Policy and Procedures Manual (p. 14), the [Plaintiff] was inactivated. Although there apparently were calls to the weekend coordinator, the weekend coordinator did not note those calls, and they were not conveyed to the Human Resources Department" (pp. 8f.). All this is not stated in the Defendants' Position Statement; they are lies.

18. As indicated, the Defendant purposely coined the term "weekend coordinator" solely for the purpose of defending themselves in this case. Ms. Genie Bush, who is implied here, was

not designated as a "weekend coordinator". By coining this new term, they have given the false impression that the official in question worked only at weekends and/or dealt with issues connected only with weekends. In the first place, Ms. Genie Bush, to whom the Plaintiff spoke on several occasions, was officially designated as Eastern Massachusetts Coordinator, who happened to have served at some weekends.

19. In their attempt to explain why the numerous efforts the Plaintiff made to speak to the President of the Defendant, Mr. Hammond, failed after the Plaintiff had been terminated, the Defendant fabricated another story which the HO accepted as truth and thus used it as a reason for her negative decision against the Plaintiff. She wrote:

> In March 1998, Hammond was in the process of removing himself from the role of "field coordinator." He testified that he needed to take a stronger management role, as many of the field staff did not know he was the owner of the company, because he was a placement person for the organization. He decided that he would no longer take calls from staff and had his calls redirected to the coordination staff. Hammond testified that this was not a measure directed against Complainant. I credit Hammond's testimony that he no longer accepted any field staff calls." (HO's Decision, p. 8).

20. It should be noted that in the above-referenced "Work History" document, there is not a single positive thing said about the Plaintiff during the entire period that he was in the Defendants' employ. Yet, as he stated in his written testimony, the Plaintiff noted how the officials, including Mr. Hammond and Mr. Lindner as well as Ms. Genie Bush often praised him for his good work performance and his work attitude in general. The Plaintiff was often praised, for example, for his willingness to step in and to work other shifts in emergency situations when other Field Staff suddenly called from time to time to say they could not work. In his written testimony, the Plaintiff also pointed out how on meeting in person the first time at the Defendants' Cambridge/Somerville office one day Ms. Bush was exhilarated and exclaimed with excitement in the presence of Kerri Lee, the office manager who introduced the Plaintiff to her: "Oh, you're Kofi! People at the office are always saying good things about you." In his own testimony in this case, Mr. Hammond confirmed that

9

there indeed had existed a good relationship between him and the office staff on the one hand and the Plaintiff on the other. Yet, all that the Defendant has done in this case is to calculatedly portray the Plaintiff as a very poor, uncooperative and belligerent worker—so very bad, in fact, that they even significantly increased his work hours! Another important factor to note also is that the "Work History" document that the Defendant filed with the MCAD, according to their own statement, was not the original but only a summary. Indeed, Mr. Hammond acknowledged under oath at the MCAD hearing that this document was prepared after the Plaintiff had filed his complaint with the MCAD. Nor were the Defendants' above-referenced telephone record the original from the telephone company.

21. The Plaintiff complained of racial harassment at his workplace in a letter he addressed to his supervisor and the Defendant retaliated almost instantly by terminating (or "inactivating" his file, as the Defendant put it) him. The Defendant then vehemently denied they terminated the Plaintiff and insisted instead that it was he himself who had failed to contact his employer for assignments for a period of one month. When this untruth was exposed, according to their own telephone record, the Defendant then fabricated all sorts of stories, some illogical, to defend themselves.

Respectfully submitted,

Pro Se Plaintiff

KOFI ASIMPI

*(signature)*

213 Kelton Street,
Apt. # G-02,
Allston, MA 02134-4384
Tel.: # 617-566-2524

Dated: the 1st day of March, 2005

### Statement of Service

I do hereby certify that on this date a true copy of the foregoing was sent by postage pre-paid, First Class Mail to Alan Seewald, Esq., Counsel for the Defendant, at Five East Pleasant Street, Amherst, MA 01002.

*(signature)*
Kofi Asimpi