UNITED STATES DISSTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
KOFI ASIMPI                  )
    PLAINTIFF                )
                             )
V.                           )         C. A. NO. 04-10117-DPW
                             )
RELIEFF RESOURCES, INC.      )
    DEFENDANT                )
_____

## AFFIDAVIT OF KOFI ASIMPI

I, KOFI ASIMPI, the undersigned, do hereby state that the following is true to the best of my knowledge, information and belief:

1. My name is Kofi Asimpi. I am and for all relevant times I have been Pro Se Plaintiff.

2. On or about April 2, 1997, I was employed by Relief Resources, Inc. as a member of its Field Staff.

3. Throughout my employment with Relief Resources, I requested to work as many hours as possible. Indeed, during my term of employment, Relief Resources did increase, and in some cases, almost doubled my work hours.

4. Prior to and about Mar 01, 1998, I complained, both in writing and orally, that a client of Adams Street, a facility belonging to The Center for Mental Health and Retardation Services (with whom Relief Resources contracts) was verbally and physically abusing me, based on my race.

5. On or about March 13, 1998, I spoke to Mr. Douglas Hammond, President of Relief Resources, about the written complaint that I had made with regard to the racial harassment from The Center for Mental Health client.

6. After March 13, 1998, no one from Relief Resources called me or returned my calls.

7. During the period of March 14 to April 22, 1998, I made numerous calls to Relief Resources requesting assignments. None of my calls about requests for assignments were returned.

8. On or about June 1, 1998, I received a letter from Relief Resources, that I had previously requested. This was the first time that I knew of my termination from Relief Resources. In this letter I was referred to as "a former employee" of the Defendant.

9. I called and spoke to Ms. Genie Bush not only at weekends but during week days as well, informing her of my availability to receive work assignments. Among the weeks days on which I called Ms. Bush, according to the Defendant's own telephone record, were Wednesday, March 18, 1998, Thursday, March 19, 1998, Friday, March 20, 1998, Friday, March 27, 1998, Thursday, April 02, 1998 and Friday, April 03, 1998. This was the time about which the Defendant maintained that I had made no contact with them for a period of one month, as a result of which my file was "inactivated".

10. During my entire term of employ with the Defendant, the Defendant never raised the issue of the problem of transportation as a reason for not assigning me anywhere in the Greater Boston area. In fact, I was assigned and I did work many times at facilities located in as far away as Dedham, West Medford and Arlington and I reached all these places by means of public transport.

11. During my entire term of employ with the Defendant, I never heard of nor did the Defendant counsel me about, my "poor work performance". I read about it the first time in the Defendant's "Work History" document on me only after my termination by the Defendant and only after I had lodged a complaint of unlawful termination with the Massachusetts Commission Against Discrimination (MCAD).

12. I never received from the Defendant the complete contents of my personnel file which I had requested following my termination. The Defendant's "Work History" document, one of the most, if not the most important of all the documents among the contents of my personnel file, was omitted, although the Defendant's cover letter to the Plaintiff stated: "Enclosed is a complete copy of the contents of your personnel file, forwarded to you per your request." I saw this "Work History" document only after my former counsel had received a copy from the Defendant's counsel, Alan Seewald, Esq.

13. Throughout the hearings at the MCAD, I never saw or heard the formal admission into evidence, and marked as an exhibit, the Defendant's RESPONDENT'S MEMORANDUM dated June 9, 2000—i.e., one-and-a-half years after the Defendant had filed a Position Statement with the MCAD claiming that they had not terminated me but that they had only placed my name on "inactive" status due to my alleged "no contact" period with my employer and eight months after the hearings at the MCAD had begun. I discovered only after the cessation of the MCAD hearings of my case that the Defendant's most serious allegations against me were actually spelt out in this unsigned document. These allegations, which shocked me, were the very basis of the MCAD Hearing Officer's decision against me.

14. It is in this RESPONDENT'S MEMORANDUM that I discovered that the Defendant at long last admitted that "Mr. Asimpi apparently did call Relief Resources speaking on several occasions with the weekend coordinator."

15. Throughout the whole time that I was making contact with the Defendant with the view to getting work assignments, no one among those I spoke to told me about "a breakdown in communication between the weekend coordinator and the human resources department", a point that was nowhere stated in the Defendant's 1998 Position Statement. Nor did I ever hear of the title "weekend coordinator" during my entire employment with the Defendant.

16. Throughout my employ with the Defendant, I was assigned to approximately thirty different facilities within the Greater Boston area.

17. Throughout my entire employment with the Defendant, I had good, enjoyable relationships with the Defendant's headquarters staff, especially with the president, Mr. Doug Hammond, and two regional coordinators, Mr. Robert Lindner and Ms. Genie Bush who had never complained to me about my "poor work performance"..

18. I had never heard about my alleged bans from the following sites until I read them in the "Work History" document, attached to the Defendant's Position Statement: (i) League School in Newtonville on "5/13/97 [for] [s]leeping during a day shift at the school while

3

attending to 1 student. Banned"[1]; (ii) Moody Street, Waltham, on 10/5/97: "Banned from Overnight shifts at Moody St (CMH)." I was the only person who worked the night shift on this date, as I had done many times previously. (iii) Norfolk Street, Cambridge, on 12/31/97: "Banned from Norfolk because he was confrontational with Katie (program director). ... As a result of 2 situations at 2 different CASCAP programs, Kofi was banned from ALL CASCAP programs. (BOB)".League School (Newtonville), Moody Street (Waltham), 808 Memorial Drive (Cambridge) and all CASCAP programs. I was not aware of the allegation that I was banned from Norfolk Street because I had allegedly been confrontational with the program manager; nor was I aware of the alleged "2 situations at 2 different CASCAP programs." I never heard of my alleged ban from ALL CASCAP programs until I read it in the Defendant's "Work History" document prepared following my termination.

19. There was absolutely no incident involving me and a consumer's dog at Norfolk Street and, in fact, Bob Lindner had told me that the program director, Katie Curly, must have confused another Field Staff with me, about whom Curly had written earlier to the Defendant, saying that this other Field Staff did not like dogs and therefore must not be sent back to Norfolk Street again.

20. I never heard until now that I was warned after "sleeping" on duty at River Street, nor that I called the program manager there so many times that she felt badgered and told me not to call her again. I read about this allegation only in the Defendant's "Work History" document.

21. The only reason Ms. Genie Bush gave me for her difficulty in giving me work assignments was that my schedules filed had been removed, action she felt had been taken by Mr. Bob Lindner. Indeed, in my call to the Defendant's office on Monday, June 01, during which time I asked about my work status and for assignments, Mr. Linder point-blank told me that I had been terminated and so I was no longer working for the Defendant. Ms. Bush also confirmed this later and explained that I was terminated because of the personal letter I had written to my supervisor complaining about Steve's abuse of me. Finally, that I was terminated because of the letter I had written to my manager was also confirmed by Ms.

Robin O'Farrell, director of human services of the Defendant, who referred to me in her letter of Monday, Jun 01, 1998, as "a former employee of Relief Resources, Inc." and indicated that my file had been placed on inactive status as of April 22, 1998. This was the first time I knew my file had been "inactivated".

22. Besides Adams Street, where I served many times during my employment with the Defendant, there were other CMH facilities in close proximity (less than ten minutes walk) to Adams: They are Banks, Brown and Gardner Streets. With the exception of Gardner Street, I at one time or another was assigned to and I did serve all these facilities.

23. During all my calls to the Defendant about my availability for work and employment status, I never stated that I "would call [the Defendant] with the dates and times [I was] available for work", as entered in the Defendant's "Work History" document. Most of the calls I made soon following my termination about March 14, 1998, was about the fact that I was available for work assignments, but I was never assigned again.

24. I had at no time heard about the Defendant's claim that they were "faced with a narrow population within the groups of mentally ill residents with whom Complainant could work" until I heard it at the MCAD hearing. There were other non-mentally ill institutions, like schools, where the Defendant had assigned me and I served.

25. Until the MCAD hearing, I had never heard that in 'March 1998, Hammond was in the process of removing himself from the role of "field coordinator", that he needed to take a stronger management role, as many of the field staff did not know he was the owner of the company, because he was a placement person for the organization' and these reasons, he decided he would no longer take calls from staff and had his calls redirected to the coordination staff.' During all my calls to the Defendant's headquarters, when I repeatedly sought to speak to Mr. Hammond, no one told me any of these. Instead, I was each time told that Mr. Hammond would call me back, but neither he nor any staff ever did (Please HO's Decision, p. 8).

26. At no time did Mr. Hammond in his alleged counselling of me on March 13, 1998, following his receipt of my Castagnola letter, inform me that I had committed a serious violation of

5

Robin O'Farrell, director of human services of the Defendant, who referred to me in her letter of Monday, Jun 01, 1998, as "a former employee of Relief Resources, Inc." and indicated that my file had been placed on inactive status as of April 22, 1998. This was the first time I knew my file had been "inactivated".

22. Besides Adams Street, where I served many times during my employment with the Defendant, there were other CMH facilities in close proximity (less than ten minutes walk) to Adams. They are Banks, Brown and Gardner Streets. With the exception of Gardner Street, I at one time or another was assigned to and I did serve all these facilities.

23. During all my calls to the Defendant about my availability for work and employment status, I never stated that I "would call [the Defendant] with the dates and times [I was] available for work", as entered in the Defendant's "Work History" document. Most of the calls I made soon following my termination about March 14, 1998, was about the fact that I was available for work assignments, but I was never assigned again.

24. I had at no time heard about the Defendant's claim that they were "faced with a narrow population within the groups of mentally ill residents with whom Complainant could work" until I heard it at the MCAD hearing. There were other non-mentally ill institutions, like schools, where the Defendant had assigned me and I served.

25. Until the MCAD hearing, I had never heard that in 'March 1998, Hammond was in the process of removing himself from the role of "field coordinator", that he needed to take a stronger management role, as many of the field staff did not know he was the owner of the company, because he was a placement person for the organization' and these reasons, he decided he would no longer take calls from staff and had his calls redirected to the coordination staff.' During all my calls to the Defendant's headquarters, when I repeatedly sought to speak to Mr. Hammond, no one told me any of these. Instead, I was each time told that Mr. Hammond would call me back, but neither he nor any staff ever did (Please HO's Decision, p. 8).

26. At no time did Mr. Hammond in his alleged counselling of me on March 13, 1998, following his receipt of my Castagnola letter, inform me that I had committed a serious violation of

5

housemates at Adams Street, just as one would expect the residents of any apartment complex to live and behave.

30. I strongly believe and contend that I lost both my case with and its appeal to the Massachusetts Commission Against Discrimination (MCAD) only because my former counsel, Thomas S. Gildea, Esq., in collaboration with the Hearing Officer, Ms. Helene Horn Figman of the MCAD, consciously and calculatively aided and abetted the Defendant in many and varied ways that accounted for my losing the case.

*[Signature]*
KOFI ASIMPI

Signed under the pains and penalties of perjury this 1st day of April, 2005.