# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOFI ASIMPI<br>    PLAINTIFF<br><br>V.<br><br>RELIEFF RESOURCES, INC.<br>    DEFENDANT | ) )<br>)<br>)<br>)<br>)<br>)<br>) |

C. A. NO. 04-10117-DPW

### PLAINTIFF'S OPPOSITION TO MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Now comes the Pro Se Plaintiff, KOFI ASIMPI, and moves this Court to dismiss the Defendant's Motion for Summary Judgment and submits the following memorandum in support of his opposition:

I.    **CAN THE PLAINTIFF NOT SUSTAIN HIS BURDEN OF PROVING A PRIMA FACIE CASE OF RETALIATION AS THE DEFENDANT CLAIMS?**

1. The Defendant is in the business of providing temporary staffing to human services organizations. The Plaintiff was an employee of the Defendant, working as a member of the Field Staff. The Plaintiff was assigned to work at various human services agencies in the Greater Boston area.

2. Among the sites the Plaintiff was assigned to work was Adams Street, a half-way community home for mentally ill adults in Waltham, MA. While working at Adams Street, the Plaintiff was verbally harassed and physically abused by one of the residents of the home.

3. On March 1, 1998, the Plaintiff wrote a letter to the manager of Adams Street detailing the abuses, based upon his race, and his concerns for his personal safety.

4. On March 13, 1998, the Defendant received a copy of the above-referenced letter.

5. On March 14, 1998, the Plaintiff worked his last shift for the Defendant. No further assignments were forthcoming and the Plaintiff's repeated telephone calls for work were never returned.

Massachusetts General Law Chapter 151B, §4 (1) and Title VII of the Civil Rights Act of 1964 state that it is unlawful to discriminate on the basis of race, color or national origin, et al. MGLc. 151B, §4 (5) prohibits aiding and abetting or compelling and coercing discriminatory acts. MGL c.151B, §4 (4A) prohibits coercing, intimidating, threatening or interfering with rights under the statute by "any person".

Employers can be held independently liable for failing to conduct an adequate investigation of harassment claims. *College Town, Div. of Interco., Inc. v. Massachusetts Commission Against Discrimination* 400 Mass. @ 167 – 168, 508 NE2nd @ 594.

It has been recognized that the discharge of an employee because of his complaints to his employer regarding discriminatory employment practices based on race ... is actionable under 42 USCS 1981. All persons within the jurisdiction of the U.S. shall have the same right in every state and territory to make and enforce contracts ... and to the full and equal benefits of all laws ... for the security of persons and property as is enjoyed by white citizens." The fact that §1981 is couched in declaratory terms and provides no explicit method of enforcement does not prevent a federal court from fashioning an equitable remedy. *Jones v. Alfred H. Mayer Co.*, 392 US 409.

A Title VII plaintiff can prove pretext by circumstantial evidence. Evidence that the employer acted contrary to its customary policy in making employment decisions may support inference of discrimination, at least in absence of evidence that employer often did not follow its own stated policy. Civil Rights Act of 1964, §701 et seq., as amended, 42 U.S.C.A. §2000e et seq., 42 U.S.C.A. §1983. *White v. Vathally*, 570 F. Supp. 1431, aff'd 732 F.2d 1037, cert denied 105 S. Ct. 331 (1983).

The Plaintiff wrote a letter to his supervisor, in which he complained about racial harassment at his workplace. Instead of taking the appropriate action to address the Plaintiff's concerns in the letter, the Defendants retaliated by almost summarily terminating him in violation of

Massachusetts General Law Chapters 151B, §4 (1), MGLc. 151B, §4 (5) & MGL c.151B, §4 (4A) and Title VII of the Civil Rights Act of 1964. This view is supported by J. Lynn Milinazzo-Gaudet, Esq. and Douglas T. Schwarz, Esq. and Sunila Thomas George, Esq., Attorney Investigator, Investigating Commissioner and Supervisor, respectively, of the MCAD. According to the three learned officials, their investigation, whose memorandum was released in July 2000 to the parties concerned, revealed that:

> "[Plaintiff] has established a prima facie case for retaliatory discharge. [Plaintiff] participated in a protected activity when he wrote the letter alleging racially motivated work place harassment. It is undisputed that [Defendant] had knowledge of said letter. [Plaintiff] has established that he was subjected to an adverse employment action when [Defendant] failed to offer him work assignments and placed [Plaintiff] on inactive status. The [Plaintiff] has also established that the timing of his complaint and the adverse employment action were such that retaliation may be inferred (MCAD Memorandum, Docket #98-13-2570 and EEOC No. 16C983153).

Not only did the Defendant violate both state and federal laws; they violated their own inactivation policy as well. Relief Resources, Inc. *Policies and Procedures* handbook states:

> Relief Resources must rely upon every active Field Staff to maintain strong lines of communication with us regarding availability, likes, dislikes and expectations. Field Staff who do not maintain contact with us and/or who do not accept and/or complete assignments on a consistent basis will be notified by mail of inactivation. Any Field Staff who would like to be placed on inactive status should notify us immediately and forward a letter to the central office (p. 14).

The Defendants wrote no letter to the Plaintiff notifying him of his inactivation until he himself had requested a letter from the Defendants to use for rental purposes. It was in this letter, dated May 29, 1998, and in which the Plaintiff was referred to as "a former employee" whose file was placed on "inactive" status that he learnt for the first time that he had been terminated. Thus the Defendants violated their own policy.

On the basis of the above-referenced findings of fact and law and the Defendants' own policy on the issue, it is indisputably evident that the Plaintiff is able to sustain his burden of proving a prima facie case of retaliation. Therefore the Defendants' motion for summary judgment must be dismissed.

A.    **DID THE PLAINTIFF NOT ENGAGE IN PROTECTED CONDUCT UNDER TITLE VII, AS THE DEFENDANT CLAIMS?**

The question here is retaliation, which is a separate issue from discrimination, "motivated at least in part, by a distinct intent to punish or to rid a workplace of someone who complains of

unlawful practices." *Kelly v. Plymouth County Sheriff's Department*, 22 MDLR 208, 215 (2000). The Plaintiff reasonably believed that the verbal harassment and physical attack he was subjected to were due to his race and national origin. He complained in writing to his manager of Adams Street, detailing what he believed to be racially motivated and expressing concern for his personal safety. The Defendants' president received by fax the Plaintiff's letter on March 13, 1998. After March 14, 1998, the Plaintiff was not given any assignments again, in spite of his repeated calls to the Defendant requesting assignments.

The Defendant cannot sustain his submission that the alleged harassment in the Plaintiff's "letter does not state a colorable cause of action under Title VII, and, as a matter of law, it does not state a basis for a reasonable ... belief that the plaintiff was opposing actionable racial harassment." As already stated, retaliation and discrimination are two separate issues and in this case the issue is retaliation and must be treated as such. As the MCAD Hearing Officer Helene Horn Figman maintains in her decision, the Plaintiff "has shown that there was adverse employment action following the protected activity within such close time proximity that a retaliatory motive could be inferred. Where, as in this case, there is no direct evidence of retaliatory motive, the Commission follows the burden-shifting framework set forth in *Wheelock College v. MCAD*, 371 Mass. 130, 136 (1976). (HO's Decision, p. 10). Thus, the Defendants have erred when they concluded that the Plaintiff's Castagnola letter does not satisfy the requirements of protected conduct under Title VII. Therefore the Defendants' motion should be dismissed.

1. **ARE THE ALLEGATIONS OF THE CASTAGNOLA LETTER NOT SUFFICIENTLY SEVERE AND PERVASIVE SO AS TO FORM AN ADEQUATE BASIS FOR A REASONABLE BELIEF THAT HE WAS BEING SUBJECTED TO RACIAL HARASSMENT IN VIOLATION OF TITLE VII, AS THE DEFENDANT CLAIMS?**

The Defendants assert that the Plaintiff's allegations in the Castagnola letter are not sufficiently severe and pervasive so as to form an adequate basis for a reasonable belief that he was being subjected to racial harassment in violation of Title VII. The Defendants further argue: "When measured against the threshold set forth by the Supreme Court for stating a cause of action based upon a hostile workplace environment, it is abundantly clear that the interactions between the

plaintiff and Steve, while unpleasant and unfortunate, are not sufficiently onerous for a reasonable person to believe that the plaintiff was being subjected to racial harassment actionable under Title [VII]." Not only is the Defendants' attempt at playing down the severity and the pervasiveness of Steve's racial attacks on the Plaintiff preposterous; it is misconceived, misplaced and disingenuous. Given the frequency of both the verbal harassment and physical attacks[1] visited upon the Plaintiff by Steve that the Defendants outline (pp. 4f.), based upon the Castagnola letter, how much more severe and pervasive do the Defendants want them to be to satisfy their standard?

Once again, the Defendants emphasize Steve's mental illness, claiming that it was that illness that "caused him to say things that were irrational and without a basis in reality." What is the basis of the Defendants' conclusion? This is false. If that had been Steve's true mental condition, he would have been sent to an asylum for the insane and he would not have willingly opted to live in a community home where he was strictly prohibited from behaving towards and verbally assaulting someone like the Plaintiff the way he did.

How did Steve know that the Plaintiff was not "intelligent", unless he was using the term from a racist's perspective? Is that not one of the common terms racists often use to describe people of color, especially Africans and people of African descent in general?[2]

The Defendants' assertion that "[b]y accepting employment as a caretaker for the mentally ill, the plaintiff implicitly accepted a workplace in which a certain level of abuse is to be anticipated and tolerated" is totally false. The Defendants are neither psychiatrists nor a psychologists, nor are they qualified experts to draw that wild conclusion. During their process of employment, staff were

---

[1] It is quite hypocritical for the Defendants to label Steve's physical assault on the Plaintiff as "unspecified 'physical assault'" when they are well aware that Steve once physically assaulted the Plaintiff by severely kicking him and thus inflicting severe pain on him. (Please see *Deposition of Asimpi,* p. 72, ln 13 through p. 74, ln 2). What about all Steve's violently threatening behavior towards the Plaintiff to the extent that the latter was very much concerned for his personal safety and even feared Steve might kill him, since he would attack the Plaintiff violently only when he realized was alone and no one was around? Is an insane person—the kind of person the Defendants wish us to believe Steve was—able to carefully time when and when not to violently attack someone?

How does the Defendant know that it was personal calls the Plaintiff was making when Steve violently unplugged the telephone from the wall? (Dep., p. 76. ln 12 through p. 77, ln 8). As the Plaintiff indicated elsewhere, the suggestion that the telephone he was using belonged to the clients and that while they could use it but staff could not is totally false. To the contrary, clients were not allowed to use the phone; only staff could. Clients were supposed to have their own telephone(s).

[2] The Plaintiff's Ph.D. history dissertation is on race relations, so he is very much familiar not only with the derogatory terms used for people of color but also with the way racists abuse those people in general.

not made to understand that they were going to work in an asylum or in an asylum-setting where they should expect to be harassed and attacked by the mentally ill people. The kind of mentally ill people the Defendants describe here are the insane who do not have the mental capacity to control and be responsible for their own actions. The insane are not given rules and regulations to obey. Steve was not insane, so he was expected to obey the community rules and regulations. Besides, he never treated any of the white people the way he did the Plaintiff. Finally, there were other clients with Steve's diagnosis not only at Adams Street, but throughout other facilities, be it CMH or CASCAP's, but the Plaintiff did not experience the kind of abuses he experienced from Steve.

## 2.   IS THERE TRULY NO EVIDENCE THAT STEVE'S COMMENTS WERE RACIALLY MOTIVATED?

In the first place, to play down Steve's verbal and physical attacks on the Plaintiff merely as "rude and insulting comments" (p. 8) and to assert that the words Steve used against the Plaintiff "(p. 9) were not overtly racial" simply shows how the Defendants have great difficulty acknowledging and telling the truth. Secondly, Steve, or any anyone who harbors racial animosity towards people other than those of his/her own race, need not necessarily use overtly racial words to demonstrate his/her true racial feelings. One of the characteristics of racists is their antipathy for people outside their own race. Racists dislike people unlike themselves simply because of who they are: they are of different racial types having different cultures; it is not because those they have or dislike have offended them in any way. Steve made it clear that he did not like the Plaintiff and each time he saw him, he either demonstrated it, if and when he had the chance, or he at least demonstrated that he had the desire to prove his dislike of him. Why would one hate another person, especially one of a different racial group, even if one has not before met or known the other, unless it has something to do with the fact that they belong to different racial types?

The Defendants' argument that there is no evidence that Steve harassed other African Americans the same way he did the Plaintiff is faulty. The lack of evidence does not necessarily mean its absence entirely. It is also faulty to jump to the conclusion that there is no evidence of something when one has not investigated it first. The Defendants did no investigation, so they

cannot make that conclusion. And in this case, it is not the responsibility of the Plaintiff to investigate to determine whether or not Steve abused other African Americans as he did the Plaintiff. There may have been other African Americans who served at the same site that the Plaintiff served, but that does not necessarily mean that they were on the same shifts with the Plaintiff, which would have given him the opportunity to determine whether or not Steve treated other African Americans the same way he treated the Plaintiff. Most importantly, however, the best way to measure Steve's treatment of the Plaintiff to determine whether or not he had any racial animus towards him was to compare Steve's treatment of the white staff with his treatment of the Plaintiff. And in this case, the difference was quite obvious. Not only did the Plaintiff observe that Steve liked the white staff and his white housemates; he also highly respected them, especially the manager and the other staff, all of whom were white. The Plaintiff never once saw Steve being even rude to any white people.

As we have seen above, it is sufficient for the Plaintiff to reasonably believe that Steve subjected him to verbal harassment and physical abuse because of his race and national origin. But the reasonableness does not merely hang in a vacuum; it is based on the very nature of Steve's abuses. Thus, the Defendants' conclusion that "the plaintiff cannot show that a reasonable person would believe that Steve's harassment was racially motivated and summary judgment is appropriate" (p. 10) should be rejected.

3. **DID THE PLAINTIFF REALLY FAIL TO GIVE THE DEFENDANT NOTICE OF THE ALLEGED RACIAL HARASSMENT? IF SO, DID THAT PRECLUDE A FINDING THAT A TITLE VII WAS OCCURRING, AS THE DEFENDANT CLAIMS?**

The Defendants assert: "The undisputed fact is that the plaintiff never gave any notice to the defendant regarding the alleged racial harassment by Steve" (p. 11). This bold assertion is, however, false and is meant to mislead the Court. As the Plaintiff has maintained, both the Defendant, Relief Resources, and the Center for Mental Health (CMH) have policies and procedures that guide their workers. A Field Staff of the Defendants is obligated to strictly observe CMH's policies and procedures once s/he is assigned to a CMH facility. The Adams Street facility, as observed, is a CMH facility and therefore the Plaintiff followed both the letter and the spirit of the

CMH's policies and procedures. Apart from verbally reporting to his manager each incident of Steve's harassment and abuse of the Plaintiff, the Plaintiff also recorded each in the Daily Incident Log-book. In addition, he filed special reports whenever major incidents like Steve's verbal harassment and physical attacks occurred. The next stage would be for the Plaintiff's manager to take action to resolve whatever problem there was between Steve and the Plaintiff.

In this case, besides the official reports the Plaintiff had written, he also wrote a personal letter to his Adams Street manager with the view to prompting him to act quickly on the reports he had made about Steve, fearing that Steve could more severely hurt, if not even kill, him if he did not take action quickly. Meanwhile, the Plaintiff also called the Defendant's headquarters and made a verbal report to Mr. Bob Lindner, telling him about the harassment he had been experiencing from Steve (Dep., p. 85, ln 21 through p. 86, ln 12). Making such a report was the only thing the Plaintiff could do at the time, since the matter was still in his manager's hand. Surprisingly, however, Bob only turned deaf ear to the Plaintiff's report. He simply did not seem interested.

As observed elsewhere, the president of the Defendants, Mr. Doug Hammond, received a faxed copy of the Castagnola letter, dated March 01, 1998, from the clinical director of the CMH, Ms. Catherine Harper, on March 13, 1998. On the same day, Hammond called the Plaintiff and ordered him not to go back to work his next scheduled shifts at Adams Street, thus canceling those shifts. The Plaintiff worked his last shift with the Defendant on March 14, 1998. He never received any further assignments thereafter, despite his repeated calls to the Defendant for assignments. In other words, the Plaintiff did not have the chance to make a formal report (in writing) to the Defendant before he was abruptly terminated. The Defendants' charge that the Plaintiff failed to notify the Defendants notice of Steve's racial harassment and physical abuses is misleading. The Plaintiff followed the officially laid down rules and regulations. The very day the president of the Defendants received the Plaintiff's above-referenced letter, he ordered the Plaintiff not to go back to work his remaining shifts at Adams Street, instead of acting upon the his complaints of verbal harassment and physical abuse, based on race, contained in the Plaintiff's letter.

**B.**    **IS THE PLAINTIFF UNABLE TO SUSTAIN HIS BURDEN OF PROVING A CAUSAL CONNECTION BETWEEN ANY PROTECTED ACTIVITY AND HIS INACTIVATION AS AN EMPLOYEE OF THE DEFENDANT?**

The Defendant's assertion that the Plaintiff cannot meet the burden of showing that his inactivation by the Defendant was causally related to the Castagnola letter is totally false. As demonstrated above, the Defendant's president received by fax the Castagnola letter on March 13, 1998. After March 14, 1998, the Plaintiff was not given any assignments again, despite the fact that he called many times to request assignments from the Defendants. Indeed, as indicated, the very day the Defendants' president received the Castagnola letter, he ordered the Plaintiff not to go work the rest of his pre-scheduled shifts at Adams Street, where he had been subjected to verbal harassment and physical abuse. The president cited the Castagnola letter he had received as his reason for asking the Plaintiff not to go back to Adams Street. This was later confirmed both by Ms. Genie Bush and Mr. Robert Lindner, both regional coordinators, in telephone conversations the Plaintiff had made to the Defendant's headquarters asking for assignments. It was further confirmed by a letter dated May 29, 1998, from the Defendants' headquarters and addressed to the Plaintiff. This letter referred to the Plaintiff as "a former employee" of the Defendants. This was the first time the Plaintiff learnt that he had been terminated not only from all CMH facilities but from the entire company operated by the Defendants.

Therefore, the Defendants' claim that the Plaintiff's inactivation was an administration action, which had no connection with the Castagnola letter, is also false. In the first place, this is a blatant fabrication, as was the Defendants' initial response to the Plaintiff's complaint of unlawful retaliation that he filed with the MCAD. In their initial response, the Defendants categorically and vehemently denied terminating the Plaintiff and rather falsely blamed him for his failure to make contact with the Defendants for a period of one month. This is how J. Lynn Milinazzo-Gaudet, Esq., expresses it in her memo:

> [D]efendant] admits receiving a copy of [Plaintiff's] letter, on or about March 13, 1998. [Defendant] denies, however, retaliating against [Plaintiff] because of his complaint. [Defendant] alleges that [Plaintiff] ceased contact with them on or about March 19, 1998 and was placed on inactive status because he failed to contact [Defendant] for a period of one month. [Defendant] contends that placing [Plaintiff] on inactive status was in accordance with [Defendant's] standard policy and procedures (MCAD Memo, Docket # 98-13-2570, July 2000).

This had been the Defendants' position until the Plaintiff, recognizing that the above-referenced reason was fabricated and wanting to prove its falsity, requested the Defendants' telephone records covering the period during which they categorically maintained that the Plaintiff had ceased contacting them. When their own telephone records exposed their original fabrication, however, they then altered their position with more egregious fabrications than the first. In their damage-control attempt, they wrote:

> The defendant acknowledges that in its initial filing with the MCAD, filed shortly after the complaint was filed with that agency and before any in depth investigation or discovery was conducted, the defendant erroneously misstated the administrative basis for the plaintiff's inactivation, alleging that his status was changed due to his failure to contact the defendant for a period of thirty days. The plaintiff clearly had contacted the defendant (and the defendant had contacted the plaintiff) in the period between the March 13, 1998, receipt of the Castagnola letter and the plaintiff's inactivation in late April. Once the defendant had the opportunity to investigate this matter in more depth, the proper administrative basis was discovered and articulated. See Respondent's Answers to Interrogatories from the Complainant, Int. 13[3] (Memo in Support of Defendant's Motion for Summary Judgment, pp. 13f.).

The above-cited statements are but a few of the Defendants' numerous fabrications contained in their document entitled, RESPONDENT'S MEMORANDUM,[4] that they, in collusion with the Plaintiff's former counsel and the MCAD Hearing Officer, secretively used during the Public Hearing proceedings on the Plaintiff's complaint. Indeed, the HO's negative decision against the Plaintiff was almost entirely based on the contents of this document. But how is it justifiable that a defendant would be allowed to entirely replace his/her Position Statement and "Work History" document one-and-half years after they have filed them in response to a plaintiff's complaint(s) and eight months into the "trial"? If the "Work History" document was supposed to be contemporaneous, why was there the need to do further investigation to record anything new or to abandon it

---

[3] "Once the defendants had the opportunity to investigate this matter in more depth, the proper administrative basis was discovered and articulated. See *Respondent's Answers to Interrogatories from the Complainant*, Int. 13". This statement is grossly misleading; in fact, it is false. The suggestion that the results of a so-called investigation are listed in this document is false. Where and how was the "investigation" carried out? One should not lose sight of the fact that the *Interrogatories* was also prepared after the Defendants had discovered their "mistake" concerning their "no contact" defense.

[4] Not only is this document, which is dated June 09, 2000, not signed; it was also not formally and, therefore, legally admitted in evidence and marked as one of the Defendants' exhibits at the MCAD Public Hearing proceedings. Thus the Plaintiff was completely unaware of its existence until after the proceedings had ceased.

completely in favor of a new document altogether? Is replacing one's Position Statement or "Work History" document in favor of a fresh one after "trial" has begun permissible in law?

In the above-quoted statements, the Defendants clearly want the Court to believe that they did, in fact, do an in depth investigation before changing their Position Statement and "Work History" document. The Plaintiff sees it quite differently, however. The Plaintiff still maintains that the only reason the Defendants were forced to adjust their initial position of "no contact" to that of "discovering the proper administrative basis" is the one and same reason for fabricating their initial "no contact" defense: they later discovered that they could not sustain their initial position, for it would pose for them a major problem of credibility, and thus a major embarrassment, in the light of their own telephone records that pointed to the contrary. It should be noted that the Defendant's deposition of the Plaintiff did not take place until November 09, 2000, and the stenographer's transcript thereof became available as far back as December 18, 2000. Similarly, RESPONDENT'S ANSWERS TO INTERROGATORIES FROM THE COMPLAINANT, which the Defendants have cited in their MEMORANDUM IN SUPPORT OF THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (p. 12, ftn.6) is also dated January 31, 2000. Since the RESPONDENT'S MEMORANDUM clearly predates the *Deposition of Asimpi*, in which of the other two documents at all are found the results of the Defendant's alleged investigation? Surely, they are found neither in RESPONDENT'S ANSWERS TO INTERROGATORIES FROM THE COMPLAINANT[5] nor in the *Deposition of Asimpi* document. The "results" of the so-called investigation are found in only one document, the unsigned secret document, RESPONDENT'S MEMORANDUM.[6]

The Plaintiff still maintains that not only was the Defendants' initial response was false, but they, in fact, replaced their initial response with more egregious fabrications contained in the illegal

---

[5] This document was prepared long after the Defendant's telephone records had exposed their only "no contact" defense to be false. In fact, not only did the Defendants re-write their "Work History" document; they also fabricated new allegations against the Plaintiff. For example, in their initial "Work History" document filed with the MCAD, they fabricated the story that the Plaintiff was banned from overnight shifts at Moody Street. No reason is given for the alleged ban, the name of the one who banned him and that of the one who made the report to the Defendant about the alleged ban are all not given. In the Defendant's "Work History" document attached to INTERROGATORIES, however, a reason is finally given for the alleged ban of the Plaintiff from Moody Street, viz., that "Mr. Asimpi was found sleeping on an awake overnight shift" and the Response to Complaint is stated as: "Bob Lindner spoke with Mr. Asimpi and told him he could not sleep on shift and could not return to Moody Street."

[6] It is interesting to note that the Defendants have so far made no reference to this document; they have not even acknowledged its existence.

RESPONDENT'S MEMORANDUM. The Plaintiff's repeated assertion that the Defendant's initial response was false does meet his burden under the tripartite burden-shifting paradigm. What the Defendants refer to as having articulated a valid, non-discriminatory reason for not assigning the Plaintiff to a shift and for placing him in "inactive status" is not valid. Indeed, as demonstrated above, the Defendants have been inconsistent, to put it mildly, throughout, changing their position here and there, assigning reasons that are untrue. "In an indirect evidence case, if the fact finder is persuaded that one or more of the employer's reasons is false, it may, but need not infer that the employer is covering up a discriminatory intent, motive or state of mind. *Lipchitz v. Raytheon Co.*, 434 (Mass. 2001). That the Defendants purported reasons for placing the Plaintiff on "inactive" status because he had failed to contact his employer for one month is false, the Defendants motion for summary judgment must be dismissed.

The Defendants' assertion that the Plaintiff "relies on the temporal proximity between the receipt of the Castagnola letter on March 13, 1998, and his inactivation six weeks later" is false. The president of the Defendants received the Castagnola letter on March 13, 1998 and on that very day, he ordered the Plaintiff not to go back to Adams Street to work his remaining scheduled shifts. He promised to call the Plaintiff back but he never did, even though the Plaintiff made numerous attempts to reach the president. When the Plaintiff was assigned to a Tri-City facility on High Street in West Medford on March 14, 1998, it was not the president who had made the assignment; it was rather Ms. Genie Bush, Eastern Massachusetts Coordinator. This happened to be the Plaintiff's last assignment with the Defendant. All his attempts to receive new assignments failed; his telephone calls were never returned. He was thus effectively terminated as of March 15, 1998 and not six weeks later when his file was inactivated. As indicated above, Bob Lindner and Ms. Bush had already told the Plaintiff that because of the Castagnola letter he had written, he had been terminated. Mr. Ray Castagnola also confirmed to the Plaintiff that because of the same letter, Cathy Harper, clinical director of the CMH, decided that the Plaintiff was banned from all CMH facilities and not only from Adams Street.

For all the foregoing reasons and upon the authorities cited, the Plaintiff submits that he has been able to sustain his burden of proving the third element of a prima facie case of retaliation.

His reclassification to "inactive" status was causally connected to the Castagnola letter; therefore the Defendants' motion for summary judgment should be dismissed.

## CONCLUSION

For all the foregoing reasons, and upon the authorities cited, the Plaintiff, KOFI ASIMPI, hereby submits that the Defendants are not entitled to summary judgment. Therefore their motion must be dismissed.

Respectfully submitted,

Pro Se Plaintiff

Kofi Asimpi
213 Kelton Street
Apt. # G-02
Allston, MA 02134-4384
Tel.: 617-566-2524

Dated: April 01, 2005

### Certificate of Service

I do hereby certify that on this date a true copy of the foregoing was sent by postage pre-paid, First Class Mail, to Alan Seewald, Esq., Counsel for the Defendant, 5 East Pleasant Street, Amherst, MA 01002

Kofi Asimpi