UNITED STATES DISSTRICT COURT
DISTRICT OF MASSACHUSETTS

KOFI ASIMPI
    PLAINTIFF

V.

RELIEFF RESOURCES, INC.
    DEFENDANT

C. A. NO. 04-10117-DPW

## PLAINTIFF'S REBUTTAL TO DEFENDANT'S STATEMENT AS TO MATERIAL FACTS NOT IN GENUINE DISPUTE

1. The Plaintiff, KOFI ASIMPI, is a citizen of the United States and resident of Allston, Massachusetts. The Plaintiff is a former employee of the Defendant, RELIEF RESOURCES, INC., a human services organization headquartered in Hadley, Massachusetts, with branch offices in Cambridge/Somerville, Worcester, Massachusetts, and in Providence, Rhode Island.

2. The Plaintiff disputed, and still disputes, most of the Defendant's claims contained in what is now termed "Defendant's Statement as to Material Facts Not in Genuine Dispute" and submits his rebuttal as follows:[1]

3. The Plaintiff denies the averment contained in paragraph 4 that he is "a native of Ghana, Africa." The Plaintiff is a citizen of the United States.

4. The Plaintiff denied and still denies the averments made in paragraph 5 that "the agencies to which the plaintiff was assigned began to complain about his performance." The Plaintiff admits that he was aware of being allegedly banned from only four sites.[2]

---

[1] Although the Plaintiff has repeatedly denied most of the allegations against him, pointing out they were deliberate fabrications, some of which so obviously defy logic, they are nevertheless repeated and are each time given new twists, ostensibly to make them more believable.

[2] The Plaintiff is aware of allegedly being banned from four sites but he denies that he was banned from all those sites. It is true that the Plaintiff himself decided not to go back to three others, making approximately a total of only seven sites of the more than thirty sites the Plaintiff had been assigned during his employ with the Defendant. The accounts of the alleged bans from these four sites are presented in detail in the Defendant's

5. The Plaintiff denied, and still denies, the averment made in paragraph 6 that "the plaintiff was found sleeping during a day shift at a facility for mentally ill adults known as River Street, and *he was given a warning.*" The Plaintiff admitted that he once dozed while sitting with two clients who were watching TV in one of the living-rooms. He categorically denies, however, that he was given a warning. In fact, this is a newly fabricated introduction altogether. As the Plaintiff has pointed out, he was not even aware that a report had been made about him, let alone given a warning. That this is a fabrication is evidenced by the fact that it is neither in the Defendant's Position Statement nor in their "Work History" document, nor anywhere else.

6. The Plaintiff denied, and still denies, the averments made in paragraph 7 that "the plaintiff allegedly slept during a day shift at a facility known as League School" and that the "plaintiff was asked not to be returned to this facility". He had never heard of this alleged ban until he read about it in the Defendant's "Work History" document, only after the former

---

"Material Facts Not in Genuine Dispute", deliberately designed to give the false impression that the Plaintiff denied being banned from them all. (Please see below the continuation of this ftn.).
The three sites which the Plaintiff categorically denied, and still denies, he was banned from are: Moody Street (CMH, Waltham), 808 Memorial Drive (CASCAP, Cambridge) and League School in Newtonville. He also denied, and still denies, being banned by CASCAP from all CASCAP facilities. In fact, the Plaintiff knew nothing about these alleged bans until he filed his complaint with the MCAD and the Defendant answered it by preparing a "Work History" document in which they fabricated these points. (Please see "Dep. of Kofi Asimpi", p. 49, ln 13 through p. 52, ln 21; p. 57, ln 14 through p. 58, ln 4; p. 53, ln 12 through p. 55, ln 13; p. 64, ln 5 through p. 66, ln 22).

The sites the Plaintiff expressed concern about, which the Defendant themselves have accurately pointed out, were: Bedford Street, the Evergreen Center (Dep. at p. 41, ln 6 through p. 42, ln 4); St. Germaine Lawrence School (Dep. at p. 47, ln 9 through p. 49, ln 12), and Marguerite Terrace, Waltham (Dep. at p. 67, ln 5 through ln 23).

Regarding Marguerite Terrace, the Plaintiff's concern was that it was dangerous to walk a long distance at night, i.e., around twelve mid-night or after, from Belmont to Waltham. Thus the Plaintiff expressed concern only about night shifts and not about day shifts also. In other words, the Plaintiff indicated that he was available and willing to work day shifts at Marguerite Terrace, contrary to the false impression the Defendant would want to give the Court. (Please see [Dep.] p. 66, ln 23 through p. 67, ln 1 through 23).

Those sites that the Plaintiff admitted he was aware of being allegedly banned from were: River St (CMH), Waltham, but he categorically denied sleeping on duty at River Street on May 24th, 1997. (Please see Dep. p. 38, ln 5 through p. 40, ln 23; p. 43, ln 5 through p. 47, ln 4); Clement Street (Tri-City), Malden; and Norfolk Street (CASCAP), Cambridge.

had filed his complaint against the latter with the Massachusetts Commission Against Discrimination. (MCAD).

7. The Plaintiff denied, and still denies, the averments made in paragraph 8 that he "was asked not to return to River Street due to alleged poor work performance" and that he "contacted the program director at River Street several times and she complained of feeling badgered and asked that the plaintiff not contact her again." What exactly does "poor work performance" mean? What work specifically did the Plaintiff do and "perform it poorly"? The telephone records of this site and the Daily Log-book will prove otherwise. (Please see "Dep. of Kofi Asimpi", p. 38, ln 8 through p. 57, ln 5).

8. The Plaintiff denied, and still denies, the averments made in paragraph 9 that "the operator of a facility known as 808 Memorial Drive asked that [t]he Plaintiff not return due to a mix-up in which the plaintiff arrived when no staff was expected, and the mental health consumers who observed him being escorted out were frightened by the experience. This is how the Defendant put it in the "Work History" document: "8/21 – Kofi is banned from 808 Memorial. He was scheduled to work on 1 of the 2 floors in the house. He was sent to the wrong floor and the consumers were not expecting someone to come work and they were afraid. He felt that he was singled out due to his race rather than the fact that they were MH consumers who were not expecting a worker and were afraid. (BOB)".). That this is a complete fabrication is clearly evidenced by the fabricator's complete ignorance of the place: (1) 808 Memorial Drive is a tall and gigantic complex, having more than twenty floors, yet the Defendant implies that there were only two floors "in the house"; (2) it is not a house as the Defendant claimed, but a mighty apartment complex rented out to both individuals and companies, including CASCAP; (3) the apartment to which the Plaintiff was inadvertently directed did not belong to CASCAP at all but to a different tenant. As the Plaintiff stated, the wrong place he was directed was a private apartment where there were only two women; (4) these women were *not* mental patients[3]; in fact, it was one of them whom the Plaintiff actually accompanied to the floor and who showed him the apartment he

---

[3] These were the alleged "mental patient consumers [who] were not expecting someone to come work and they were afraid"!

was directed to; (5) CASCAP owned only two units in the entire building, one of which it used as an office and the other as the consumers' living quarters; (6) the Plaintiff did not go to the consumers quarters at all. After discovering that he had been misdirected, the Plaintiff did find the right office, i.e., the CASCAP administration office. He did not see a single consumer and vice-versa. So, how could the consumers have been afraid when they did not see the Plaintiff and he did not see them either? (7) Who escorted the Plaintiff out and why? The owner? The CASCAP program manager and the Daily Log-book, will surely prove that these are complete concoctions.

9. The Plaintiff denied, and still denies, the averment made in paragraph 10 that he personally made a medication error at Clement Street. He also denied, and still denies, that Mr. Lindner or Mr. Hammond advocated for the Plaintiff's return. There was practically no need for them to do that; the Plaintiff never begged to be allowed to return to a site he was no longer wanted. Secondly, as already pointed out, it was rather a client who took his own medicine at this site without telling the Plaintiff first. The Plaintiff was not aware of the allegation that Lindner or Hammond advocated for his return to this site until he read about it in the "Work History" document prepared in response to his complaint he had filed with the MCAD. The Plaintiff made his denials clear in the Dep., p. 61, ln 12 through p. 63.

10. The Plaintiff denied, and still denies, the averment made in paragraph 11 and in the Defendant's "Work History" document that on December 31, 1997, he was banned from Norfolk Street "because he did not get along with a consumer's dog", that "he became confrontational with [Katie Curley], the program director," that he engaged in a heated discussion with her and finally that "...as a result of 2 situations at 2 different CASCAP programs, [he] was banned from ALL CASCAP programs."[4] Here again, the Defendant mentions no name as the one who banned the Plaintiff from ALL CASCAP sites and no evidence is produced to back their claim. Secondly, what does it mean to say that the

---

[4]It is interesting to note that where the Plaintiff clearly denies anything in the Dep., the Defendant's Motion for Summary Judgment cleverly avoids specific reference to those pages most of the time. (Dep. 64, ln 5 through p. 66, ln 22). Please see, e.g., p. 66, ln 3 through 22 for the Plaintiff's clear denials.

Plaintiff "did not get along with a consumer's dog"? This is not only a fabrication; it is also meaningless. There was absolutely no dog incident involving the Plaintiff. Thirdly, whatever the two specific situations at two different CASCAP programs were are not mentioned[5]; nor are they noted anywhere else in the Defendant's "Work History" document. Like most of the alleged bans, the Plaintiff was unaware of this alleged CASCAP ban also until he read about it in the Defendant's "Work History" document after filing his complaint with the MCAD. Obviously, all these are fabrications calculated only to tarnish as a "poor" worker the good image of the Plaintiff and so to win this case. (Please see Mr. Thomas S. Gildea's letter dated January 15, 1999, which is "the Petitioner's Rebuttal to Respondent's Position Letter", marked as Exhibit V).[6] Most importantly, what the Defendant originally stated in their

---

[5] CASCAP, like the CMH, are two large and separate organizations owned and operated by two distinct proprietors/administrations altogether and are headquartered in Hadley and Cambridge (both in Massachusetts), respectively, from which the Defendant contracted. And any such ban by CASCAP as alleged by the Defendant here can be effected only by action from its headquarters. No program manager at a small site like Norfolk Street has the power and the authority to ban a staff from the entire company any more than the Adams Street manager could ban any staff from the entire CMH sites. Unlike the CMH programs from where the Plaintiff is said to have been banned, the president of the Defendant did not speak to the Plaintiff about this alleged ban. In fact, the Plaintiff knew absolutely nothing about this ban until he read about it in the Defendant's hurriedly composed "Work History" document, following his sudden termination. This alleged ban is obviously another example of the Defendant's numerous and blatant fabrications. The truth will surely come to light if and when the program manager and the Daily Log-book are subpoenaed.

[6] Please note finally on this point that in spite of the Plaintiff's denial that most of these alleged bans took place, the MCAD HO merely accepted the Defendant's concocted versions as facts and used them as one of her reasons for her decision against the Plaintiff. The HO made no effort whatsoever either by cross-examining or by making use of any other means available to her to determine the truth.

As if she must at all costs rule against the Plaintiff, the HO merely ignored the distinctions between the two companies (CMH and CASCAP) and so confused the CASCAP facility at Norfolk Street in Cambridge with what she called a CMH facility. As indicated, she made no attempt to probe to determine the truth of the issue. For example, the Plaintiff stated in his testimony that there was no incident involving him and a dog and that, in fact, Bob Lindner had told him that the Norfolk Street program director, Katie Curly, must have confused the Plaintiff with another Field Staff about whom Curly had earlier written to the Defendant, telling them that this other Field Staff did not like dogs and therefore he must not be sent back to Norfolk Street. This is how the HO put it in her decision:

"Hammond testified that the program manager of the Norfolk Street facility called him and requested that Complainant not be re-assigned there. Hammond spoke at length with her on Complainant's behalf and she agreed to have Complainant re-assigned to her facility. However, during a subsequent assignment at Norfolk Street, Complainant was involved in an incident with one of the resident's dogs. As a result, the manager cancelled Complainant's next scheduled shift and requested that Respondent send a different field staff worker. Complainant did not receive any communication from Respondent prior to reporting to work again at Norfolk Street. He was angry to find out that he was being replaced and engaged in a heated discussion with staff at Norfolk Street. After that incident, Respondent received a request that Complainant not be assigned to work at any of the CMH facilities." (HO's Decision, p. 4). All this was news to the Plaintiff.

"Work History" document, something the MCAD Hearing Officer (HO) in her Decision alluded to, despite all her distortions, was that because of the Plaintiff's alleged dog "incident", the program manager asked that he not return to Norfolk Street. According to the Defendant's "Work History" document, the Plaintiff had already been scheduled to work a particular shift on the date in question but before they could reach him at home that day to convey to him the message from the program manager not to report back, he had already left, so they did not reach him. Thus, the Plaintiff's alleged ban from Norfolk Street had nothing to do with his alleged "confrontation" with the program manager, as the Defendant would now want the Court to believe. In fact, the Defendant first stated that the Plaintiff was banned "from Norfolk because he was confrontational" with Katie (program director). In the next sentence, however, the Defendant gave a different reason for the Plaintiff's ban. "Katie had called before the shift and asked that Kofi not be sent because he and one of the consumer's dogs did not get along. We tried to call him but we couldn't reach him before the shift." In other words, the Defendant now say that it was rather because of the dog "incident" that the Plaintiff was asked not to go back to Norfolk. Which is the truth? (For clearer and more accurate information on the Norfolk Street affair, please see SUPPLEMENT TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, pp. 6f. Please see also Defendant's "Work History" document, p. 5; HO's Decision, p. 4; Dep. p. 64, ln 7 through p. 66, ln 22).

11. The Plaintiff denied, and still denies, the averments made in paragraph 12 that "[a]fter each time the plaintiff was banned from a site, one of the professional staff at Relief Resources counseled [him] as to the appropriate way to conduct himself while on site as a Relief Resources employee." The Plaintiff also denied, and still denies, the averment made in the second sentence that "Mr. Hammond and others at Relief Resources spent an inordinate amount of time dealing with these incidents and trying to find a site that was a good match for [t]he plaintiff." All this is totally false.[7] At any rate, this is one of the fabricated charges the

---

[7] The Plaintiff is portrayed here like a child and as if he is stupid. But he is a mature and well educated individual and minister of religion who is now in his mid-60s. He has for many years been in the ordained ministry, having served churches and Christian communities in Ghana, England, the United States and other countries. To assassinate his character like this in order to win this case is totally unjust and immoral.

Defendant made in their RESPONDENT'S MEMORANDUM, secretively introduced one-and-a-half years after they had filed their "Work History" document with the MCAD in response to the Plaintiff's complaint and eight months after the hearing had commenced at the MCAD. To determine the truth, the Defendant must produce their original "Work History" document[8] which, if true, would clearly state this allegation. At any rate, this allegation is no where stated in the Defendant's "Work History" document.

12. The Plaintiff denies the averment made in paragraph 13 that he asked not to be sent to "several sites ... including ..." Both the Defendant and the Plaintiff have all along maintained that the Plaintiff opted not to work any longer at only three facilities, viz., Germaine Lawrence School, Marguerite Terrace and Bedford Street (Evergreen Center). Why now change their position again, giving the false impression that there were more than three sites where the Plaintiff decided not to be sent?

13. The Plaintiff denies the averment made in paragraph 14 that the "sites to which the Plaintiff could be sent was further limited by the fact that he did not drive and depended on public transportation." This is another untrue statement that is nowhere found in the Defendant's "Work History" document. As the Plaintiff has indicated, throughout the Plaintiff's employ with the Defendant, the case of his lack of a means of transport was never an issue. Please note that the Defendant have offered no example of a site in the Boston metroplex where they could have assigned the Plaintiff but were hampered by his lack of a means of transport. In other words, there is nowhere in the Greater Boston area where public transport is not available.

14. The averments made in paragraph 15 are completely new additions. They were neither in the Defendant's Position Statement nor anywhere else.

---

[8] It should be noted that the president of the Defendant, Mr. Doug Hammond, admitted under oath during cross-examination at the MCAD hearing that this "Work History" document, which he claimed was based on the original with the same paper size, was compiled by the Defendant's human resources director, Robin O'Farrell, after the Plaintiff had filed his complaint with the MCAD. To determine the truth, the audiotapes of the hearing are available and can be replayed, if need be. If the original "Work History" document is genuine and is not full of fabrications, why did the Defendant not simply make photocopies of it and submit them to the concerned parties? Why was a fresh document produced altogether?

15. The Plaintiff denied, and still denies, the averments made in paragraph 16. As indicated, the Plaintiff stated that he had been allegedly banned from four sites and he himself chose to no longer work at three others. That is the position the Defendant have taken all along. Only their presentation here is different, giving the false impression that there were many more sites than they actually were. Clauses like "the number of sites from which the plaintiff had been banned" and "those from which he opted out of being assigned" are deliberately intended to mislead the Court. The Plaintiff was banned from only CMH sites, according to the Defendant's own testimony. There were, in fact, many other available sites where the Plaintiff could still have been sent. These included the entire CASCAP programs, except Norfolk Street. Please see paragraphs 10 and 12 above. It should be noted also that most of the CMH facilities were located in Waltham, most of which were in close proximity to each other and the problem of transport did not arise. For example, Adams, Bank, Brown, Gardner and Moody Streets, all CMH facilities, are within a short walking distance, between three and five minutes, from each other. Even those sites which were farther away, like Marguerite Terrace, posed no problem in terms of transport availability. So, the Defendant's claim that given "the necessity that the site be accessible by public transportation, the available sites that provided regular on-going employment for the plaintiff was severely limited" is totally false. In fact, this is not found anywhere in the Defendant's "Work History" document or in their Position Statement.

16. The Plaintiff denies the averment made in paragraph 17 that "[t]he existing 'on-going' site to which the plaintiff could be assigned on a regular basis was a facility known as Adams Street". This is another attempt to mislead the Court. The impression created here that until the CMH allegedly banned the Plaintiff from all CMH facilities, and thus from Adams Street because of the personal letter he had written to his supervisor, is false. It is also false to suggest that the Plaintiff had already been banned from so many sites, including even other CMH sites, that only this facility was available to him. As indicated, the Defendant themselves indicated that there was only a total of seven sites (even though this figure too is false), none of them a CMH facility (with the exception of River Street), from which the

Plaintiff had been banned. This means that all the other sites, both those belonging to the CMH and other companies, including CASCAP's, were still available. Indeed, after the Plaintiff had been banned from River Street, the Defendant continued to assign him to all the remaining CMH and non-CMH facilities where he had been assigned previously. Please see the Defendant's "Work History" document detailing the facilities where the Plaintiff worked in addition to River Street.

17. The Plaintiff denied, and still denies, the averment made in paragraph 18 that the Defendant was unaware of the fact that a client had been harassing the Plaintiff. As he has pointed out, the Plaintiff made a verbal report, the only thing he could do at the time, to Mr. Lindner, but the latter merely ignored him. Further, the Plaintiff indicated that, apart from the letter he wrote his manager complaining about the physical and verbal attacks visited upon him by Steve, he did enter each incident in the Daily Log-book. And when the same Steve physically attacked him, not only did he enter it into the log-book; he even wrote an incident report as required. (Please see Dep. p. 85, ln 21 through p. 86, ln 13).

18. The Plaintiff admits the averment made in paragraph 19 that he wrote a personal letter to his manager at Adams Street in which he complained about Steve's verbal and physical abuse.

19. The Plaintiff denies the averment made in paragraph 20. The fact that the Plaintiff did not investigate to find out whether Steve racially attacked other African-Americans does not necessarily mean that there is no evidence that he racially abused them as well. The best way to determine whether Steve discriminated against the Plaintiff was to see whether he treated white people the same way he treated the Plaintiff. And the answer is not at all.

20. The Plaintiff admits the averment made in paragraph 21 that the Defendant was not aware of the personal letter the Plaintiff wrote to his manager until Catherine Harper, Clinical Director of the CMH, faxed it to Mr. Hammond. The Plaintiff and other staff however meticulously followed the officially laid down policy and procedures when staff, including the Plaintiff himself who also made verbal complaints, reported in writing Steve's constant attacks on the Plaintiff. Secondly, the Plaintiff could not at the time make an official report

(i.e., in writing) to Relief Resources as the matter was still in his supervisor's hand. Thus he made a verbal report to Mr. Lindner of the Defendant about being harassed, but he merely ignored him. The Plaintiff would have officially made a report to the Defendant had his manager failed to take action after the receipt of the Plaintiff's letter, but he was terminated soon after his letter had been received by the Defendant's president.

21. The Plaintiff denies the averment made in paragraph 22 that Mr. Hammond expressed his displeasure to the Plaintiff by stating that the Plaintiff was "fomenting dispute among the residents, and that the plaintiff's attempt to hold this mentally ill consumer to the same standard of conduct that one would expect of a mentally healthy person was troublesome." This is a completely new charge made by the Defendant. It is nowhere stated in their Position Statement and in the "Work History" document. It is thus a fabrication.

22. The Plaintiff denies the false impression created in paragraph 24 that he was banned from only Adams Street. According to the Defendant's own admission, the Plaintiff was not only banned from Adams Street; he was entirely terminated from the Defendant's employ, including all CMH programs. This view is confirmed by the MCAD HO also. Here is yet another attempt by the Defendant to mislead the Court. Besides, this is a fresh concoction. It is nowhere stated in their Position Statement and "Work Hisotry". (Please see HO's Decision, pp. 4, 9; also the Plaintiff's            ).

23. The Plaintiff denies the averment made in paragraph 25 that "the last available client that regularly used Relief Resources services to which the plaintiff could be assigned" was Adams Street. (Please see paragraphs 16 and 22 above). The Plaintiff also denies the averment made in the second sentence that the Tri-City facility at High Street (West Medford) was not a regular customer of the Defendant and that it requested services from the Defendant on an intermittent basis. The Defendant was indeed regularly used by Tri-City, which had other facilities besides High Street. The Plaintiff also denies the averment made in the last sentence that the "plaintiff's scheduled shifts at Adams Street after March 13, 1998 were cancelled because he was banned from the site." The Plaintiff's scheduled shifts were cancelled because he was terminated. At any rate, this statement is not in the

Defendant's "Work History" document or anywhere else. This is a completely new position fabricated by the Defendant.

24. The Plaintiff denies the half-truth averment made in paragraph 26. Genie Bush, Eastern Mass Coordinator's unsuccessful attempts to place the Plaintiff was due to the fact that the Plaintiff was terminated and his schedules file removed. This is the information Ms. Bush gave the Plaintiff. Mr. Lindner also indirectly confirmed this when he told the Plaintiff that he was terminated.

25. The Plaintiff denies the averment made in paragraph 27 that the Defendant "inactivated" the Plaintiff because he had not been given an assignment for a period of thirty days. The Plaintiff was, in fact, terminated. In the first place, the Plaintiff knew nothing about his alleged "inactivation" at the time. It is not even mentioned anywhere in the Defendant's Position Statement. Indeed, a letter from the Defendant referred to the Plaintiff as a "former employee". Mr. Lindner had already informed the Plaintiff that he had been terminated. Please see "Complainant's Answers to Respondent's Interrogatories", p. 3 and Defendant's letter dated 29 May, 1998, and signed by Robin O'Farrell.

26. The Plaintiff denied, and still denies, the averments made in paragraph 28. The Defendant's failure to assign the plaintiff after March 14, 1998, was due to no other reason than that he was terminated, motivated by retaliation animus. All the reasons given by the Defendant here are no where mentioned in their Position Statement or in the "Work History" document.

27. The Plaintiff denied, and still denies, the averment made in paragraph 29. The sole reason why the Plaintiff's file was inactivated was that he was terminated, driven by retaliation animus. If the explanations given by the Defendant here are true, why did they not state them in their Position Statement or anywhere else?

Respectfully submitted,

Pro Se Plaintiff

KOFI ASHIPI

213 Kelton Street
Apt. # G-02
Allston, MA 02134-4384

Tel.: 617-566-2524

Dated: this 1st day of April, 2005

### Certificate of Service

This will certify that on this day, I served a copy of the foregoing documents upon the parties in this action by prepaid, First Class postage, to Alan Seewald, Esq., and Kristi A Bodin, Esq.

_____
Kofi Asimpi