**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KOFI ASIMPI )<br>    PLAINTIFF )<br>)<br>v )<br>)<br>RELIEF RESOURCES, INC. )<br>    DEFENDANTS ) | CIVIL ACTION NO. 04-10117-DPW |

**PLAINTIFF'S PETITION FOR REVIEW**

Now comes the Plaintiff, Kofi Asimpi, and petitions the Court to review the decision of the United States District Court, District of Massachusetts, presided over by Honorable Douglas P. Woodlock, dated Friday, August 05, 2005, dismissing the Plaintiff's Motion for Summary Judgment against the Defendant, Relief Resources, Inc., while granting that of the Defendant's.

## FACTS OF THE CASE

1. The Plaintiff, KOFI ASIMPI, is a resident of Allston, Suffolk County, Massachusetts, and a citizen of the United States. The Plaintiff is a former employee of the Defendant. He studied theology at Trinity Theological Seminary in Ghana and at Perkins School of Theology, Southern Methodist University (SMU). He further studied History at Boston University. He served in Ghana as National Representative of Campus Crusade for Christ, International; he also served as a Minister of Religion under the auspices of the Evangelical Presbyterian Church, Ghana. The Plaintiff holds the Doctor of Ministry and Doctor of Philosophy degrees from SMU, Dallas, Texas, and from Boston University, Boston, respectively.

2. The Plaintiff is a former employee of the Defendant, RELIEF RESOURCES, INC. He was employed by the Defendant effective April 02, 1997, and was a member of the field staff until the spring of 1998. As a member of the field staff, the Plaintiff was assigned to work at various human services facilities. His duties included administering medication and

1

counseling the residents at the assigned facilities. These facilities were clients of the Defendant for whom they provided staffing.

3. Mr. Douglas Hammond is the President and owner of the Defendant, RELIEF RESOURCES, INC., a human services organization headquartered in Hadley, Massachusetts, with branch offices in Cambridge/Somerville, in Worcester, Massachusetts, and until recently, in Providence, Rhode Island.

4. The Plaintiff's final day of work for the Defendant was Saturday, March 14, 1998. The Defendant received from Ms. Catherine Harper, Clinical Director of The Center for Mental Health, a faxed copy of personal letter dated March 1, 1998, written by the Plaintiff and addressed to Ray Castagnola, Manager of the Adam's Street facility operated by The Center for Mental Health. The letter addressed the Plaintiff's concerns about his work environment at The Center for Mental Health, especially physical attack and verbal abuse, based on his race, that he suffered at work and his concerns for his personal safety there. This followed numerous appeals the Plaintiff had made to have his manager intervene, but to no avail. Thus the Plaintiff's sole aim of writing the letter was to prompt his manager to action. The person about whom the Plaintiff complained in his letter was a resident of the Adam's Street facility. The resident's diagnosis was schizophrenic affective disorder.

5. After March 14, 1998, the Plaintiff received no further assignments, and his repeated telephone calls for work and for the resolution of the issue were never returned. In other words, as a result of the personal letter the Plaintiff wrote to his manager, the Defendant summarily retaliated by terminating the Plaintiff in violation of Title VII of the Civil Rights Act of 1964 and of M.G.L. c. 151B

6. The Plaintiff testified that having failed in his numerous attempts to resolve the termination issue with Mr. Hammond, who apparently chose not to cooperate with him, he lodged a complaint of retaliation against the Defendant on August 18, 1998, with the Massachusetts Commission Against Discrimination (MACD).

7. In their testimony, the Defendant categorically denied that they terminated the Plaintiff and insisted that they merely inactivated the Plaintiff's personnel file and that this inactivation

was *not* due to the Plaintiff's complaint of racial harassment, but rather the result of his failure to contact his employer for one month. Indeed, the Defendant in their Position Statement relied upon their assertion that "***Mr. Asimpi was placed on inactive status due solely and exclusively to his failure to contact his employer for a period of one month.***" The Defendant also alleged that based upon the Plaintiff's work performance, it would have been justified to terminate him.

8. To bolster their claim that the Plaintiff's file "was placed on 'inactive' status due *solely* and *exclusively* to his failure to contact his employer for a period of one month", the Defendant hurriedly prepared a document entitled, "Work History", expressly designed to emphatically and clearly demonstrate that the Plaintiff had indeed failed to contact the Defendant for a period of one month. On the first page of the "Work History" document, under "KOFI ASIMPI", the following entries, *inter alia*, are made:

   [a.] "Date of hire:      April 2, 1997
   "Date of Inactivation: April 22, 1998
   "Reason: No contact for over 1 month."

   [b.] For the week of 3/14 – 3/20 (1998) and under the sub-title, "**Date of Incident, Reason and outcome**", it is falsely stated, thus: "3/19 – Kofi said that he would call us with the dates and time he is available for work", p. 6.

   [c.] For the week of 3/21 - 3/27, the reason given for the Plaintiff's alleged failure to work is given: "3/22 – We left a message for Kofi regarding when he was available to work. We did not hear back from him."

   [d] For the weeks of 3/28 -4/3 (1998), 4/4 – 4/24 (1998), and 4/11 – 4/17 (1998), the reason the Plaintiff did not work is said to be: "No contact"; "No contact"; "No contact", respectively.

   [e] Then finally for the week of 4/18 - 4/24 (1998), the reason the Plaintiff did not work is said to be his failure to contact the Defendant's office for assignments: "No contact, so his file was inactivated."

   [f] Please see the Defendant's Position Statement captioned: "Re: Kofi Asimpi v. Relief Resources, No. 98132570, signed by Mr. Alan Seewald, the Defendant's counsel, and addressed to Mary Garippo, Investigator, Massachusetts Commission Against Discrimination (MCAD), dated October 30, 1998, and marked as Exhibit III; also "Work History" document; marked as Exhibit IV. (Already submitted to the Court).

9. The Defendant's own telephone record has, however, evidently shown that the Plaintiff was, in fact, in sustained contact with his employer during the period they alleged he was

not. This fact was acknowledged by the MCAD Hearing Officer (HO) in her decision of January 15, 2003, when she observed:

> Hammond testified that once an employee is not placed, he/she is "inactivated." Hammond testified that [Plaintiff] remained employed but was notified on May 19, 1998 that he had been reclassified as "inactive." This reclassification allegedly took place because the regional coordinator had not received a request for assignment from him for a period of thirty days. However, Defendant's records show that outgoing calls to [Plaintiff] were made on 3/18/98 and 3/20 and that incoming calls from [Plaintiff] were received on 3/19, 3/27, 3/31, and 4/2. After this reclassification, [Plaintiff] placed calls to Defendant on 5/29, 5/31, 6/1, 6/3, 6/5, and 6/12. (Exhibit C-5 "RESPONDENT'S ANSWERS TO INTERROGATORIES FROM THE COMPLAINANT"). Further, staff at Defendant's Cambridge office contacted [Plaintiff] on 4/15/98 asking [Plaintiff] if he would conduct an orientation for newly employed field staff. The details were never provided to [Plaintiff] and his calls to the Cambridge office, regarding this opportunity, were not returned. I find that [Plaintiff] did attempt to stay in contact with the Defendant, that he was no longer called for work, and was thus terminated for all practical purposes (p. 9).

10. Mr. Hammond testified that beginning in May, 1997, the agencies to which the Plaintiff was assigned began to complain about his "poor work performance" and, as a result, he was banned from working at four facilities while the Plaintiff himself chose not to work at three others. As recently as Friday, August 05, 2005, when he appeared before Honorable Justice Woodlock in connection with this case, the Defendant's counsel, however, changed this to make it sound even more plentiful than the banned sites actually were. He said: "There were a number of places that would not accept him, and there were a number of places that he asked not to be returned to, and Adams Street where this whole event took place was one of those places that outsourced to Relief Resources this position. It wasn't what would be called an intermittent temporary employment user. This was an outsource, and so Dr. Asimpi was assigned there fairly regularly, and this was a place he could get to."

11. In his testimony, however, the Plaintiff vehemently denied that he was a "poor" worker and that he was banned from all those sites. He also denied ever having heard about his "poor work performance" complaint until after he had filed this case with the MCAD. In addition, counsel's use of the phrase "a number of places" and his statement that Adams Street was one of those places that outsourced to Relief Resources are deliberately meant to confuse and to mislead the Court. The Adams Street facility in Waltham is a Center for Mental Health facility and, as the Plaintiff testified, Mr. Hammond ordered him the very day of

4

March 13, 1998, when he received a faxed copy of the Castanogla letter from Ms. Catherine Harper not go back to do his remaining shifts there. He cancelled those shifts. The suggestion that Adams Street was a separate entity quite apart from The Center for Mental Health is totally false. Once the Plaintiff was allegedly banned from this and all the entire Center's facilities, that was it. At no time was the Plaintiff allegedly banned from The Center for Mental Health while being retained at Adams Street.

As the Plaintiff has also testified, not only did the Plaintiff not hear about his "poor work performance" allegation before, the Defendant has neither shown any evidence that the Plaintiff was indeed a bad worker. Was the allegation really true, the Defendant would have followed its own *Policies and Procedures* handbook which states the nature of actions they would take in terms of their "Progressive Disciplinary Action Procedures":

> The goal of the progressive disciplinary action procedure is to identify unacceptable conduct/- performance and to outline a corrective action plan in an effort to improve performance quality. Incidents brought to our attention will be investigated thoroughly by us and will include a discussion with both the program and the Field Staff. Any Field Staff who does not meet our professional expectations will be subject to progressive disciplinary action up to and including termination (p. 12).
>
> A corrective action plan created as a result of progressive disciplinary action will be applied in all cases where a Field Staff has displayed poor performance or conduct. Verbal and/or written warnings are used to put a Field Staff on notice that performance or conduct must be improved to an acceptable level. When a Field Staff doesn't respond to this type of counseling, there is justification for imposing more serious discipline. (ibid.)
>
> **VERBAL WARNING**: This is an informal counseling designed to identify an unacceptable level of performance. The incident will be reviewed with you by telephone and a written document summarizing the conversation and the mutually agreeable corrective action plan will be sent to you. A copy of this "verbal warning will be kept in your personnel file.(ibid., p. 13)
>
> **SECOND WRITTEN WARNING**: This is a formal written warning, similar to the first written warning, and is considered to be the last step officially informing a Field Staff that conduct or performance continues to be unsatisfactory. Since this is a final notice, continued displays of poor performance or conduct will result in termination (ibid., p. 13)

The Defendant did not implement any of the above, and that is only because the Plaintiff did not receive any warning or hear about his "poor work performance" during his entire employ with the Defendant.

12. The Plaintiff testified that whereas they indeed categorically stated in their "Work History" document and elsewhere that the Plaintiff had failed to contact his employer for a period of one month and so his file was placed on "inactive" status, the Defendant later shifted their

position, at long last admitting in a secretly[1] introduced and unsigned document entitled "RESPONDENT'S MEMORANDUM", that the Plaintiff did after all contact them. Indeed, from the Defendant's own telephone record, it is crystal clear that the Plaintiff was in sustained contact with the Defendant, including the following dates: 3/18/98, 3/19/98, 3/20/98, 3/22/98, 3/27/98, 4/2/98, 4/3/98, 5/3/98, 5/31/98, 6/1/98, 6/5/98 and 6/12/98. It should be noted that the Defendant wrote this document one-and-a-half years following the filing of their Position Statement and eight months after the Public Hearing proceedings at the MCAD had begun. Besides, this document is simply vaguely entitled, "RESPONDENT'S MEMORANDUM", unlike all the Defendant's other documents, without indicating specifically what the memo is about. Nor, as indicated, was it formally accepted into evidence and marked as one of the exhibits. It was done through the back door.

13. The Plaintiff testified that on January 15, 2003, the HO issued her unfair decision against the Plaintiff and in favor of the Defendant, stating "that Plaintiff failed to establish that the [Defendant] had engaged in unlawful retaliation. [Therefore, according to her, the Plaintiff's] case must be dismissed" (HO's Decision, p. 12).

14. The Plaintiff testified that that the HO issued her unjust decision against him was due almost solely and exclusively to the fact that his own former counsel, Mr. Thomas S. Gildea, had apparently conspired with the Defendant, represented by their counsel, and the HO against the Plaintiff to ensure the latter's defeat. In other words, this deliberate and clear perversion of justice was possible only because of the acquiescence, connivance and condonation of the Plaintiff's own former counsel. For example, in their testimony, the Defendant categorically denied that they terminated the Plaintiff and insisted that they merely "inactivated" his personnel file and that this inactivation was *not* due to the Plaintiff's complaint of unlawful termination, but rather the result of his failure to contact his employer

---

[1] "Secretely" because this document was not officially admitted into evidence and marked as an exhibit, like all the other documents that were formally and legally admitted. This document was at no time even mentioned during the entire hearing process. Indeed, the Plaintiff never knew anything about its existence until after the HO had issued her decision. The HO and the Plaintiff's former counsel were, however, privy to it and the HO did in fact accept and heavily utilized it; indeed, this document formed, in the main, formed the basis of the HO's negative decision against the Plaintiff.

for one month. As indicated, this is how the Defendant expressed it in their Position Statement: "***Mr. Asimpi was placed on inactive status due solely and exclusively to his failure to contact his employer for a period of one month.***" Once this blatant lie was later exposed by the Plaintiff through the Defendant's own telephone record, however, the Defendant maneuvered, in concert with the Plaintiff's former counsel and the HO, and altered their original position with fresh, more egregious and elaborate fabrications spelt out in the above-referenced and vaguely titled document, "RESPONDENT'S MEMORANDUM". They informally and secretively introduced this illegal document one-and-a-half years after they had filed their Position Statement in response to the Plaintiff's complaint with the MCAD and eight months after the MCAD Public Hearing proceedings had commenced. (For a more detailed discussion of how the three parties comprising of the Plaintiff's former counsel, the Defendant and the MCAD HO conspired and did ensure the Plaintiff's defeat, please see the enclosed document entitled, "SUPPLEMENT TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT", already submitted to the Court).

15. Thus, the Defendant's counsel's belated admission that their initial categorical claim that it was the Plaintiff himself who had failed to contact the Defendant for assignments for a period of thirty days was faulty because they had not had the opportunity at the time "to dig out"[2] Mr. Asimpi's phone records is totally false and is calculated to mislead the Court. First, the phone records were not the Plaintiff's as counsel claims, but the Defendant's; in fact, it was the Defendant who submitted it, but only upon the Plaintiff's demand after the Defendant denied having terminated the Plaintiff and that that they had not given him assignments was due solely and exclusively to his own failure to contact the Defendant's office for thirty days. Second, if the Defendant's "Work History" document was indeed a contemporaneous logging of time, dates and events in respect of the Plaintiff's employment with the Defendant, would it not be fair to conclude that the Plaintiff's telephone calls and conversations with the different officials were also carefully recorded? And if not, why not? Third, the Defendant need not "to go back and dig out all the [Plaintiff's] phone records" to

---

[2] Please see "Motion Hearing Proceedings Before the Honorable Douglas P. Woodlock, U. S. District Court Judge" document, August 5, 2005, p. 4, ln 6 through p. 5, ln 2.

7

determine the truth of whether or not he was in contact with the Defendant for thirty days. Given the number of officials he spoke to at the office and the numerous messages he left at the time for the Defendant's President, Mr. Hammond, who had personally promised to call the Plaintiff back but failed to do so, it is, or it must be, quite obvious that the Plaintiff had maintained sustained contact with the Defendant during the period they claimed he had not. Indeed, among the officials the Plaintiff spoke to more than once during those thirty days when he called the Defendant's office were Gennie Bush, Bob Lindner, Jonathan (all regional coordinators), Robin O'Farrell, Human Resources Department Director, and the lady receptionist at the time. And each time the Plaintiff called he was assured that Mr. Hammond or someone else would return the Plaintiff's call, but they never did. Did the Defendant then forget—and how could that be!—all these facts when they were preparing their "Work History" document on the Plaintiff? Or, how could the Defendant claim they were ignorant of the existence of their own telephone records that clearly contradicted their false statement? In other words, if the Defendant did not have the "opportunity to dig out all their phone records", what about the fact that the Plaintiff spoke to these several officials on numerous occasions? Did Ms. O'Farrell, to whom Mr. Hammond attributed the preparation of the new "Work History" document, also forget that the Plaintiff had, in fact, been in sustained contact with the Defendant during the period they claimed he was not?[3] Fourth, when did the Defendant finally have the opportunity to "dig out" their telephone records? One-and-a-half years after the Plaintiff had filed his complaint with the MCAD and eight months after the Public Hearing proceedings had started? Or, did they do so only after the Plaintiff's demand exposed the falsity of their claim?[4] Fifth, if the Defendant did not intend to lie about their termination of the Plaintiff,

---

[3] It is to be noted that not only did the Plaintiff personally contact Ms. Robin O'Farrell, but upon his request, she in turn wrote a letter dated March 31, 1998, addressed to the Plaintiff, giving his hourly rates and work hours for the period of February 21st through March 28, 1998. It is important also to remember that a copy of this letter (already submitted to the Court) was placed on the Plaintiff's personnel file. If all the above-referenced officials forgot, i.e., if that was a possibility, that the Plaintiff was indeed in contact with the Defendant during the period they claimed he was not, did or should Ms. O'Farrell also forget?

[4] It should be recalled that it became known to the Plaintiff for the fist time that that the Defendant changed their position from "no contact" to "several contacts" was actually spelt out in their secretely admitted and unsigned document titled, "DEFENDANT'S MEMORORANDUM", dated June 9, 2000, (i.e., written one-and-a-

8

why did they not merely reproduce by photocopying their original "Work History" document on the Plaintiff but choose to compose a fresh one altogether, as Mr. Hammond testified under oath during the MCAD Public Hearing proceedings? And what exactly happened to the original "Work History" document? Apparently, they wanted to hide some information that would further expose their numerous fabrications.

16. The Defendant testified that they did not terminate the Plaintiff but merely "inactivated" his personnel file. If so, why did they not inform him about this "inactivation" throughout the whole period he was in contact with them? What about the fact that in her letter of May 29, 1998, addressed to the Plaintiff, Ms. O'Farrell referred to him as "a former employee" of the company? To be sure, this is a pointer to the undeniable truth of the Plaintiff's termination. As a former employee, therefore, Ms. O'Farrell's letter says, the Plaintiff's file was placed on "inactive" status. Thus the term, "terminated" and the sentence "[his] file was placed on inactive status" are synonymous, contrary to the Defendant's vehement denial that they terminated the Plaintiff; in fact, they insisted instead that only the Plaintiff's personnel file had been "inactivated". If the Plaintiff was indeed not terminated, why did both Genie Bush and Bob Lindner inform him that he had been terminated when he inquired about his work status following his receipt of Ms. O'Farrell's letter in which she referred to him as a former employee? If they indeed did not terminate the Plaintiff but still consider him as an employee, why did they not implement their own reactivation policy by notifying him by mail of the inactivation?[5] (Please refer to item 19 below for more on this).

17. The truth of the matter is that it is apparent that from the very beginning of the case (i.e., when the Plaintiff filed his complaint with the MCAD and the Defendant submitted their Position Statement in response), the Defendant decided to find a cheap and easy way to defend themselves against the charge of retaliation by rather blaming the victim that "*Mr.*

---

half years after they had filed their "Work History" document and eight months after the Public Hearing proceedings had begun).

[5] The Defendant's inactivation policy states: "Relief Resources must rely upon every active Field Staff to maintain strong lines of communication with us regarding availability, likes, dislikes and expectations. *Field Staff who do not maintain contact with us and/or who do not accept and/or complete assignments on a consistent basis will be notified by mail of inactivation*" (Relief Resources, Inc. *Staffing Solutions for Human Services: Policies and Procedures*, p. 14).

*Asimpi was placed on inactive status due solely and exclusively to his failure to contact his employer for a period of one month."* In other words, the Defendant decided right from the very beginning to lie about their real motive behind their "inactivation" of the Plaintiff's personnel file, as they themselves put it), unaware that he would next demand the submission of their telephone record to prove them wrong and that the lie would later come back to haunt them.

18. The Plaintiff testified that as a result of losing his case before the HO, he appealed to the MCAD's Full Commission—a three-member panel that *strangely* included the very HO who also presented to the Commission for review the case she had already unfairly decided on. Yet, neither was the Plaintiff similarly given the opportunity to present his own version of the case before the Full Commission, nor was he even invited to be present during the Commission's deliberations. It is no wonder, therefore, that the Full Commission similarly dismissed the case on June 12, 2003, when the HO presented her own version with lots of fabrications, distortions, inaccuracies and biases, all for the express purpose of dismissing the Plaintiff's case against the Defendant. (Full Commission' Decision, p. 2, already submitted to the Court).

19. The Plaintiff testified that on January 16, 2004, he filed a complaint with the United States District Court, District of Massachusetts, Boston, following his receipt of a "right-to-sue" notice from the United States Equal Employment Opportunity Commission (EEOC). The Plaintiff's complaint was that the Defendant unlawfully retaliated against him by summarily terminating him after he had written a personal letter to his manager about verbal and physical abuse at his workplace.

20. The Defendant filed their Answer to the Plaintiff's Complaint on July 15, 2004.

21. The Plaintiff testified that on September 02, 2004, he filed with the United States District Court, District of Massachusetts, Boston, a settlement proposal as advocated by the Court. The Defendant, through their counsel, rejected the proposal, however.

10

22. The Plaintiff filed "Motion for Summary Judgment" on February 16, 2005, which he supplemented on February 28, 2005. The Defendant filed their "Opposition to the Plaintiff's Motion" on March 11, 2005.

23. The Plaintiff testified that the Defendant deliberately fabricated stories of bans which were allegedly placed on the Plaintiff who insisted that he knew nothing about most of these bans until he read about them in the Defendant's "Work History" document.[6] Below are outlined the Defendant's testimony of the alleged four banned sites, the supposed reasons for the said bans and the Plaintiff's written testimony in response to each:

(I) **League School, Newtonville** on "5/13/97 [for] [s]leeping during a day shift at the school while attending to 1 student. Banned"[7]. The Defendant testified that one of the female teachers called and reported that the Plaintiff had dozed while attending to one child (cf. HO's version below in which she made a reference to "the [male] principal of the school" who she said had called and made the report to Mr. Hammond; cf. also the HO's reference to the allegation about the Plaintiff "leaving the children unsupervised" and so he was banned. The Plaintiff testified that this charge was totally false, pointing out that the specific name of the alleged reporter who also issued the ban was not given. The Plaintiff also stated that no one told him about his alleged dozing at this school. Nor did the Plaintiff know anything about it until after he had filed this case with the MCAD and read about it for the first time in the Defendant's Position Statement. The Plaintiff finally added that he worked with only female staff on this date and that he did not meet any male staff on duty on the day in question. Therefore, no male principal could have called Mr. Hammond and reported the Plaintiff to him for his alleged dozing.

---

[6] The Plaintiff still maintains that the four alleged ban are the Defendant's blatant fabrications and that he was unaware of them until he read about them in the Defendant's "Work History" document. Even if the Plaintiff was aware of all the allegations, as the Defendant argue in their "Memorandum in Support of their Motion for Summary Judgment" (p. 12), mere awareness does not constitute acknowledgment that the allegations are true.

[7] It is to be observed that the HO deliberately exaggerated this to make it sound even worse than it really was when she stated: "The principal of the League School called Hammond to complain that [Plaintiff] had fallen asleep, leaving the children unsupervised. As a result, he would not allow [Plaintiff] to be reassigned to the facility." (HO's Decision, p. 3).

11

(II)   **634 Moody Street, Waltham (CMH)** on 10/5/97: The Defendant fabricated the story that the Plaintiff had been banned from overnight shifts here: "Banned from Overnight shifts at Moody St (CMH)." The Plaintiff testified, however, that in the Defendant's "Work History" document no reason is given for the alleged ban and the name of the one who allegedly executed the ban is not supplied. But they fabricated a completely new position in their "DEFENDANT'S ANSWERS TO INTERROGATORIES FROM THE PLAINTIFF" brief, which was dated and signed on the 31st day of January, 2000—i.e., a document that the Defendant illegally submitted one-and-a-half years after filing their Position Statement with the MCAD in response to the Plaintiff's complaint against them and eight months after its Public Hearing (PH) proceedings had commenced. In this latter document the Defendant alleged that "Mr. Asimpi was found sleeping on an awake overnight shift." In the *Response to Complaint* column of the document, the Defendant also fabricated the statement that "Bob Lindner spoke with Mr. Asimpi and told him he could not sleep on shift and could not return to Moody Street." The Plaintiff, however, denied this allegation also. He testified that this document also makes no mention of the name of the person who allegedly found the Plaintiff sleeping. The Plaintiff further testified, interestingly enough, that he was the sole staff on duty throughout the overnight shift in question, as he had done many times previously;[8] no one else worked with him that night and no one reported him about his work that night. The Plaintiff testified also that he knew nothing about this alleged ban on him until he read about it in the Defendant's Position Statement, i.e., only after the Plaintiff had lodged his complaint with the MCAD against the Defendant in this case. The Plaintiff categorically denied that he was banned from overnight shifts at this facility. At any rate, does the allegation that the Plaintiff was banned from overnight shifts imply that the facility

---

[8] A good work performance report at Moody Street was written about the Plaintiff who asked his counsel to invite the manager and his assistant as witnesses to testify about his work performance in general and about this alleged ban specifically, but his counsel failed to do so, even though the two men were willing to testify. Counsel also failed to subpoena the Daily Incident Log-book which would have exposed the Defendant's fabrications. Not only did the Plaintiff's former counsel fail to invite these two officials to testify at the hearing, but he failed to invite any and all of the numerous potential witnesses whose list of names the Plaintiff had furnished him at the latest one year before the MCAD hearing proceedings started.

was still available to him to work day shifts there? Whatever the response, the Plaintiff was unaware of this. In fact, it is a complete fabrication.

The Plaintiff further testified that the Program Manager and his assistant here were ready to testify to the contrary. Also the Daily Incident Log-book would have shown otherwise, i.e., a good work performance report written about the Plaintiff. The Plaintiff earnestly urged his counsel to subpoena the daily log-book and the facility's telephone record covering the period of the alleged ban, but not only did he ignore him, he also intentionally suppressed this information.[9]

(III)  **Norfolk Street, Cambridge (CASCAP)**, on 12/31/97: The Plaintiff testified in their "Work History" document that the Defendant fabricated the story that on December 31, 1997, the Plaintiff was banned from Norfolk Street "because he did not get along with a consumer's dog", that "he became confrontational with [Katie Curley], the program director," that he engaged in a heated discussion with her and finally that "...as a result of 2 situations at 2 different CASCAP programs, Kofi was banned from ALL CASCAP programs." The Plaintiff testified that here again the Defendant have failed to record the name of the one who allegedly banned him from ALL CASCAP sites and that they tendered in no evidence to back their claim, as they allegedly did in the case of The Center for Mental Health (CMH) from where the Plaintiff was said to have been banned due to the letter he had written to his manager in which he complained about verbal and physical racial assaults at his workplace. Though they have not identified the name of the one who allegedly banned the Plaintiff from the entire CASCAP sites, the Defendant have somehow created the false impression that it was Curley.

The following are other crucial observations that must be made in the light of the Defendant's testimony:

---

[9] Indeed, both the Plaintiff's counsel Gildea and the HO behaved as if they were scared of the truth being revealed, so in order not to expose it, they both intentionally failed to appropriately and adequately cross-examine the Defendant's President on this and other important issues, leaving so many begging questions unanswered. To be sure, it was apparently only this way that both persons could win the case for the Defendant while at the same time defeating the Plaintiff.

(a) The Plaintiff pointed out in his testimony that with the exception of this small facility which she managed, Curley had absolutely no power and authority to ban the Plaintiff or anyone else from *all* CASCAP facilities, as the Defendant implied. The only person who could reject any of the Defendant's staff from *all* CASCAP facilities was the Executive Director of CASCAP, or someone who was likewise in the upper echelon of the company, just as Catherine Harper was at The Center for Mental Health.

(b) What does it mean to say that the Plaintiff "did not get along with a consumer's dog"? It is a vague and meaningless statement. The Plaintiff, in fact, testified that there was absolutely no incident involving him and the dog in question, as the HO's own fabricated version has it. The Plaintiff also testified, contrary to what Ms. Curley reported to the Defendant about the Plaintiff's alleged fear of dogs, that he had actually played with this particular consumer's dog (not dogs) on a previous shift.

(c) Whatever the two specific situations at two different CASCAP programs were have not been indicated by the Defendant; nor are they noted anywhere else in the Defendant's "Work History" document. This is because they simply did not happen. Like most of the alleged bans, the Plaintiff was unaware of this alleged CASCAP ban also until he read about it in the Defendant's Position Statement, which they filed in response to the Plaintiff's complaint to the MCAD.

(d) The Plaintiff further pointed out that *if it was indeed true that he was banned from all CASCAP programs, no one ever told him about it and that he read about it only in the Defendant's hurriedly composed "Work History" document on him*

(e) The Plaintiff also indicated that the Defendant produced no evidence in support of this alleged ban from all CASCAP programs.

(f) The Defendant also lied in their testimony, which lie was, however, upheld by the HO, by stating that the Plaintiff was rejected, while his colleague (i.e., another field staff) was retained to work when both of them were inadvertently sent to the same shift at this facility under Katie Curley on the day in question. In fact, the Plaintiff further testified that Bob Lindner, the Defendant's regional coordinator, admitted having made a scheduling

14

error and so sent both field staff to the same shift. In other words, the Plaintiff's colleague, Luke, was also *not* retained to work there that day as the HO falsely decided; both staff members were sent away. Mr. Lindner even apologized to the Plaintiff for his scheduling error and promised to pay the Plaintiff at least his transport fare.

(g) The Plaintiff also testified that the alleged "dog incident" the Defendant attributed to the Plaintiff was also totally false, adding that there was absolutely no dog incident involving the Plaintiff whatsoever. He insisted that the so-called "dog incident" was a distortion the Defendant deliberately incorporated in their "Work History" document only to portray the Plaintiff in a negative light. Indeed, the Plaintiff testified that Mr. Lindner himself told him that the Defendant's office had received a copy of letter from Curly who informed them that another Field Staff had indicated that he was afraid of dogs, therefore, Linder opined, Curly must have confused this other staff with the Plaintiff.[10] Obviously, all these fabrications are the Defendant's calculated attempts to tarnish the good image of the Plaintiff as a "poor" worker and thus to establish some legitimate, nondiscriminatory reason for their unlawful termination of the Plaintiff solely for the purpose of wining this case. (Please see Thomas S. Gildea, Esq.'s letter dated January 15, 1999, which is "the Petitioner's Rebuttal to Defendant's Position Letter", marked as Exhibit V, already submitted to the Court).[11]

---

[10] It should be noted that the Defendant deliberately omitted from their "Work History" and "RESPONDENT'S ANSWERS TO INTERROGATORIES" documents the information that Mr. Lindner had told the Plaintiff that Katie Curly must have confused the Plaintiff with another Field Staff who Curly said was afraid of dogs and therefore should not return to work at this facility. This is another example of the Defendant's selective rewriting of their "Work History" document. It will be recalled that the Defendant deliberately failed to reproduce the original to the MCAD and to the Plaintiff, as Mr. Hammond testified under oath during the MCAD Public Hearing proceedings that this "Work History" document was compiled only after this case had cropped up.

It should also be noted that the Defendant have made elaborate efforts in their "RESPONDENT'S ANSWERS TO INTERROGATORIES" document to "improve upon" what they have already stated in their "Work History" document by fabricating more stories. Please compare their entries under "Date of Incident, Reason and Outcome" column of the "Work History" document (p. 5) with those under the "Reason for Complaint" section of the "RESPONDENT'S ANSWERS" document section, p. 4.

[11] Please note finally on this point that in spite of the Plaintiff's denial that most of these alleged bans took place, the MCAD HO merely accepted the Defendants' concocted versions as facts and used them as one of her reasons for her decision against the Plaintiff. The HO made no effort whatsoever either by cross-examining or by making use of any other means available to her to determine the truth.

(IV) **808 Memorial Drive, Cambridge (CASCAP).** The Defendant testified that the "operator"[12] of this facility asked that [t]he Plaintiff not return due to a mixup in which the plaintiff arrived when no staff was expected, and the mental health consumers who observed him being escorted out were frightened by the experience. This is how the Defendant put it in their "Work History" document:

"8/21 – Kofi is banned from 808 Memorial. He was scheduled to work on 1 of the 2 floors in the house. He was sent to the wrong floor and the consumers were not expecting someone to come work and they were afraid. He felt that he was singled out due to his race rather than the fact that they were MH consumers who were not expecting a worker and were afraid. (BOB)". (Please see Defendant's "Work History" document on the Plaintiff, p. 3).

(i) That all this is a complete fabrication is clearly evidenced by the fabricator's complete ignorance of the place: (1) 808 Memorial Drive is a tall and gigantic complex, having more than twenty floors, yet the Defendant implies that there were only two floors "in the house"; (2) it is not a house as the Defendant claimed, but a mighty apartment complex rented out to both individuals and companies, including CASCAP; (3) the apartment to which the Plaintiff was inadvertently directed did not belong to CASCAP at all but to a different tenant. As the Plaintiff stated, the wrong place he was directed was a private apartment where there were only two women; (4) these women were *not* mental patients[13]; in fact, it was one of them whom the Plaintiff actually accompanied to the floor and who showed him the apartment he

---

For the sake of justice, the Court must determine the veracity of these allegations against the Plaintiff, which he denied and still denies and calls them fabrications, by requiring the Defendant to submit their original "Work History" document. Also, the Court must not ignore but address the question of why and how the Defendant was allowed to substitute through the backdoor their original Position Statement and "Work History" document with a completely new document entitled, "RESPONDENT'S MEMORANDUM", dated June 09, 2000 (i.e., one-and-a-half years after they had filed their original Position Statement with the MCAD in response to the Plaintiff's complaint and eight months after the commencement of the Public Hearing proceedings).

[12]In the "DEFENDANT'S ANSWERS TO INTERROGATORIES FROM THE PLAINTIFF" document, they refer to this as "owner" and not as "operator", but the real owner was no one specific individual, as implied here, but in reality a real estate company. This then is a clear example of the Defendant's fabrications laid bare by the fabricator's complete ignorance of the CASCAP facility at 808 Memorial Drive.

[12]According to the Defendant, these were the supposed "mental patient consumers [who] were not expecting someone to come work and they were afraid"!

---

16

was directed to; (5) CASCAP owned only two units in the entire building, one of which it used as an office and the other as the consumers' living quarters; (6) the Plaintiff did not go to the consumers quarters at all. After discovering that he had been misdirected, the Plaintiff did find the right office, i.e., the CASCAP administration office which he was actually looking for. He did not see a single consumer and vice-versa. So, how could the consumers have been afraid when they did not see the Plaintiff and he did not see them either? (7) Who escorted the Plaintiff out and why? The "owner", as the Defendant stated in their "Work History" document, or "security personnel" as Mr. Hammond testified at the Public Hearing proceedings? The CASCAP program manager and the Daily Log-book will surely prove that these are complete concoctions.

(ii) In his testimony, however, the Plaintiff asked how the clients could be afraid of him when he never saw them and they him. The Plaintiff was indeed misdirected to another floor where he saw only two women and not those he was sent to serve.

(iii) The Defendant's allegation that security personnel escorted the Plaintiff out of the building was another apparent fabrication.[14] The Plaintiff saw no security personnel there whatsoever. Jeniffer Evans, the program manager of this facility, would have testified to the contrary, but not only did the Plaintiff's counsel fail to invite her to testify at the Public Hearing (PH), he also expunged this very crucial information

---

[14] In their efforts to improve upon their fabrications, the Defendant have now amended their "Date of Incident, Reason and Outcome" section of their "Work History" document (p. 3) to read: "Mr. Asimpi assigned to the wrong floor and had to be escorted out of the building. Given the mental illness of the consumers who witnessed Mr. Asimpi being escorted out, Ms. English thought it best if he not return". (Please see p. 2 of the Defendants' "RESPONDENT'S ANSWERS TO INTERROGATORIES FROM THE COMPLAINANT" document, dated 31st day of January, 2000 and signed by both Mr. Douglas Hammond and Mr. Alan Seewald, the Defendant's president and counsel, respectively; and marked as Exhibit V). The most significant problem of this fabrication for the Defendant is that the supposed lady, Eileen English, who is mentioned here as the "Person Making [the] Complaint" did not exist. There is, however, Elaine Farash, another Clinical Director, who works for The Center for Mental Health. Besides, the 808 Memorial Drive facility, where the lady supposedly worked, is a CASCAP program located in Cambridge. Both the CMH and CASCAP are two distinct human services organizations under two distinct administrations. Therefore "Eileen English" could not have made a report about the Plaintiff, let alone banned him from this CASCAP facility. At any rate, the Plaintiff was unaware of this lady's alleged report until he read about it in the Defendant's "RESPONDENT'S ANSWERS TO INTERROGATORIES FROM THE COMPLAINANT" document. Also this information is nowhere recorded in the Defendant's "Work History" document. These are thus clear examples of the Defendant's numerous fabrications about the Plaintiff's "bad" character and his so-called "poor work performance".

when filing the Plaintiff's appeal for review document with the MCAD's Full Commission. (Please see "PETITION FOR REVIEW" document already submitted to the Court and marked as Exhibit III, which was largely the HO's decision against the Plaintiff but which, curiously, counsel actually submitted to the MCAD's Full Commission; also another "PETITION FOR REVIEW" document, marked as Exhibit IV, about which counsel lied to the Plaintiff, falsely assuring him that he had submitted the true and correct version of this to the Full Commission for review. (Please see a photocopy of e-mail correspondence the Plaintiff and his counsel had exchanged between February 15 and February 18, 2003, marked as Exhibit VI, already submitted to the Court).[15] But, as he emphatically told his counsel and testified, nothing like that ever happened. The Plaintiff testified that *if it was true that he had been banned, no one ever told him about it and that he read about it only in the Defendant's hurriedly composed "Work History" document on him, as Mr. Hammond admitted under oath at the MCAD PH?* The Plaintiff also indicated that the Defendant gave no evidence in support of this alleged ban from all CASCAP programs.

(iv) The Plaintiff testified that the Defendant lied also when they stated that the Plaintiff was rejected, while his colleague Luke (i.e., another Field Staff) was retained to work when both of them were inadvertently sent to the same shift at this facility under Katie Curley on the day in question. In fact, Bob Lindner admitted he had made a scheduling error and so sent both field staff to the same shift. In other words, the Plaintiff's colleague was also *not* retained to work there that day as the HO falsely alleged; in fact, both were sent away. Mr. Lindner even apologized to

---

[15] In his e-mail message of February 15, 2003 to the Plaintiff, counsel Tom Gildea's reference to "the appeal brief" that he asked Plaintiff to review and send back to him is to Exhibit IV. It is the same document he promised in his February 18, 2003 message to "make changes to ... (using most of your input)". He further promised to mail a copy of the final version of this document to the Plaintiff. The fact, however, is that counsel did not make use of this document at all; he instead used for the "PETITION FOR REVIEW" document the Hearing Officer's entire negative decision against the Plaintiff (already submitted to the court and marked as Exhibit III and entitled "PETITION FOR REVIEW"), making only innocuous changes here and there). He thus ignored the Plaintiff's "comments/corrections/additions" that he himself had asked for.

          the Plaintiff for his scheduling error and promised to pay the Plaintiff at least his transport fare.

(v)    The Plaintiff also testified that the alleged "dog incident" the Defendant attributed to the Plaintiff was also totally false, adding that there was absolutely no dog incident. He insisted that the so-called "dog incident" was a distortion the Defendant incorporated in their "Work History" document only to portray the Plaintiff in a bad light.

(vi)    Indeed, the Plaintiff testified that Lindner himself told him that the Defendant's office had received a letter from Curly who indicated that another Field Staff had informed them that he was afraid of dogs, so Curly must have confused this staff with the Plaintiff.[16]

(V) **Clement Street, Malden (Tri-City)**. The Defendant testified that the Plaintiff was banned from this facility following his work there on Wednesday, October, 1997 ("Work History" document, p. 4). In his testimony, the Plaintiff acknowledged having been banned from this facility, but he denied that he had personally made a medication error. The Plaintiff testified that it was rather a client who, contrary to Tri-City's rules and procedures, took his own medicine without telling the Plaintiff first. The Plaintiff denied also the Defendant's claim that either Lindner or Hammond pleaded for his return to this site. In fact, neither Mr. Lindner nor Mr. Hammond ever told the Plaintiff that he pleaded for the latter's return to this facility. The Plaintiff made his denials crystal clear in the Dep., p. 61, ln 12 through p. 63."[17]

---

[16] It should be noted that the Defendant did not mention in either their "Work History" or in the "RESPONDENT'S ANSWERS TO INTERROGATORIES" documents that Lindner had told the Plaintiff that Katie Curly must have confused the Plaintiff with another Field Staff who Curly said was afraid of dogs and therefore he should not be allowed back to work at this facility.

It should also be noted that the Defendant have made elaborate efforts in their "RESPONDENT'S ANSWERS TO INTERROGATORIES" to "improve upon" what they have already stated in their "Work History" document by fabricating more stories. Please compare the entries for the "Date of Incident, Reason and Outcome" column of the "Work History" document (p. 5) with the "Reason for Complaint" section of the same document, p. 4, and the Defendant's desperate attempts to "improve upon" their fabrications.

[17] It's noteworthy that where the Plaintiff clearly denies anything in the Deposition, the Defendant's counsel cleverly avoids specific references to those pages most of the time, while at the same time