19. The Plaintiff testified that he also spoke to Mr. Bob Lindner about the Plaintiff's request for assignments, but he bluntly told him that so far as he was aware, the Plaintiff was no longer working for the company, i.e., Relief Resources, Inc.; the Plaintiff, according to Lindner, had been terminated.

20. In fact, the Plaintiff testified that the reason Ms. Bush gave him for not assigning him was that his schedules file had been removed by Mr. Bob Lindner. At no time did Ms. Bush tell the Plaintiff that she was having difficulty finding him an assignment because of his lack of a means of transport, for the Plaintiff exclusively depended on public transport. In fact, the Plaintiff testified that there is nothing in the Defendant's "Work History" document to that effect. Most importantly, the problem of public transportation in the Boston Metroplex was never an issue. It is thus a complete fabrication contained in this unsigned, vaguely titled, "RESPONDENT'S MEMORANDUM" introduced through the back door in concert with the Plaintiff's counsel and the MCAD's HO long after the Public Hearing proceedings had started.[18]

---

giving the false impression that the Plaintiff acknowledged responsibility for it (Dep. 64, ln 5 through p. 66, ln 22. Please see also, e.g., p. 66, ln 3 through 22 for the Plaintiff's clear denials).

[18] It is mind-boggling that despite the Plaintiff's persistent denials of almost all the Defendant's obvious fabrications contained in this illegitimate document, and despite his pointing out their numerous weaknesses and illogical nature, their counsel has consistently repeated the fabrications and distortions. As recent as Friday, August 05, 2005, for instance, the Defendant's counsel made the following statements before Honorable Douglas P. Woodlock, U. S. District Court Judge:

(I) Regarding the Defendant's belated change of position from "no contact" to "there apparently were calls to the weekend coordinator" in respect of their termination of the Plaintiff, counsel asserted: "We [i.e., Relief Resources] obviously didn't have Mr. Asimpis' phone records. It was our understanding ... that because [Relief Resources is] a temporary agency, it has hundreds of employees coming and going all the time and often without notice, just sort of falling off the face of the earth every thirty days or thereabouts". "I think what was being expressed, this was an administrative process, and whether it was improperly stated that there was no contact for [thirty] days or whether there was no assignment for [thirty] days, what [we were] trying to put forth was no one said, 'Let's fire Kofi Asimpi, let's not assign him anymore.' This was done administratively in a batch of inactivation of any number of people, and I couldn't tell the Court at this point." (Motion Hearing, p. 4, ln 19 – 25; p. 5, ln 21 through p. 6, ln 4).

(II) Regarding whether or not the Defendant still attempted to find the Plaintiff assignments: "He wasn't receiving further assignments, and I believe the evidence would show, and this is probably inappropriate for summary judgment, that [Genie] Bush and others who were doing the assignments were looking for places to send Dr. Asimpi, and they couldn't find any, and as Mr. Hammond's affidavit sets forth, Dr. Asimpi did not drive, he didn't have a car, so he needed to find some place on public transportation (Motion Hearing, p 6, ln 7 through 14).

"There were a number of places that would not accept him, and there were a number of places that he asked not to be returned to, and Adams Street where this whole event took place was one of those places that outsourced to Relief Resources this position. It wasn't what would be called an intermittent temporary employment user. This was an outsource, and so Dr. Asimpi was assigned there fairly regularly, and this was a place he could get to (Motion Hearing, p. 6, ln 7 through 22).

21. The Plaintiff testified that whereas the Defendant's initial and sole reason for allegedly placing the Plaintiff's file on inactive status, according to their "Work History" document, was that the Plaintiff had failed to contact his employer for one month period, in the above-referenced "RESPONDENT'S MEMORANDUM", another reason is manufactured to the effect that "the director of Human Resources Department [i.e., Ms. Robin O'Farrell] believed that after being banned from all CMH sites, the [Plaintiff] failed to contact the [Defendant] for assignment." The statement adds: "Therefore, in adherence to the stated policy contained in the Policy and Procedures Manual (p. 14), the [Plaintiff] was inactivated. Although there apparently were calls to the weekend coordinator, the weekend coordinator did not note those calls, and they were not conveyed to the Human Resources Department" (pp. 8f.). The Defendant did not state all this in their "Work History" document, because they were only later fabricated. If the Defendant did adhere to their state policy, as counsel claims, what about the same stated policy on "Inactivation" which reads: "**Field Staff who do not maintain contact with us and/or who do not accept and/or complete assignments on a consistent basis will be notified by mail of inactivation**"? Why did they not notify the Plaintiff about their inactivation of his personnel file?

---

Once [Adams] Street no longer was willing to take him, Relief Resources really had nowhere else to send him. I understand that Dr. Asimpi disputes that, but that's what Mr. Hammond and his staff would say is that we did try to find places for him, and I would point out, your Honor, that throughout the time and the complaints that Dr. Asimpi had levelled against him, they worked with him, they tried to find other places and they would continue to do that because they need workers (Motion Hearing, p. 6, ln 23 through p. 7, ln 6).

(III)    Regarding the Court's question as to what to make of the Defendant's original insistence that the sole and exclusive reason why the Plaintiff's personnel file was inactivated was his failure to contact his employer for thirty days, counsel responded: "... I do agree that there was an improper reference at the very early stage of the MCAD because the MCAD demands a position." Counsel explained what he meant by "improper reference". "Dr. Asimpi did not call for [thirty] days as opposed to there was no assignment for [thirty] days, for whatever reason, and, therefore, he was inactivated, and so that's what I would suggest the Court make of that" (Motion Hearing, p. 7, ln 7 through 19).

(IV)    Counsel added the following unsolicited comments: "Your Honor, may I just add one thing just to be clear because Dr. Asimpi said repeatedly that Mr. Hammond fired him immediately, those words, and I want to be clear that Dr. Asimpi worked in another location the next day on the 14th, and I don't think there's any dispute about that, he worked in a different place, one of the places that used the services intermittently, and they needed a one-day fill-in, and he was scheduled to work there and he worked there. I just want to make sure this is clear on the record (Motion Hearing, p. 21, ln 22 through p. 22, ln 6).

The Plaintiff has already abundantly and clearly addressed these points in this brief and elsewhere, pointing out why they are deliberate fabrications, outright lies, distortions and contradictions, all carefully designed by counsel and his client to mislead the Court and thus win the case. It is therefore not the Plaintiff's intention to repeat those points here, suffice it to draw attention, for example, to the "PLAINTIFF'S REBUTTAL TO DEFENDANT'S STATEMENT AS TO MATERIAL FACTS NOT IN GENUINE DISPUTE", the "PLAINTIFF'S OPPOSITION TO MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT" and "AFFIDAVIT OF KOFI ASIMPI", all of which one way or another address the issues, including those of the "AFFIDAVIT OF DOUGLAS HAMMOND".

22. The Plaintiff testified that the Defendant purposely coined the term "weekend coordinator" solely for the purpose of defending themselves in this case by deliberately misleading the Court. Ms. Genie Bush, who is apparently implied here, was not designated, whether formally or informally, as a "weekend coordinator". By coining this new term, the Defendant have given the false impression that the official in question worked only at weekends and/or dealt with issues connected only with weekends. In the first place, Ms. Genie Bush, to whom the Plaintiff spoke on several occasions, was officially designated as "Eastern Massachusetts Coordinator", who happened to have served at some weekends also.

23. The Plaintiff testified that in their attempt to explain why the numerous efforts the Plaintiff made to speak to the President of the Defendant, Mr. Hammond, failed after the Plaintiff had been terminated, the Defendant fabricated another story which the HO accepted as gospel truth and thus used it as a reason for her negative decision against the Plaintiff. She wrote:

> In March 1998, Hammond was in the process of removing himself from the role of "field coordinator." He testified that he needed to take a stronger management role, as many of the field staff did not know he was the owner of the company, because he was a placement person for the organization. He decided that he would no longer take calls from staff and had his calls redirected to the coordination staff. Hammond testified that this was not a measure directed against Plaintiff. I credit Hammond's testimony that he no longer accepted any field staff calls." (HO's Decision, p. 8).

24. In his testimony, the Plaintiff called attention to the above-referenced "Work History" document, pointing out that there is not a single positive thing said in it about him during the entire period that he was in the Defendant's employ. Yet, as he stated in his written testimony, the Plaintiff noted how the officials, including Mr. Hammond and Mr. Lindner as well as Ms. Genie Bush often praised him for his good work performance and his positive attitude in general towards work. The Plaintiff testified that he was often praised, for example, for his willingness to step in to work other shifts in emergency situations when other Field Staff suddenly called from time to time saying they could not work. In his written testimony, the Plaintiff also pointed out how on meeting in person for the first time at the Defendant's Cambridge/Somerville office one day Ms. Bush was exceedingly exhilarated and exclaimed with excitement in the presence of Ms. Kerri Lee, the office manager who

introduced the Plaintiff to her: "Oh, you're the Kofi! People at the office are always saying good things about you." In his own testimony in this case, Mr. Hammond confirmed that there indeed had existed a cordial relationship between him and the office staff on the one hand and the Plaintiff on the other. Yet, all that the Defendant have done in this case is to calculatingly portray the Plaintiff as a very poor, uncooperative, stupid and belligerent worker—so very bad, in fact, that they even significantly increased his weekly work hours, sometimes almost to 100%! The Plaintiff also drew attention to another important factor, pointing out that the Defendant's "Work History" document that they filed with the MCAD, according to their own testimony, was not the original but only a summary. Indeed, Mr. Hammond acknowledged in his testimony under oath during the MCAD Public Hearing proceedings that this document was prepared after the Plaintiff had filed his complaint with the MCAD. Nor was the Defendant's above-referenced telephone record the original from the telephone company.

25. The Plaintiff testified that he complained of verbal and physical attack at his workplace in a personal letter he addressed to his supervisor with the express purpose of prompting him to quick action because he feared for his safety and life and the Defendant retaliated almost instantly by terminating him (or "inactivating" his file, as the Defendant put it). The Defendant then vehemently denied they terminated the Plaintiff and insisted instead that it was he himself who had failed to contact his employer for assignments for a period of one month. When this untruth was exposed, according to their own telephone record, the Defendant then fabricated all sorts of stories, some very illogical, to defend themselves.

**ARGUMENT**

Massachusetts General Law, Ch.151B, §4(4) prohibits employers from discharging, expelling or otherwise discriminating against a person who has opposed any practice prohibited by Chapter 151B or who has filed a complaint alleging a violation of Chapter 151B. In order to establish a prima facie case of retaliation, a Plaintiff must show that, (1) he was engaged in a

protected activity; (2) that the employer was aware of the protected activity; (3) he subsequently was subject to an adverse employment action; and (4) ev

Evidence existed sufficient to establish a retaliatory motive or the adverse employment action followed the protected activity within such time as a retaliatory motive can be inferred. Richards v. Bull HN Information Systems, Inc. 16 MDLR 108, 1639 (1996). To succeed on a claim of retaliation, "the plaintiff must prove that he reasonably and in good faith believed that the employer was engaged in wrongful discrimination, that he acted reasonably in response to his belief and that the employer's desire to retaliate against him was a determinative factor in its decision to terminate his employment." Abramian v. President & Fellows of Harvard College, 432 Mass. 107 (2000) quoting Tate v. Department of Mental Health, 419 Mass 356, 364 (1995).

If an employer articulates a legitimate, nondiscriminatory reason for its challenged actions, employment discrimination plaintiff is given an opportunity to prove by a preponderance of the evidence that the asserted reason is a mere pretext for unlawful discrimination. Civil Rights Act of 1964, §701 et seq., as amended 42 U.S.C.A. §2000 e et seq.; *Johnson v. Allyn & Bacon, Inc.*, 731 E 2d 64, cert. denied 105 S.Ct. 433 (1981), Holden v. *Commission Against Discrimination of Comm. of Massachusetts*, 671 E2d 30 (1982), cert denied 103 S.Ct. 97, 459 US 843, 74 L.Ed. 2d 88.

A Title VII plaintiff can prove pretext by circumstantial evidence. Evidence that the employer acted contrary to its customary policy in making employment decision may support their inference of discrimination, at least in absence of evidence that employer often did not follow its own stated policy. Civil Rights Act of 1964, §701 et seq., as amended, 42 U.S.C.A. §2000 e et seq., '42 U.S.C.A. §1983. *White v. Vathally*, 570 F. Supp. 1431, affirmed 732 E2d 1037, cert. Denied 105 S.Ct. 331, 83 L.Ed. 2d 267 (1983).

An employee makes out a prima facie showing of retaliatory discharge for exercising rights under Civil Rights Act of 1964 by showing that she engaged in protected activity, that employer was aware of protected activities, that she was discharged, and, absent other evidence tending to establish a retaliatory motivation, *that her discharge followed her protected activities within such a period of time that the Court can infer retaliatory motivation*, and once a prima facie

24

case has been demonstrated, the burden shifts to employer to articulate a legitimate, nondiscriminatory reason for discharge, whereupon the employee has the opportunity to demonstrate that the reasons assigned by the employer are pretexts. Civil Rights Act of 1964, §704 (a) as amended, 42 U.S.C.A 2000 e – 3 (a). *Hochstadt v. Worcester Foundation for Experimental Biology, Inc..*, 425 F. Supp. 318 aff'd 545 F. 2d. 222 (1997). (Emphasis added).

Evidence was sufficient to permit a reasonable jury to find in favor of a former employee, in a race discrimination action he brought against former employer; the question was purely one of credibility, as employer's owner testified that employee's discharge was the product of unsatisfactory work and insubordination, and employee contended that his discharge was the result of a cumulative history of discrimination at the former employer. Civil Rights Act of 1964, §701 et seq., as amended, 42 U.S.C.A. §2000 e et seq.; MGLA c. 151 B §4; F.R.C.P. Rule 50 (b). *Mendoza v. Union Street Bus Col, Inc.*, 876 f. Supp. 8 (1995).

"A finding of Probable Cause shall be made when, after appropriate investigation, the Investigating Commissioner concludes that there is sufficient evidence upon which a fact finder could form a reasonable belief that the respondent committed an unlawful practice. In making this determination, disputes involving genuine issues of material fact are to be reserved for determination at hearing" 804 C.M.R. §1.13 (7) (a).

"Once an employer sets forth non-discriminatory reasons for its actions, the analysis moves to the third stage, where the employee must show that the basis of the employer's decision was unlawful discrimination. <u>Abramian,</u> quoting Blare, supra at 442-443, 446. This may be accomplished by showing that the reasons advanced by the employer for making the adverse decision are not true. In an indirect evidence case, if the fact finder is persuaded that one or more of the employer's reasons is false, it may, but need not infer that the employer is covering up a discriminatory intent, motive or state of mind. Lipschitz v. Raytheon Co., 434 Mass. 493 (Mass 2001)."

The crux of this case is retaliation, resulting in unlawful termination. This case is no longer about whether or not it was racial, as the U. S. District Court recently argued (Motion Hearing, p. 8,

25

In 1 – 3, Friday, August 05, 2005). The racial aspect, which was a separate issue, was already dealt with when Douglas T. Schwarz, Esq., MCAD's Investigating Commissioner, determined in July 2000 that a finding of lack of probable cause was made regarding the Plaintiff's complaint of harassment based on race and color. According to Commissioner Schwarz, the MCAD's investigation of the Plaintiff's complaint did not reveal sufficient evidence of an unlawful act of discrimination. He thus dismissed the racial aspect of the case while finding probable cause to credit the Plaintiff's allegations of retaliation. Confirming the panel's decision, Commissioner Schwarz, Esq., wrote: "[O]ur investigation of the complaint did not reveal sufficient evidence of an unlawful act of discrimination. Therefore, the constructive discharge and aiding and abetting portions of the complaint have been dismissed" (MCAD, Re: Kofi Asimpi v. Relief Resources, No.: 98-13-2570).

This being the case, the focus must be shifted entirely onto the issue of retaliation, which is also an entirely separate issue. The Plaintiff wrote a letter to his supervisor/manager, in which he complained about verbal and physical attacks on him that he believed to be racially motivated at his workplace. Instead of taking the appropriate action to address the Plaintiff's concerns in the letter, the Defendant retaliated by summarily terminating him in violation of Massachusetts General Law Chapters 151B, §4 (1), MGLc. 151B, §4 (5) & MGL c.151B, §4 (4A) and Title VII of the Civil Rights Act of 1964. Indeed, this was precisely the decision an MCAD's three-member panel, composed of J. Lynn Milinazzo-Gaudet, Esq., Attorney Investigator, and Sunila Thomas George, Esq., Supervisor, plus Douglas T. Schwarz, Esq. reached. In other words, having thoroughly investigated the Plaintiff's complaint against the Defendant, the panel concluded that the Plaintiff did establish a prima facie case for retaliatory discharge. According to these officials, their investigation, upon which they issued a memorandum in July 2000 to the parties concerned, revealed that:

> [Plaintiff] has established a prima facie case for retaliatory discharge. [Plaintiff] participated in a protected activity when he wrote the letter alleging racially motivated work place harassment. It is undisputed that [Defendant] had knowledge of said letter. [Plaintiff] has established that he was subjected to an adverse employment action when [Defendant] failed to offer him work assignments and placed [Plaintiff] on inactive status. The [Plaintiff] has also established that the timing of his complaint and the adverse employment action were such that retaliation may be inferred (MCAD Memorandum, Docket #98-13-2570 and EEOC No. 16C983153).

This view was later confirmed by the MCAD Hearing Officer, Helene Horn Figman, in her decision of Janaury 15, 2003, when she likewise determined that:

> "[r]etaliation is a separate claim from discrimination, motivated at least in part, by a distinct intent to punish or to rid a workplace of someone who complains of unlawful practices." Kelly v. Plymouth County Sheriff's Department, 22 MDLR 208, 215 (2000). The [Plaintiff] reasonably believed that he was being subjected to [verbal and physical abuse] based upon his race and/or national origin. On March 1, 1998, he wrote a letter to the manager of the Adams Street facility [belonging to The Center for Mental Health], detailing what he believed to be [abuses], based upon his race. On March 13, 1998, the [Defendant] received a copy of said letter. On March 14, 1998, [Plaintiff] worked his last shift for [Defendant]. [Defendant] alleges that there is no causal connection between the [Plaintiff's] letter and his being placed on inactive status. However, the [Plaintiff] has shown that there was adverse employment action following the protected activity within such close time proximity that a retaliatory motive could be inferred. Where, as in this case, there is no direct evidence of retaliatory motive, the Commission follows the burden-shifting framework set forth in Wheelock College v. MCAD, 371 Mass. 130, 136 (1976). (MCAD Hearing Officer's Decision, p. 10, already submitted to the Court).

It cannot be over-emphasized that the question must not be whether or not the harassment visited upon the Plaintiff at his workplace was racial. The question must be asked, did the Plaintiff *reasonably and in good faith believe* that the Defendant was engaged in wrongful termination, that he acted reasonably in response to his belief and that the employer's desire to retaliate against him was a determinative factor in itheir decision to terminate his employment. Abramian v. President & Fellows of Harvard College, 432 Mass. 107 (2000) quoting Tate v. Department of Mental Health, 419 Mass 356, 364 (1995). Based upon the above analysis, the decisions reached by the three MCAD learned experts and the HO plus the sources cited, there is no doubt that the Plaintiff reasonably and in good faith believed that he was subjected to harassment at his workplace because of his race, color or national origin.

The same principle applies to the question of whether or not the kind of harassment the Plaintiff suffered was pervasive ("Motion Hearing", ibid., p. 8, ln 4 through 11). The answer likewise is that the Plaintiff reasonably believed and perceived the harassment to be severe and pervasive. The fact that he was often subjected to verbal and physical attack to the extent that he could not do his work in peace and tranquility and was constantly in fear of being seriously hurt or even killed any time the abusive client was around or attacked him, one must reasonably conclude that the harassment was severe and pervasive enough. It is a question that must ultimately be considered from the victim's (Plaintiff's) perspective and not from someone else's, much less from the Defendant's who have clearly played down the severity and pervasiveness of the attacks with the express purpose of winning this case.

The next question to be addressed is, should the Plaintiff hold the Defendant, Relief Resources, Inc., liable for unlawful termination? As the Plaintiff has testified, it was Relief Resources, not The Center for Mental Health, which terminated the Plaintiff. The Plaintiff wrote to his manager/supervisor complaining about verbal and physical attacks on him that he reasonably and in good faith believed to be racially motivated. The President of the Defendant received by fax on March 13, 1998, the said letter, dated March 01, 1998. He called and spoke to the Plaintiff about the letter that very day he received it, expressing his displeasure that the Plaintiff had concluded in his letter that if no action was taken and the abusive client attacked him again, he would have legal action taken against him on the Plaintiff's behalf. The Plaintiff explained to Mr. Hammond that he did not intend to really take legal action against the client but that he made that statement merely to prompt his manager/supervisor to quick action for his intervention as the Plaintiff was very much concerned and afraid that the client Steve could seriously injure, or even kill him, given his constant violent behavior towards the Plaintiff.

The next issue to be considered is, who really terminated the Plaintiff's employment. Was it the Defendant or The Center for Mental Health? If it was the latter, there is no evidence of that. In fact, the Plaintiff himself neither received any notification from The Center to that effect, nor did Mr. Hammond personally tell him in their March 13, 1998, telephone conversation that The Center had decided to ban the Plaintiff from all its entire facilities, including Adams Street. Mr. Hammond only told the Plaintiff that he would call him back again on an unspecified date. Meanwhile, he ordered the Plaintiff, who had already been scheduled to work several shifts at Adams Street, not to go back to work those shifts until he got back to him again. But he never did, notwithstanding numerous attempts the Plaintiff himself had made to contact him personally. More importantly, however, if The Center did in fact decide to ban the Plaintiff, Mr. Hammond would no doubt have told the Plaintiff. He would not merely have told him not to go back to work only at Adams Street until he got back to him; he would have surely told the Plaintiff there and then that Catherine Harper or The Center decided to ban him from all its facilities, if The Center had truly banned him.

As indicated, the idea that the Plaintiff was banned from the entire facilities of The Center and not only from Adams Street did not come to the Plaintiff from Mr. Hammond; it came from third

28

parties, not immediately on March 13th, but only later when the Plaintiff continued to call the Defendant's office with the view to speaking to Mr. Hammond and to requesting work assignments. The Plaintiff has already testified that Ms. Genie Bush and Mr. Robert Lindner told him that he had been terminated from Relief Resources, *not* from The Center for Mental Health, because of the March 01, 1998, letter he had written to his manager at Adams Street. The Plaintiff also testified that he received a letter from Ms. Robin O'Farrell, the Defendant's Director of Human Resources Department, a letter dated June 29, 1998, in which he was referred to as "a former employee" of the Defendant (letter already submitted to the Court). This was the first time that the Plaintiff received any official, but indirect, notification that he had been terminated by Relief Resources, even though Mr. Lindner had earlier told him he was no longer an employee of the Defendant and that Ms. Bush also confirmed that she could not assign the Plaintiff because Mr. Lindner had removed his schedules file and for that reason she could not assign him work.

    Now, who was the source of the information that the Plaintiff was banned not only from Adams Street, but from every and all the facilities belonging to The Center for Mental Health? According to Mr. Lindner and Ms. Bush, it was Mr. Hammond who gave them the information and, indeed, it was the latter who spoke to Ms. Catherine Harper, Clinical Director of The Center for Mental Health, following his receipt of the Plaintiff's March 01, 1998, letter on March 13th. Given all the signs of anger he exhibited towards the Plaintiff as a result of his receipt of the faxed copy of letter the Plaintiff had addressed to his manager, and as a result of which Mr. Hammond automatically stopped having anything to do with the Plaintiff in any way at all—despite all the Plaintiff's pleas to have him speak to him and despite all the positive and cordial relationship the Plaintiff had had with the President and the rest of the office staff, why should Mr. Hammond be believed that the Plaintiff's alleged ban from all The Center's facilities was not solely and exclusively his decision rather than The Center's?

    The Plaintiff has throughout his testimony in this case underscored the fact that the Defendant have fabricated numerous stories and deliberately distorted the facts to defend themselves. The Plaintiff has testified, for example, that the Defendant, in a conspiracy with the Plaintiff's own former counsel and the MCAD's HO, was allowed to secretively introduce a

29

completely new document, i.e., "RESPONDENT'S MEMORANDUM", as a corrective to their Position Statement in which they fabricated the story that they had not terminated the Plaintiff but only "inactivated" his personnel file for the sole and exclusive reason that he had failed to contact the Defendant for assignments for one month. As the Plaintiff strongly disagreed and his demand for the Defendant's telephone record forced to expose the falsity of their claim, they then engaged in the above-referenced conspiracy one-and-a-half years after they had filed their Position Statement (to which their "Work History" document on the Plaintiff was attached) and eight months after the MCAD Public Hearing proceedings had begun. In their above-named memorandum, the Defendant finally acknowledged that the Plaintiff did after all make some calls to the Defendant's officer, albeit to a non-existent "weekend coordinator" who had failed to pass the information on to the Director of the Human Resources Department. Why should the Defendant be credited with these weird and illogical fabrications?

      Another significant testimony the Plaintiff gave is about the Defendant's claim that the Plaintiff was banned from all of CASCAP'S programs (pp. 12 – 18). Again, the Plaintiff in his testimony vehemently denied it, pointing out the several weaknesses of this claim and asserted that it is a complete fabrication. He indicated that he had never even heard about his alleged ban from this company until he read about it in the Defendant's "Work History" document. Given the numerous fabrications and distortions the Defendant have made throughout this case, some of which really defy logic, why should this Court or anyone else believe that the Defendant's claim that it was The Center for Mental Health which, rather than the Defendant themselves, banned the Plaintiff? The Plaintiff is of the opinion that just as the Defendant fabricated the stories of the alleged bans of the Plaintiff from all CASCAP programs, so also they fabricated the story that the Plaintiff was banned by The Center for Mental Health from its facilities, including that of Adams Street.

      Should this Court, or any court for that matter, simply ignore all the Defendant's numerous consistencies, fabrications, distortions, illogical claims and outright lies that the Plaintiff has over and again identified in this case? Should the Court not seriously examine at least some of the Plaintiff's complaints of fabrications and distortions against the Defendant to determine which of the

two parties is really telling the truth? Should this Court, or any other court, allow the Defendant to almost completely replace or amend their Position Statement more than a year after they had filed it and almost a year into the "trial" proceedings? Should the Defendant's counsel's claim that the Defendant did not have the "Plaintiff's telephone records" at the time they wrote their Position Statement be taken seriously? It should be recalled that it was not the Plaintiff who gave the Defendant their telephone record; all that the Plaintiff did was to ask them to produce *their* telephone record with the view to exposing their lie that they did not terminate the Plaintiff but only inactivated his personnel file after he had failed to call the Defendant's office for assignments for one month. The Plaintiff would once again like to draw the Court's attention to M.G.L. that states:

"Once an employer sets forth non-discriminatory reasons for its actions, the analysis moves to the third stage, where the employee must show that the basis of the employer's decision was unlawful discrimination. Abramian, quoting Blare, supra at 442-443, 446. This may be accomplished by showing that the reasons advanced by the employer for making the adverse decision are not true. In an indirect evidence case, if the fact finder is persuaded that one or more of the employer's reasons is false, it may, but need not infer that the employer is covering up a discriminatory intent, motive or state of mind. Lipschitz v. Raytheon Co., 434 Mass. 493 (Mass 2001)."

The Plaintiff also wishes to comment on the Defendant's counsel's statement which he recently made regarding the Plaintiff's contention that Mr. Hammond had fired him immediately upon his receipt of the Castagnola letter from Ms. Harper:

"Your honor, may I just add one thing just to be clear because Dr. Asimpi said repeatedly that Mr. Hammond fired him immediately, those words, and I want to be clear that Dr. Asimpi worked in another location the next day on the 14th, and I don't think there's any dispute about that, he worked in a different place, one of the places that used the services intermittently, and they needed a one-day fill-in, and he was scheduled to work there and he worked there. I just want to make sure this is clear on the record" (Motion Hearing, ibid., p. 21f.).

It is true that the Plaintiff repeatedly testified that Mr. Hammond immediately terminated him following his receipt of the Plaintiff's Castagnola letter from Catherine Harper. As indicated above, the very day Mr. Hammond received the letter, he ordered the Plaintiff not to go back to Adams Street to complete his pre-scheduled shifts. He had them cancelled, but promised to get

31

back to the Plaintiff later. But he never did and nobody else from the Defendant's officer contacted him again. Only the Plaintiff called the Defendant's office numerous times

Counsel's claim that Mr. Hammond did not terminate the Plaintiff because the latter worked on March 14 at a Tri-City facility in West Medford is grossly misleading.[19] To be sure, Mr. Hammond did not tell the Plaintiff, "You're fired as of today." Instead, he told him not to go and work his remaining shifts at Adams Street and that he would get back to him later, but he never did. It was Mr. Hammond who cancelled the Plaintiff's pre-scheduled shifts at Adams Street and in their

---

[19] Defendant's counsel's contention that the Plaintiff was *not* terminated immediately because he worked on March 14, 1998, and that Ms. Genie Bush and others were still looking for a place to assign him is totally false and deliberately calculated to mislead the Court.

First, who were those individuals, apart from Ms. Bush, who were trying to find a place for the Plaintiff? Could they have been Mr. Hammond and Mr. Lindner? Besides Ms. Bush, the only officials who ever assigned the Plaintiff to facilities were Mr. Hammond and Mr. Lindner. But, as the Plaintiff has testified, Mr. Hammond ordered the Plaintiff on March 13, 1998, the very day he said he received a fax from Ms. Catherine Harper of The Center for Mental Health, not to go back to work his remaining scheduled shifts at Adams Street, and the Plaintiff never ever heard from him again, even though Hammond told him he would get back to him later; and when he didn't, the Plaintiff made numerous attempts, as indicated, to reach him but to no avail. In spite of the Plaintiff's very cordial relationship to him and to the other staff, Mr. Hammond even refused to speak to the Plaintiff again.

Second, Mr. Lindner had already clearly made the Plaintiff understand that he had been terminated because of the letter he had written to his manager at Adams Street. As if to demonstrate that the Plaintiff was indeed "no longer working for the company", as he put it, Mr. Lindner removed the Plaintiff's schedules file out of reach of Ms. Bush.

Third, only Ms. Bush, who was very sympathetic to the Plaintiff's case, assured him she would assign him to facilities other than those of The Center for Mental Health (like CASCAP, Tri-City, etc.) to which the President ordered him not to go back to work his remaining shifts. Ms. Bush was however prevented, as stated, from assigning the Plaintiff to other places because, according to her, his schedules file had been removed by Mr. Lindner. That the Plaintiff worked the last time for the Defendant on March 14, 1998, was due to the fact that Ms. Bush was willing to assign the Plaintiff to other facilities and she did so on her own accord, as she had always done. But once the Plaintiff's schedules file was removed, she couldn't assign him anywhere again. Given this circumstance, it is totally false for counsel to attribute the Defendant's failure to offer assignments to the Plaintiff to his lack of a means of transport because of his reliance upon public transport only. Indeed, Ms. Genie Bush never made that claim and the whole question of the unavailability of public transport in the Greater Boston area is a non-issue, since the Defendant did not and cannot point to just one area where they had wanted to assign the Plaintiff but failed because of his lack of a means of transport.

Four, where is evidence that "others" were still trying to find work for the Plaintiff after March 13, 1998, as counsel claims? If this was the case, why was that important "fact" not recorded in the Defendant's "Work History" document or elsewhere, but only in this illegitimate and unsigned 'DEFENDANT'S MEMORANDUM' brief?

Fifth, if "others" were really trying to find the Plaintiff assignments, how come he was never told that, apart from Ms. Bush's initial effort? How could "others" have been trying to find the Plaintiff assignments when he was told he was no longer working for the company, when his schedules file was removed and access to it was no longer possible and when the Director of Human Resources Department referred to him in her correspondence as "a former employee" of the company?

conversation he did not even mention to the Plaintiff that Catherine Harper or The Center for Mental Health had decided to ban him from their programs. And he did not do so only because Ms. Harper did not ban the Plaintiff from all her facilities.

Secondly, as the Plaintiff has testified, it was Ms. Genie Bush who assigned him to the shift in West Medford on March 14, 1998, and not Mr. Hammond. In fact, Mr. Hammond was not even aware of it immediately. This date was the last day the Plaintiff was given an assignment, in spite of his repeated calls for more. Soon following this date, Ms. Bush could not place the Plaintiff again, because, according to her, Mr. Lindner had removed his schedules file and for that reason she could not assign the Plaintiff to other available facilities. Since it was Mr. Lindner who removed the Plaintiff's schedules file, it is logical to conclude that he must have been ordered by Mr. Hammond to do so. It should be borne in mind that it was Mr. Hammond who spoke to Ms. Harper and the Plaintiff and but not to Mr. Lindner on telephone the day before. If therefore after March 14 Lindner removed the Plaintiff's schedules file so that Ms. Bush could no longer assign him to other available facilities, it is logical to conclude that Mr. Hammond must have advised Lindner to remove the Plaintiff's file. As the Plaintiff has already testified, it was Mr. Lindner who first hinted him that so far as he was aware, the latter was no longer an employee of Relief Resources. Ms. Bush at a later date confirmed this, and specifically explained that because of the Castagnola letter the Plaintiff had written, her company had terminated him.

Thirdly, counsel's argument that Ms. Bush and others were looking for an assignment for the Plaintiff but that there were no available facilities to which to assign him, because he had been banned from all the others and that his lack of a means of transport also made it impossible for the Defendant to place him was simply not true. As the Plaintiff has testified, another equally large company like The Center for Mental Health, CASCAP, and many other similar ones, some of which were educational institutions, were still available. The Defendant had surely anticipated that the Plaintiff might as well take legal action some day against them, given their unlawful termination of him, thus they fabricated all these stories about these bans and about his so-called "poor work performance." It should be recalled that these alleged bans are based solely on Mr. Hammond's testimony and that he produced no evidence to support his claims. Neither was the Plaintiff even

33

aware of the most serious ones until he filed his complaint with the MCAD and read about them in the Defendant's hurriedly composed "Work History" document on the Plaintiff. And again, this Court's attention should be drawn to the fact that by their own admission, the Defendant's "Work History" document on the Plaintiff is not the original one. If the Defendant did not intend to fabricate stories about the Plaintiff, why did they not simply photocopy for the purpose of this case the original?

Finally, for the sake of justice, and to discourage the Defendant from treating in the future their employees merely as easily disposable objects, the Plaintiff is earnestly appealing to the Court to reconsider these issues carefully to determine their veracity. Who is telling the truth, the Defendant or the Plaintiff? Should the Defender win this case, they would surely conclude that it pays to fabricate lies about their former employees, denigrate them and get away with their fabrications. The Plaintiff welcomes the Court's willingness to visit this case again, indicating that it reserves "the right to tidy up [its] findings and conclusions if it becomes necessary."

The Defendant claim in their Position Statement of 10/30/98 that "Mr. Asimpi was placed on inactive status due solely and exclusively to his failure to contact his employer for a period of one month." The Plaintiff claims that he was in contact with the Defendant throughout the alleged "failure to contact" time and that his calls were not returned.

In fact, the Cambridge office of the Defendant contacted the Plaintiff on 4/15/98 asking the Plaintiff to conduct an orientation for newly employed field staff. The Plaintiff agreed and was told that details would be forthcoming. Details never came and his repeated calls to the Cambridge office went unreturned. The Defendant claim that it would have been justified in terminating the Plaintiff because of his "poor work performance." Yet the Defendant's branch office offered this allegedly "poor" employee a job of training new field staff during the period the Plaintiff was allegedly not in contact with them. When this untruth was exposed, the Defendant then switched their position from "no contact" to "there apparently were calls to the weekend coordinator [who] did not note those calls, and they were not conveyed to the Human Resources Department". Obviously, the Defendant's claim that the Plaintiff performed poorly is a pretext solely for the purposes of opposing this action.

34

Additionally, the Defendant claim that "Mr. Asimpi was placed on inactive status on April 22, 1998 <u>in accordance with Relief Resources standard procedure</u> because he had failed to contact his employer for a period of one month." According to the Defendant's employee handbook, as pointed out: "Field Staff who do not maintain contact with us and/or who do not accept and/or complete assignments on a consistent basis will be <u>notified by mail of inactivation</u>." The Plaintiff requested and received a letter dated 5/29/98 reflecting his "inactive" status as of 4/22/98. The Defendant failed to follow its own stated procedures by not sending the Plaintiff an inactivation letter until a month later and only after requested by the Plaintiff. No other "inactivation" letter was in the Plaintiff's personnel file as received by both the Plaintiff and his former counsel.

A comparison of dates shows that, in fact (by the Defendant's own belated admission), the Plaintiff was in contact with the Defendant during the period the Defendant claim he was not. The Defendant's "ANSWERS TO INTERROGATORIES FROM THE PLAINTIFF" shows that the Plaintiff called the Defendant on numerous dates, including 3/22/98, 3/27/98, 3/31/98, 4/2/98, and 4/3/98. This hardly represents no contact for a period of one month.

After the Plaintiff had filed a complaint with the MCAD against them, the Defendant answered by stating that the <u>only</u> reason they "inactivated" Plaintiff's personnel file was due to his failure to maintain contact with them for a one month period. When this statement was exposed to be completely false, the Defendant, in a face-saving, damage-control attempt, fabricated even more egregious sets of lies than the first. To do this, the Defendant strangely and belatedly amended their Position Statement, so to speak, set forth in an unsigned, secretively introduced document entitled, "RESPONDENT'S MEMORANDUM", and dated June 09, 2000. This "illegitimate" document, which in the main formed the basis of the MCAD's HO's decision against the Plaintiff, was apparently written as a corrective to the Defendant's one and only defense set forth in their Position Statement. (Please see "RESPONDENT'S MEMORANDUM", already supplied to the Court). All this happened solely because of the acquiescence, connivance and condonation of the Plaintiff's own counsel at the time and in collaboration with the Defendant and the HO.

35

Then, in accordance with the practices of defending against an employment discrimination claim, the Defendant claim that the Plaintiff was a bad employee. So bad, in fact, that they twice gave him pay raises, they significantly increased his weekly hours, sometimes well over and above the standard forty hours and they initially offered him a position conducting orientation and training of new field staff during the alleged period of no contact!

The HO acknowledged that the Defendant set forth "inconsistent reasons throughout these proceedings for terminating" the Plaintiff (Hearing Officer's Decision, p. 12). The HO also acknowledged that "despite the Defendant's alleged dissatisfaction with the Plaintiff's performance", the Plaintiff was offered a position training new field staff. The HO determined that the Defendant had legitimate, non-discriminatory reasons for terminating the Plaintiff. However, the Plaintiff's testimony clearly contradicted the Defendant's claim of "poor work performance" at numerous facilities.

The Defendant, throughout the proceedings, created defenses to suit their needs. First, it was the Plaintiff's failure "to contact". Then, it was the Plaintiff's poor work performance. And still then there "apparently were calls but the weekend coordinator did not pass on the information to the Human Resources Department director."

The evidence shows that the Plaintiff was offered a training position, at least until the Defendant realized that they wanted to get rid of the Plaintiff. The only evidence offered by the Defendant that the Plaintiff was a "poor" performing employee was the testimony of Mr. Hammond. There were no written or documented complaints entered into evidence detailing this "poor" performance or showing the "alleged" banning from work sites. The bulk of the Defendant's complaints against the Plaintiff is found only in a document they introduced through the backdoor but in concert with the Plaintiff's own former counsel, the Defendant's counsel and the HO. And this unsigned and vaguely titled document, "RESPONDENT'S MEMORANDUM", was written and dated June 9, 2000, i.e., one-and-a-half years after the Plaintiff had filed his complaint against the Defendant with the MCAD and eight months after the MCAD Public Hearing proceedings had commenced.

The Plaintiff notes that the Defendant provide "temporary" services. The Plaintiff was always available for temporary employment, even if intermittent. Therefore, it is apparent that the Defendant fabricated these allegations of "poor performance" just as it fabricated the "no contact" defense.

Additionally, the Defendant stated that they are very active in providing immigrants, such as Plaintiff, with employment. Yet the truth is that the Defendant needs low-wage labor to work in these positions. The fact that they employ immigrants in these positions is less of a public service than it is a reality of business. The fact that 60 to 64% of the Defendant's employees are minorities does not mean that the Defendant is incapable of discriminating against them. In the Plaintiff's case, he was treated as easily as expendable. It is a reality that immigrants are more vulnerable to unlawful practices of employers as the Plaintiff discovered...complain and be terminated.

## CONCLUSION

The Plaintiff was terminated because he complained of being verbally and physically assaulted at his workplace. Throughout the proceedings in this matter, the Defendant have presented defense solely developed to meet the law. The Defendant's first defense was proved, by its own admission, to be blatantly false. The Defendant's second defense is solely based on unsupported and contradicted oral evidence. Based upon the Defendant's inconsistent and obviously false defense of "no contact", this Court should give less veracity to the Defendant's claims and reverse the U. S. District Court's decision dismissing the Plaintiff's motion for summary judgment while granting that of the Defendant. The Plaintiff requests this Court to assess damages and award attorney's fees and costs against the Defendant.

Respectfully submitted,

Pro Se Plaintiff

*[signature]*

KOFI ASIMPI
213 Kelton Street
Apt. # G-02

Allston, MA 02134-4384
Tel.: # 617-566-2524

Dated: Monday, the 5th day of September, 2005

### Statement of Service

I do hereby certify that on this date a true copy of the foregoing was sent by postage pre-paid, First Class Mail, to Mr. Douglas S. Hammond, President, Relief Resources, Inc.,
104 Russel Street, P. O. Box 538
Hadley, MA 01035-0538

_____
KOFI ASIMPI